IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Kathleen Ragan, an individual. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 1:17-cv-09208** |
| | ) | |
| BP Products North America, Inc., | ) | Judge Marvin E. Aspen |
| a Maryland corporation; | ) | Magistrate Jeffrey T. Gilbert |
| BP America, Inc., | ) | |
| a Delaware corporation; | ) | JURY DEMANDED |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff, KATHLEEN RAGAN, through her attorneys, Segal McCambridge Singer & Mahoney Ltd., for her First Amended Complaint against Defendants, BP Products North America, Inc. and BP America, Inc., alleges:

## NATURE OF THIS ACTION

1. This is an action by Kathleen Ragan against BP Products North America, Inc. and BP America, Inc. (collectively "BP") related to BP's pretextual termination of Ms. Ragan for cause in order to withhold a substantial amount of earned bonuses to which Ms. Ragan was entitled. BP breached its agreement with Ms. Ragan, violated the implied covenant of good faith and fair dealing, and has failed and refused to pay Ms. Ragan her final compensation.

## PARTIES

2. Ms. Ragan is a resident of New York, New York. At all times relevant to this lawsuit, Ms. Ragan was a resident of Cook County, Illinois.

3. BP Products North America, Inc. is a corporation organized under the laws of the state of Maryland with its principal place of business in Houston, Texas.

4. BP America, Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business in Houston, Texas.

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). This is an action between a citizen of New York and citizens of Delaware, Maryland, and Texas. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to the claims occurred in Cook County, Illinois.

**FACTUAL ALLEGATIONS**

7. Prior to joining BP, Ms. Ragan was employed as a carbon trader at Shell Energy North American, L.P. ("Shell").

8. In or around April of 2015, BP began recruiting Ms. Ragan to join BP.

9. Ms. Ragan received a written offer of employment from BP dated April 23, 2015.

10. Ms. Ragan accepted and executed BP's offer on April 27, 2015. Ms. Ragan does not have the executed copy of this offer in her possession but, on information and belief, Defendants have the executed offer in their possession.

11. Ms. Ragan began working for BP in June of 2015.

12. The Offer Letter detailed certain terms of Ms. Ragan's employment as an Emissions Trader in the Marketing & Origination group of BP.

13. Ms. Ragan's compensation included, among other items, a minimum additional payment of $500,000.00 for the 2015 performance year, and a separate grant of restricted stock units valued at $500,000.00 at the time of grant. The purpose of this grant was to compensate

Ms. Ragan for relinquishing hers shares in Shell when she left Shell to work for BP. As of March 2017, Ms. Ragan was entitled to 18,480 shares, of which 883 were awarded in January 2017.

14. Ms. Ragan performed admirably as a trader during 2015 and received a uniformly positive performance evaluation for the 2015 performance year.

15. BP's 2015 evaluation characterized Ms. Ragan as "a tremendous asset to our team since joining BP earlier [in 2015]." Ms. Ragan was further commended on "play[ing] a big role in helping people from all areas all over the office get up to sped on key elements of the emissions markets," for being "very valuable in helping us chart a way forward," and for "[building] solid relationships."

16. In March of 2016, Ms. Ragan received her 2015 additional compensation, which was contractually required to be a minimum of $500,000.00. However, only $415,000.00 was cash, while the remaining $85,000.00 was awarded as restricted stock units that did not begin to vest until 2019.

17. In other words, BP unilaterally structured Ms. Ragan's 2015 additional compensation so that a portion of that "minimum" amount could be delayed three years, and forfeited in BP's sole discretion.

18. Ms. Ragan was never informed that part of her minimum additional compensation could or would be deferred.

19. Ms. Ragan received a mixed evaluation for mid-year 2016. However, BP acknowledged in that review that "the carbon markets have fallen off since February [2016]," which resulted in losses for Ms. Ragan's books. However, BP recognized that "[t]he book positions and strategy had been proposed and supported by others in the team, so the losses are not [Ms. Ragan's] sole responsibility."

20. Ms. Ragan's mid-year 2016 review also mentioned "two incidents" related to "not following process and staying within [] [Delegations of Authority]." BP attributed those incidents to a combination of "learn[ing] the way BP does things" and a purported lack of attention to detail.

21. Ultimately, Ms. Ragan was not terminated for those or any other incidents. Instead, Ms. Ragan was reassigned from a trading role to a customer origination role in May of 2016.

22. Ms. Ragan's mid-year 2016 evaluation noted that Ms. Ragan was transitioned to a customer origination role to "mak[e] better use of her natural inclination to engage customers." BP believed that the customer origination role would "play to [Ms. Ragan's] strengths and allow her to reset her performance."

23. Ms. Ragan performed well in her new role, and BP's mid-year 2016 review noted that BP has "seen positive behavior and energy from [Ms. Ragan]" in her new role, which included engaging customers, identifying potential deal structures to test in the market, and showing positive energy about her new accountabilities.

24. In September of 2016, Ms. Ragan met with Daniel Barry, Global Head of Environmental Markets, in New York for a review of her performance in her client origination role. Mr. Barry provided uniformly positive feedback and expressed excitement over Ms. Ragan's progress.

25. In October of 2016, Ms. Ragan attended the North American Carbon World (NACW) conference on behalf of BP.

26. Ms. Ragan told Sean Reavis, a BP manager, that she was attending the NACW conference. Mr. Reavis told Ms. Ragan that BP was working with a company, the identity of

which he disclosed to Ms. Ragan, to purchase part of their company, but it was on a "need to know" basis and confidential. Ms. Ragan was not part of any conversations about this company nor had any knowledge of the events Mr. Reavis described. There was a code name assigned to this project and Ms. Ragan was not privy to any information regarding the project. Mr. Reavis began to tell Ms. Ragan confidential information unnecessarily, at which point Ms. Ragan told Mr. Reavis that she owned stock in this company. Ms. Ragan then asked Mr. Reavis not to tell her anything more, and that she would not engage in any conversations with employees from this company at the conference.

27. Before her conversation with Mr. Reavis, Ms. Ragan had no knowledge that BP was involved in any way with this company.

28. Upon hearing that information from Mr. Reavis, Ms. Ragan disclosed to Mr. Barry, another one of her supervisors, of her equity position in this company.

29. BP interviewed Ms. Ragan on November 2, 2016 about her equity position in that company to determine if Ms. Ragan had violated any of BP's conflict of interest policies.

30. BP's internal investigation concluded that there was no evidence that Ms. Ragan acted on inside information or knowledge of BP's relationship with that company.

31. Despite that finding, Ms. Ragan was terminated on December 14, 2016.

**Count I: Breach of Contract**

32. Plaintiff incorporates Paragraphs 1-31 as though fully stated in this Paragraph 32.

33. Ms. Ragan had a valid and enforceable employment agreement with BP.

34. Ms. Ragan's Offer Letter states that Ms. Ragan is eligible for minimum additional compensation for the 2015 performance year of $500,000.00.

35. In or about March of 2016, Ms. Ragan received her 2015 additional compensation in the form of $415,000.00 in cash and $85,000.00 worth of deferred, restricted stock.

36. The deferred stock portion of Ms. Ragan's 2015 additional compensation does not vest until January of 2019.

37. According to BP's restricted stock plan, all unvested, restricted stock units are generally forfeited by an employee if the employee's employment with BP is terminated before the vesting date.

38. However, the restricted stock plan also provides that unvested shares are not forfeited if an employee is terminated more than twelve months after the grant date because of "involuntary termination of employment" that is not due to conduct or performance.

39. Ms. Ragan was pretextually terminated by BP on December 14, 2016 based on purported issues that were unrelated to her current position as a client originator. Those purported issues occurred as far back as October 15, 2015 and at the time of each incident, BP determined that Ms. Ragan should not be terminated.

40. BP elected to attribute Ms. Ragan's termination to purported performance issues to avoid paying Ms. Ragan the remaining $85,000.00 earned compensation for the 2015 performance year.

41. As a result of BP's pretextual termination, BP breached its agreement with Ms. Ragan that she would receive a minimum compensation of $500,000.00 for the 2015 performance year.

42. Additionally, Ms. Ragan's ability to vest her equity and secure her additional compensation was solely within BP's power and discretion.

43. Ms. Ragan's termination was not based on any conduct or performance issues and was not for cause. BP is using purported issues with Ms. Ragan as a pretext to terminate Ms. Ragan for cause. BP unilaterally caused the forfeiture of earned, unvested equity that would not have been forfeited if the termination was not for cause.

44. BP's termination of Ms. Ragan, based on pretextual performance issues just before she earned a significant portion of her compensation, is a violation of the implied covenant of good faith and fair dealing.

45. Ms. Ragan has been damaged in the amount of at least $85,000.00, not including interest, dividends, and increase in value of those shares since Ms. Ragan's termination.

WHEREFORE, Plaintiff Kathleen Ragan respectfully requests that this Court will enter judgment in her favor and against Defendant BP on Count I, award Plaintiff damages, costs, and grant all other relief that this Court deems just and proper.

**Count II: Breach of Contract**

46. Plaintiff incorporates Paragraphs 1-45 as though fully stated in this Paragraph 46.

47. Ms. Ragan had a valid and enforceable employment agreement with BP.

48. The Offer Letter provides that Ms. Ragan would be granted restricted stock units valued at $500,000.00 at the time of grant. This grant was separate from, and in addition to, the minimum additional compensation for 2015 referred to above.

49. The paragraph entitled "Restricted Stock Units" contained in the Offer Letter makes no mention of the Restricted Stock Units being discretionary.

50. Twenty-five percent of these restricted stock units vested two years after the grant date, and the remaining seventy-five percent vested three years after the grant date.

51. These restricted stock units were granted to Ms. Ragan in June of 2015, and therefore twenty-five percent would vest in June of 2017.

52. According to BP's restricted stock plan, all unvested restricted stock units are generally forfeited by an employee if the employee's employment with BP is terminated before the vesting date. This term of BP's restricted stock plan was not listed in the Offer Letter.

53. The terms of BP's restricted stock plan were not explicitly incorporated by reference into the Offer Letter.

54. However, the restricted stock plan also provides that unvested shares are not forfeited if an employee is terminated more than twelve months after the grant date because of "involuntary termination of employment" that is not due to conduct or performance.

55. Ms. Ragan was pretextually terminated by BP on December 14, 2016 based on purported issues that were unrelated to her current position as a client originator. Those purported issues occurred as far back as October 15, 2015, and at the time of each incident, BP determined that Ms. Ragan should not be terminated.

56. By inaccurately characterizing Ms. Ragan's termination as based on her conduct or performance, BP avoided the first vesting date of Ms. Ragan's restricted stock units.

57. BP elected to attribute Ms. Ragan's termination to performance issues to avoid the upcoming vesting dates for at least $500,000.00 of earned compensation.

58. As a result of BP's pretextual termination, BP breached its agreement with Ms. Ragan.

59. Additionally, Ms. Ragan's ability to vest her equity and secure her bonus was solely within BP's power and discretion.

60. Ms. Ragan's termination was not based on any conduct or performance issues and was not for cause. BP is using purported issues with Ms. Ragan as a pretext to terminate Ms. Ragan for cause. BP unilaterally caused the forfeiture of earned, unvested equity that would not have been forfeited if the termination was not for cause.

61. BP's termination of Ms. Ragan based on pretextual performance issues just before she earned a significant portion of her compensation is a violation of the implied covenant of good faith and fair dealing.

62. Ms. Ragan has been damaged in the amount of at least $500,000.00, not including interest, dividends, and increase in value of those shares since Ms. Ragan's termination.

WHEREFORE, Plaintiff Kathleen Ragan respectfully requests that this Court will enter judgment in her favor and against Defendant BP on Count II, award Plaintiff damages, costs, and grant all other relief that this Court deems just and proper.

**Count III: Specific Performance**
**(Alternate Count to Count I)**

63. Plaintiff incorporates Paragraphs 1-31 as though fully stated in this Paragraph 63.

64. Ms. Ragan had a valid and enforceable employment agreement with BP.

65. Ms. Ragan's Offer Letter states that Ms. Ragan is eligible for minimum additional compensation for the 2015 performance year of $500,000.00.

66. In or about March of 2016, Ms. Ragan received her 2015 additional compensation in the form of $415,000.00 in cash and $85,000.00 worth of deferred, restricted stock.

67. The deferred stock portion of Ms. Ragan's 2015 additional compensation does not vest until January of 2019.

68. According to BP's restricted stock plan, all unvested, restricted stock units are generally forfeited by an employee if the employee's employment with BP is terminated before the vesting date.

69. However, the restricted stock plan also provides that unvested shares are not forfeited if an employee is terminated more than twelve months after the grant date because of "involuntary termination of employment" that is not due to conduct or performance.

70. Ms. Ragan was pretextually terminated by BP on December 14, 2016 based on purported issues that were unrelated to her current position as a client originator. Those purported issues occurred as far back as October 15, 2015 and at the time of each incident, BP determined that Ms. Ragan should not be terminated.

71. Ms. Ragan complied with the terms of her employment contract with BP.

72. BP elected to attribute Ms. Ragan's termination to purported performance issues to avoid paying Ms. Ragan the remaining $85,000.00 deferred stock portion of her earned compensation for the 2015 performance year.

73. Despite demand having been made, BP has failed and refused to provide Ms. Ragan with the remainder of her 2015 bonus.

WHEREFORE, Plaintiff Kathleen Ragan respectfully requests that this Court will enter judgment in her favor and against Defendant BP on Count III, award Plaintiff damages, costs, and grant all other relief that this Court deems just and proper.

**Count IV: Specific Performance**
**(Alternate Count to Count II)**

74. Plaintiff incorporates Paragraphs 1-31 as though fully stated in this Paragraph 74.

75. Ms. Ragan had a valid and enforceable employment agreement with BP.

76. The Offer Letter provides that Ms. Ragan would be granted restricted stock units valued at $500,000.00 at the time of grant. This grant was separate from, and in addition to, the minimum additional compensation for 2015 referred to above.

77. The paragraph entitled "Restricted Stock Units" contained in the Offer Letter makes no mention of the Restricted Stock Units being discretionary.

78. Twenty-five percent of these restricted stock units vested two years after the grant date, and the remaining seventy-five percent vested three years after the grant date.

79. These restricted stock units were granted to Ms. Ragan in June of 2015, and therefore twenty-five percent would vest in June of 2017 and seventy-five percent would vest in February 2018.

80. According to BP's restricted stock plan, all unvested restricted stock units are generally forfeited by an employee if the employee's employment with BP is terminated before the vesting date. This term of BP's restricted stock plan was not listed in the Offer Letter.

81. The terms of BP's restricted stock plan were not explicitly incorporated by reference into the Offer Letter.

82. However, the restricted stock plan also provides that unvested shares are not forfeited if an employee is terminated more than twelve months after the grant date because of "involuntary termination of employment" that is not due to conduct or performance.

83. Ms. Ragan was pretextually terminated by BP on December 14, 2016 based on purported issues that were unrelated to her current position as a client originator. Those purported issues occurred as far back as October 15, 2015, and at the time of each incident, BP determined that Ms. Ragan should not be terminated.

84. By inaccurately characterizing Ms. Ragan's termination as based on her conduct or performance, BP avoided both vesting dates of Ms. Ragan's restricted stock units.

85. BP elected to attribute Ms. Ragan's termination to performance issues to avoid the upcoming vesting dates for at least $500,000.00 of earned compensation.

86. Additionally, Ms. Ragan's ability to vest her equity and secure her bonus was solely within BP's power and discretion.

87. Ms. Ragan's termination was not based on any conduct or performance issues and was not for cause. BP is using purported issues with Ms. Ragan as a pretext to terminate Ms. Ragan for cause. BP unilaterally caused the forfeiture of earned, unvested equity that would not have been forfeited if the termination was not for cause.

88. Ms. Ragan has complied with the terms of her employment contract with BP.

89. Despite demand having been made, BP has failed and refused to perform under Ms. Ragan's employment contract with BP and provide Ms. Ragan with the $500,000.00 in restricted stock units not including interest, dividends, and increase in value of those shares since Ms. Ragan's termination.

WHEREFORE, Plaintiff Kathleen Ragan respectfully requests that this Court will enter judgment in her favor and against Defendant BP on Count IV, award Plaintiff damages, costs, and grant all other relief that this Court deems just and proper.

**Count V: Violation of the Illinois Wage Payment Collection Act**
**820 ILCS 115/1 et seq.**

90. Plaintiff incorporates Paragraphs 1-89 as though fully stated in this Paragraph 90.

91. BP is an employer as defined in 820 ILCS 115/2.

92. Ms. Ragan had a valid and enforceable employment agreement with BP.

93. Ms. Ragan's Offer Letter states that Ms. Ragan is eligible for minimum additional compensation for the 2015 performance year of $500,000.00.

94. In or about March of 2016, Ms. Ragan received her 2015 additional compensation in the form of $415,000.00 in cash and $85,000.00 worth of deferred, restricted stock.

95. The deferred stock portion of Ms. Ragan's 2015 additional compensation does not vest until January of 2019.

96. According to BP's restricted stock plan, all unvested, restricted stock units are generally forfeited by an employee if the employee's employment with BP is terminated before the vesting date.

97. However, the restricted stock plan also provides that unvested shares are not forfeited if an employee is terminated more than twelve months after the grant date because of "involuntary termination of employment" that is not due to conduct or performance.

98. Ms. Ragan was pretextually terminated by BP on December 14, 2016 based on purported issues that were unrelated to her current position as a client originator. Those purported issues occurred as far back as October 15, 2015 and at the time of each incident, BP determined that Ms. Ragan should not be terminated.

99. BP elected to attribute Ms. Ragan's termination to purported performance issues to avoid paying Ms. Ragan the remaining $85,000.00 earned compensation for the 2015 performance year.

100. In other words, although BP promised Ms. Ragan that her minimum additional compensation for 2015 would be $500,000.00, BP paid Ms. Ragan only $415,000.00 in cash and granted $85,000.00 in restricted stock, one-third of which vested prior to Ms. Ragan's departure.

101. Ms. Ragan is still due final compensation for the remainder of her 2015 bonus.

WHEREFORE, Plaintiff Kathleen Ragan respectfully requests that this Court will enter judgment in her favor and against Defendant BP on Count V, award Plaintiff damages, costs, two percent interest per month on the unpaid compensation, attorneys' fees, and grant all other relief that this Court deems just and proper.

**Count VI: Violation of the Illinois Wage Payment and Collection Act**
**820 ILCS 115/1 et seq.**

102. Plaintiff incorporates Paragraphs 1-101 as though fully stated in this Paragraph 102.

103. BP is an employer as defined in 820 ILCS 115/2.

104. Ms. Ragan had a valid and enforceable employment agreement with BP.

105. The Offer Letter provides that Ms. Ragan would be granted restricted stock units valued at $500,000.00 at the time of grant. This grant was separate from, and in addition to, the minimum additional compensation for 2015 referred to above.

106. The paragraph entitled "Restricted Stock Units" contained in the Offer Letter makes no mention of the Restricted Stock Units being discretionary.

107. Twenty-five percent of these restricted stock units vested two years after the grant date, and the remaining seventy-five percent vested three years after the grant date.

108. These restricted stock units were granted to Ms. Ragan in June of 2015, and therefore twenty-five percent would vest in June of 2017 and seventy-five percent would vest in February 2018.

109. According to BP's restricted stock plan, all unvested restricted stock units are generally forfeited by an employee if the employee's employment with BP is terminated before the vesting date. This term of BP's restricted stock plan was not listed in the Offer Letter.

110. The terms of BP's restricted stock plan were not explicitly incorporated by reference into the Offer Letter.

111. However, the restricted stock plan also provides that unvested shares are not forfeited if an employee is terminated more than twelve months after the grant date because of "involuntary termination of employment" that is not due to conduct or performance.

112. Ms. Ragan was pretextually terminated by BP on December 14, 2016 based on purported issues that were unrelated to her current position as a client originator. Those purported issues occurred as far back as October 15, 2015, and at the time of each incident, BP determined that Ms. Ragan should not be terminated.

113. By inaccurately characterizing Ms. Ragan's termination as based on her conduct or performance, BP avoided both vesting dates of Ms. Ragan's restricted stock units.

114. BP elected to attribute Ms. Ragan's termination to performance issues to avoid the upcoming vesting dates for at least $500,000.00 of earned compensation.

115. Additionally, Ms. Ragan's ability to vest her equity and secure her bonus was solely within BP's power and discretion.

116. In other words, BP owes Ms. Ragan $500,000.00 in unpaid compensation.

117. Ms. Ragan's termination was not based on any conduct or performance issues and was not for cause. BP is using purported issues with Ms. Ragan as a pretext to terminate Ms. Ragan for cause. BP unilaterally caused the forfeiture of earned, unvested equity that would not have been forfeited if the termination was not for cause.

118. Ms. Ragan is due final compensation for the earned $500,000.00 restricted stock units.

WHEREFORE, Plaintiff Kathleen Ragan respectfully requests that this Court will enter judgment in her favor and against Defendant BP on Count VI, award Plaintiff damages, costs, two percent interest per month on the unpaid compensation, attorneys' fees, and grant all other relief that this Court deems just and proper.

**JURY DEMAND**

119. Plaintiff requests a trial by jury on all claims triable by jury.

Dated: August 3, 2018

Respectfully submitted,
Kathleen Ragan

By: s/ Joseph L. Kish
One of her attorneys

Joseph L. Kish – jkish@smsm.com
Kelley S. Gordon – ksgordon@smsm.com
Segal McCambridge Singer & Mahoney LTD.
233 S. Wacker Dr.
Suite 5500
Chicago, IL 60606
(312) 645-7800

**CERTIFICATE OF SERVICE**

The undersigned certifies that copies of Plaintiff's First Amended Complaint, were served upon all counsel of record electronically through CM/ECF, on August 3, 2018.

Respectfully submitted,

By: /s/ *Darline L. Dabney*

Joseph L. Kish – jkish@smsm.com
Kelley S. Gordon – ksgordon@smsm.com
Segal McCambridge Singer & Mahoney Ltd.
233 S. Wacker Dr.
Suite 5500
Chicago, IL 60606
(312) 645-7800