**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Kathleen Ragan, an individual,<br><br>Plaintiff,<br><br>v.<br><br>BP Products North America, Inc., a Maryland corporation; BP America, Inc., a Delaware corporation,<br><br>Defendants.<br><br>and<br><br>BP Products North America Inc. and BP America Inc.,<br><br>Counter-Plaintiffs,<br><br>v.<br><br>Kathleen Ragan,<br><br>Counter-Defendant. | Case No. 1:17-cv-09208<br><br>Honorable Marvin E. Aspen<br><br>Magistrate Judge Jeffrey T. Gilbert |

**DEFENDANTS' ANSWER AND DEFENSES TO KATHLEEN RAGAN'S FIRST AMENDED COMPLAINT AND COUNTERCLAIM AGAINST KATHLEEN RAGAN**

Defendants BP Products North America Inc. and BP America Inc. (collectively, "BP"), for their Answer and Defenses to Kathleen Ragan's First Amended Complaint, state as follows:

**NATURE OF THIS ACTION**

**COMPLAINT ¶1:**

This is an action by Kathleen Ragan against BP Products North America, Inc. and BP America, Inc. (collectively "BP") related to BP's pretextual termination of Ms. Ragan for cause in order to withhold a substantial amount of earned bonuses to which Ms. Ragan was entitled. BP breached its agreement with Ms. Ragan, violated the implied covenant of good faith and fair dealing, and has failed and refused to pay Ms. Ragan her final compensation.

**ANSWER:**

BP admits that Plaintiff Kathleen Ragan ("Plaintiff") claims that BP pretextually terminated her for cause in order to withhold a substantial amount of earned bonuses to which she was entitled, that BP breached an agreement with Plaintiff, that BP violated the implied covenant of good faith and fair dealing, and that BP has failed and refused to pay Plaintiff her final compensation, but BP denies that it pretextually terminated Plaintiff, denies that it withheld any earned bonuses to which Plaintiff was entitled, denies that it breached any agreement with Plaintiff, denies that it violated the implied covenant of good faith and fair dealing, denies that it has failed and refused to pay Plaintiff any final compensation, and denies that it has incurred any liability to Plaintiff whatsoever.

**PARTIES**

**COMPLAINT ¶2:**

Ms. Ragan is a resident of New York, New York. At all times relevant to this lawsuit, Ms. Ragan was a resident of Cook County, Illinois.

**ANSWER:**

BP is without knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

**COMPLAINT ¶3:**

BP Products North America, Inc. is a corporation organized under the laws of the state of Maryland with its principal place of business in Houston, Texas.

**ANSWER:**

BP Products North America Inc. admits that it is a corporation organized under the laws of the state of Maryland. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶4:**

BP America, Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business in Houston, Texas.

**ANSWER:**

BP America Inc. admits the allegations contained in this paragraph.

**JURISDICTION AND VENUE**

**COMPLAINT ¶5:**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). This is an action between a citizen of New York and citizens of Delaware, Maryland, and Texas. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

**ANSWER:**

BP admits the allegations contained in this paragraph but denies that Plaintiff has any valid claims against BP.

**COMPLAINT ¶6:**

Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to the claims occurred in Cook County, Illinois.

**ANSWER:**

BP admits that venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2), but denies that Plaintiff has any valid claims against BP.

**FACTUAL ALLEGATIONS**

**COMPLAINT ¶7:**

Prior to joining BP, Ms. Ragan was employed as a carbon trader at Shell Energy North American, L.P. ("Shell").

**ANSWER:**

BP is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

**COMPLAINT ¶8:**

In or around April of 2015, BP began recruiting Ms. Ragan to join BP.

**ANSWER:**

BP admits that around March of 2015, it began discussions with Plaintiff to join BP. BP is without knowledge or information sufficient to form a belief as to what Plaintiff means by "recruiting." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶9:**

Ms. Ragan received a written offer of employment from BP dated April 23, 2015.

**ANSWER:**

BP America Inc. admits that it sent a written offer of employment to Plaintiff dated April 23, 2015. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶10:**

Ms. Ragan accepted and executed BP's offer on April 27, 2015. Ms. Ragan does not have the executed copy of this offer in her possession but, on information and belief, Defendants have the executed offer in their possession.

**ANSWER:**

BP admits that Plaintiff accepted and executed BP America Inc.'s offer on April 27, 2015. BP admits that it has a copy of the executed offer in its possession. BP is without knowledge or information sufficient to form a belief about the truth of Plaintiff's allegation that she does not have the executed copy of the offer in her possession. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶11:**

Ms. Ragan began working for BP in June of 2015.

**ANSWER:**

BP admits the allegations contained in this paragraph.

**COMPLAINT ¶12:**

The Offer Letter detailed certain terms of Ms. Ragan's employment as an Emissions Trader in the Marketing & Origination group of BP.

**ANSWER:**

BP admits the allegations contained in this paragraph.

**COMPLAINT ¶13:**

Ms. Ragan's compensation included, among other items, a minimum additional payment of $500,000.00 for the 2015 performance year, and a separate grant of restricted stock units valued at $500,000.00 at the time of grant. The purpose of this grant was to compensate Ms. Ragan for relinquishing hers shares in Shell when she left Shell to work for BP. As of March 2017, Ms. Ragan was entitled to 18,480 shares, of which 883 were awarded in January 2017.

**ANSWER:**

BP admits that the Offer Letter stated: "subject to you remaining eligible to participate in the IST Trader and Originator Bonus Plan (the "Plan"), and the conditions outlined below, you will be eligible for a minimum bonus for the 2015 performance year (January 1st to December 31st 2015) in the amount of $500,000. This potential bonus amount, which is provided at the sole discretion of BP, is strictly subject to the requirements of the Plan. . . . BP reserves the right to make you no award or a bonus award of less than that stated above . . . if, in the absolute discretion of BP, you fail to meet the conditions outlined in this agreement." BP admits that the Offer Letter also stated: "you will also be granted Restricted Stock Units ("RSUs") representing BP plc American Depositary Shares ("ADSs") valued at $500,000 at the time of grant. . . . all awards are subject to the terms of the plan under which they are granted." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶14:**

Ms. Ragan performed admirably as a trader during 2015 and received a uniformly positive performance evaluation for the 2015 performance year.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶15:**

BP's 2015 evaluation characterized Ms. Ragan as "a tremendous asset to our team since joining BP earlier [in 2015]." Ms. Ragan was further commended on "play[ing] a big role in helping people from all areas all over the office get up to sped on key elements of the emissions markets," for being "very valuable in helping us chart a way forward," and for "[building] solid relationships."

**ANSWER:**

BP admits that Plaintiff's 2015 evaluation stated: "Kathleen has been a tremendous asset to our team since joining BP earlier this year;" "Kathleen played a big role in helping people from areas all over the office get up to speed on key elements of the emissions markets;" that "I have found [Kathleen's] approach to commercial situations . . . to be very valuable in helping us chart a way forward;" and that "she has built solid relationships." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶16:**

In March of 2016, Ms. Ragan received her 2015 additional compensation, which was contractually required to be a minimum of $500,000.00. However, only $415,000.00 was cash, while the remaining $85,000.00 was awarded as restricted stock units that did not begin to vest until 2019.

**ANSWER:**

BP admits that in March of 2016, Plaintiff received 2015 variable pay in the form of a cash bonus of $415,000.00 and an $85,000.00 Integrated Supply and Trading-Deferred Annual Bonus award in the form of restricted share units, one-third of which vested in January 2017, one-third of which would have vested in January 2018, and one-third of which would have vested in January 2019. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶17:**

In other words, BP unilaterally structured Ms. Ragan's 2015 additional compensation so that a portion of that "minimum" amount could be delayed three years, and forfeited in BP's sole discretion.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶18:**

Ms. Ragan was never informed that part of her minimum additional compensation could or would be deferred.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶19:**

Ms. Ragan received a mixed evaluation for mid-year 2016. However, BP acknowledged in that review that "the carbon markets have fallen off since February [2016]," which resulted in losses for Ms. Ragan's books. However, BP recognized that "[t]he book positions and strategy had been proposed and supported by others in the team, so the losses are not [Ms. Ragan's] sole responsibility."

**ANSWER:**

BP admits that Plaintiff's evaluation for mid-year 2016 noted that: "The carbon markets have fallen off since February [2016], and the books have lost a material amount of money. The book positions and strategy had been proposed and supported by others in the team, so the losses are not [Plaintiff]'s sole responsibility." BP is without knowledge or information sufficient to form a belief as to what Plaintiff means by a "mixed evaluation." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶20:**

Ms. Ragan's mid-year 2016 review also mentioned "two incidents" related to "not following process and staying within [] [Delegations of Authority]." BP attributed those incidents to a combination of "learn[ing] the way BP does things" and a purported lack of attention to detail.

**ANSWER:**

BP admits that Plaintiff's mid-year 2016 review stated that Plaintiff "had two incidents, a Cat A and a Cat B, due to not following process and staying within her [Delegations of

Authority],” and that “Some of this is attributable to continuing to learn the way BP does things, and some is due to lack of attention to detail.” BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶21:**

Ultimately, Ms. Ragan was not terminated for those or any other incidents. Instead, Ms. Ragan was reassigned from a trading role to a customer origination role in May of 2016.

**ANSWER:**

BP admits that Plaintiff was not terminated at the time of the two incidents described in paragraph 20. BP admits that Plaintiff was reassigned from a core trading role to a customer origination role around May of 2016. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶22:**

Ms. Ragan’s mid-year 2016 evaluation noted that Ms. Ragan was transitioned to a customer origination role to “mak[e] better use of her natural inclination to engage customers.” BP believed that the customer origination role would “play to [Ms. Ragan’s] strengths and allow her to reset her performance.”

**ANSWER:**

BP admits that Plaintiff’s mid-year 2016 evaluation stated that the customer origination role “should play to [Plaintiff’s] strengths and allow her to reset her performance,” and that “After getting to know [Plaintiff] over the past year, the GEP LT and [Plaintiff] discussed making better use of her natural inclination to engage customers by switching her from a core trading role to a customer origination role. After the Cat A incident in May, [Plaintiff]’s trading DoAs were removed and the transition to the origination role was expedited.” BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶23:**

Ms. Ragan performed well in her new role, and BP's mid-year 2016 review noted that BP has "seen positive behavior and energy from [Ms. Ragan]" in her new role, which included engaging customers, identifying potential deal structures to test in the market, and showing positive energy about her new accountabilities.

**ANSWER:**

BP admits that Plaintiff's mid-year 2016 review stated "In the limited amount of time since starting this transition, we have seen positive behavior and energy from [Plaintiff]. . . . she has engaged customers, she has identified potential deal structures that can be tested in the market, and she has shown positive energy about her new accountabilities." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶24:**

In September of 2016, Ms. Ragan met with Daniel Barry, Global Head of Environmental Markets, in New York for a review of her performance in her client origination role. Mr. Barry provided uniformly positive feedback and expressed excitement over Ms. Ragan's progress.

**ANSWER:**

BP is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

**COMPLAINT ¶25:**

In October of 2016, Ms. Ragan attended the North American Carbon World (NACW) conference on behalf of BP.

**ANSWER:**

BP is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

**COMPLAINT ¶26:**

Ms. Ragan told Sean Reavis, a BP manager, that she was attending the NACW conference. Mr. Reavis told Ms. Ragan that BP was working with a company, the identity of which he disclosed to Ms. Ragan, to purchase part of their company, but it was on a "need to know" basis and confidential. Ms. Ragan was not part of any conversations about this company

nor had any knowledge of the events Mr. Reavis described. There was a code name assigned to this project and Ms. Ragan was not privy to any information regarding the project. Mr. Reavis began to tell Ms. Ragan confidential information unnecessarily, at which point Ms. Ragan told Mr. Reavis that she owned stock in this company. Ms. Ragan then asked Mr. Reavis not to tell her anything more, and that she would not engage in any conversations with employees from this company at the conference.

**ANSWER:**

BP admits that Plaintiff told Sean Reavis, a BP manager, that she was attending a conference. BP admits that Mr. Reavis told Plaintiff that BP was working with a company, the identity of which he disclosed to Ms. Ragan, to purchase part of their company, but it was on a "need to know" basis and confidential. BP admits there was a code name assigned to this project. BP admits that Plaintiff told Mr. Reavis that she owned stock in this company. BP admits that Plaintiff told Mr. Reavis she would not engage in any conversations with employees from this company at the conference; however, BP is without knowledge or information sufficient to form a belief as to whether Plaintiff asked Mr. Reavis not to tell her anything more. BP is without knowledge or information sufficient to form a belief as to whether Plaintiff was part of any conversations about this company or had any knowledge of the events Mr. Reavis described. BP is without knowledge or information sufficient to form a belief as to whether Plaintiff was privy to any information regarding the project. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶27:**

Before her conversation with Mr. Reavis, Ms. Ragan had no knowledge that BP was involved in any way with this company.

**ANSWER:**

BP is without knowledge or information sufficient to form a belief about the truth of the allegations contained in this paragraph.

**COMPLAINT ¶28:**

Upon hearing that information from Mr. Reavis, Ms. Ragan disclosed to Mr. Barry, another one of her supervisors, of her equity position in this company.

**ANSWER:**

BP is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

**COMPLAINT ¶29:**

BP interviewed Ms. Ragan on November 2, 2016 about her equity position in that company to determine if Ms. Ragan had violated any of BP's conflict of interest policies.

**ANSWER:**

BP admits the allegations contained in this paragraph.

**COMPLAINT ¶30:**

BP's internal investigation concluded that there was no evidence that Ms. Ragan acted on inside information or knowledge of BP's relationship with that company.

**ANSWER:**

BP admits that its internal investigator stated "we have no evidence that [Plaintiff] possessed inside information or knowledge about BP's upcoming deal with [that company]." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶31:**

Despite that finding, Ms. Ragan was terminated on December 14, 2016.

**ANSWER:**

BP admits that Plaintiff was terminated on December 14, 2016. BP denies the remaining allegations contained in this paragraph.

**Count I: Breach of Contract**

**COMPLAINT ¶32:**

Plaintiff incorporates Paragraphs 1-31 as though fully stated in this Paragraph 32.

**ANSWER:**

BP incorporates its answers to Paragraphs 1 through 31 of the First Amended Complaint as its answer to Paragraph 32 of the First Amended Complaint.

**COMPLAINT ¶33:**

Ms. Ragan had a valid and enforceable employment agreement with BP.

**ANSWER:**

BP admits the allegations contained in this paragraph.

**COMPLAINT ¶34:**

Ms. Ragan's Offer Letter states that Ms. Ragan is eligible for minimum additional compensation for the 2015 performance year of $500,000.00.

**ANSWER:**

BP admits that Plaintiff's Offer Letter states: "subject to you remaining eligible to participate in the IST Trader and Originator Bonus Plan (the "Plan"), and the conditions outlined below, you will be eligible for a minimum bonus for the 2015 performance year (January 1st to December 31st 2015) in the amount of $500,000." BP admits that the Offer Letter further states: "This potential bonus amount, which is provided at the sole discretion of BP, is strictly subject to the requirements of the Plan. Please note that the Plan is discretionary and all awards under the Plan are at the absolute discretion of BP. The Plan can be varied or withdrawn at any time, including part way through the performance year. . . . you will lose your eligibility for this bonus opportunity if, in the sole discretion of BP, you: Fail to comply with any of BP Policies, the BP Code of Conduct, BP Trading Guidelines, and any Federal or state laws or regulations; Fail to achieve the deliverables outlined in your MyPlan and other relevant performance documentation (as determined in the sole discretion of BP management); Your performance is rated as "Below Expectations" for the 2015 performance year; Otherwise fail to meet BP's expectations. BP

reserves the right to make you no award or a bonus award of less than that stated above . . . if, in the absolute discretion of BP, you fail to meet the conditions outlined in this agreement." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶35:**

In or about March of 2016, Ms. Ragan received her 2015 additional compensation in the form of $415,000.00 in cash and $85,000.00 worth of deferred, restricted stock.

**ANSWER:**

BP admits that in or about March of 2016, Plaintiff received 2015 variable pay in the form of a $415,000.00 cash bonus and an $85,000.00 Integrated Supply and Trading-Deferred Annual Bonus award in the form of restricted stock units. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶36:**

The deferred stock portion of Ms. Ragan's 2015 additional compensation does not vest until January of 2019.

**ANSWER:**

BP admits that one-third of the $85,000.00 deferred annual bonus in the form of restricted share units was not scheduled to vest until January of 2019. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶37:**

According to BP's restricted stock plan, all unvested, restricted stock units are generally forfeited by an employee if the employee's employment with BP is terminated before the vesting date.

**ANSWER:**

BP admits that the BP p.l.c. Restricted Share Plan II Prospectus states "Generally, if you cease to be an employee of BP before the vesting date then you will forfeit your R[estricted] S[hare] U[nit]s," and that the BP p.l.c. Restricted Share Plan II Prospectus also states "The

general rule is that if you terminate employment with BP during the restricted period you will forfeit your RSUs." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶38:**

However, the restricted stock plan also provides that unvested shares are not forfeited if an employee is terminated more than twelve months after the grant date because of "involuntary termination of employment" that is not due to conduct or performance.

**ANSWER:**

BP admits that the BP p.l.c. Restricted Share Plan II Prospectus states "However, if your employment with BP terminates for any of the following exceptional reasons before the vesting date then you will not forfeit all of your RSUs, and a proportion of the RSUs may continue to vest according to the original terms: a. Termination more than twelve (12) months after the start of the Restricted Period as a result of . . . "involuntary termination of employment" with any member of the Group, other than due to your conduct or performance." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶39:**

Ms. Ragan was pretextually terminated by BP on December 14, 2016 based on purported issues that were unrelated to her current position as a client originator. Those purported issues occurred as far back as October 15, 2015 and at the time of each incident, BP determined that Ms. Ragan should not be terminated.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶40:**

BP elected to attribute Ms. Ragan's termination to purported performance issues to avoid paying Ms. Ragan the remaining $85,000.00 earned compensation for the 2015 performance year.

**ANSWER:**

BP admits that it terminated Plaintiff's employment for performance and conduct. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶41:**

As a result of BP's pretextual termination, BP breached its agreement with Ms. Ragan that she would receive a minimum compensation of $500,000.00 for the 2015 performance year.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶42:**

Additionally, Ms. Ragan's ability to vest her equity and secure her additional compensation was solely within BP's power and discretion.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶43:**

Ms. Ragan's termination was not based on any conduct or performance issues and was not for cause. BP is using purported issues with Ms. Ragan as a pretext to terminate Ms. Ragan for cause. BP unilaterally caused the forfeiture of earned, unvested equity that would not have been forfeited if the termination was not for cause.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶44:**

BP's termination of Ms. Ragan, based on pretextual performance issues just before she earned a significant portion of her compensation, is a violation of the implied covenant of good faith and fair dealing.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶45:**

Ms. Ragan has been damaged in the amount of at least $85,000.00, not including interest, dividends, and increase in value of those shares since Ms. Ragan's termination.

**ANSWER:**

BP denies the allegations contained in this paragraph.

## Count II: Breach of Contract

**COMPLAINT ¶46:**

Plaintiff incorporates Paragraphs 1-45 as though fully stated in this Paragraph 46.

**ANSWER:**

BP incorporates its answers to Paragraphs 1 through 45 of the First Amended Complaint as its answer to Paragraph 46 of the First Amended Complaint.

**COMPLAINT ¶47:**

Ms. Ragan had a valid and enforceable employment agreement with BP.

**ANSWER:**

BP admits the allegations contained in this paragraph.

**COMPLAINT ¶48:**

The Offer Letter provides that Ms. Ragan would be granted restricted stock units valued at $500,000.00 at the time of grant. This grant was separate from, and in addition to, the minimum additional compensation for 2015 referred to above.

**ANSWER:**

BP admits that the Offer Letter states "you will also be granted Restricted Stock Units ("RSUs") representing BP plc American Depositary Shares ("ADSs") valued at $500,000 at the time of grant. . . . all awards are subject to the terms of the plan under which they are granted." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶49:**

The paragraph entitled "Restricted Stock Units" contained in the Offer Letter makes no mention of the Restricted Stock Units being discretionary.

**ANSWER:**

BP denies the allegations in this paragraph.

**COMPLAINT ¶50:**

Twenty-five percent of these restricted stock units vested two years after the grant date, and the remaining seventy-five percent vested three years after the grant date.

**ANSWER:**

BP admits that the Offer Letter states "25% of the grant will vest 2 years after the grant date and the remaining 75% of the grant will vest 3 years after the grant date." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶51:**

These restricted stock units were granted to Ms. Ragan in June of 2015, and therefore twenty-five percent would vest in June of 2017.

**ANSWER:**

BP admits that these restricted stock units were granted to Plaintiff in 2015 and that twenty-five percent would vest in 2017. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶52:**

According to BP's restricted stock plan, all unvested restricted stock units are generally forfeited by an employee if the employee's employment with BP is terminated before the vesting date. This term of BP's restricted stock plan was not listed in the Offer Letter.

**ANSWER:**

BP admits that the BP p.l.c. Restricted Share Plan II Prospectus states "Generally, if you cease to be an employee of BP before the vesting date then you will forfeit your R[estricted] S[hare] U[nit]s," and that the BP p.l.c. Restricted Share Plan II Prospectus also states "The general rule is that if you terminate employment with BP during the restricted period you will forfeit your RSUs." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶53:**

The terms of BP's restricted stock plan were not explicitly incorporated by reference into the Offer Letter.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶54:**

However, the restricted stock plan also provides that unvested shares are not forfeited if an employee is terminated more than twelve months after the grant date because of "involuntary termination of employment" that is not due to conduct or performance.

**ANSWER:**

BP admits that the BP p.l.c. Restricted Share Plan II Prospectus states "However, if your employment with BP terminates for any of the following exceptional reasons before the vesting date then you will not forfeit all of your RSUs, and a proportion of the RSUs may continue to vest according to the original terms: a. Termination more than twelve (12) months after the start of the Restricted Period as a result of . . . "involuntary termination of employment" with any member of the Group, other than due to your conduct or performance." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶55:**

Ms. Ragan was pretextually terminated by BP on December 14, 2016 based on purported issues that were unrelated to her current position as a client originator. Those purported issues occurred as far back as October 15, 2015, and at the time of each incident, BP determined that Ms. Ragan should not be terminated.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶56:**

By inaccurately characterizing Ms. Ragan's termination as based on her conduct or performance, BP avoided the first vesting date of Ms. Ragan's restricted stock units.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶57:**

BP elected to attribute Ms. Ragan's termination to performance issues to avoid the upcoming vesting dates for at least $500,000.00 of earned compensation.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶58:**

As a result of BP's pretextual termination, BP breached its agreement with Ms. Ragan.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶59:**

Additionally, Ms. Ragan's ability to vest her equity and secure her bonus was solely within BP's power and discretion.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶60:**

Ms. Ragan's termination was not based on any conduct or performance issues and was not for cause. BP is using purported issues with Ms. Ragan as a pretext to terminate Ms. Ragan for cause. BP unilaterally caused the forfeiture of earned, unvested equity that would not have been forfeited if the termination was not for cause.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶61:**

BP's termination of Ms. Ragan based on pretextual performance issues just before she earned a significant portion of her compensation is a violation of the implied covenant of good faith and fair dealing.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶62:**

Ms. Ragan has been damaged in the amount of at least $500,000.00, not including interest, dividends, and increase in value of those shares since Ms. Ragan's termination.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**Count III: Specific Performance**
**(Alternate Count to Count I)**

**COMPLAINT ¶63:**

Plaintiff incorporates Paragraphs 1-31 as though fully stated in this Paragraph 63.

**ANSWER:**

BP incorporates its answers to Paragraphs 1 through 31 of the First Amended Complaint as its answer to Paragraph 63 of the First Amended Complaint.

**COMPLAINT ¶64:**

Ms. Ragan had a valid and enforceable employment agreement with BP.

**ANSWER:**

BP admits the allegations contained in this paragraph.

**COMPLAINT ¶65:**

Ms. Ragan's Offer Letter states that Ms. Ragan is eligible for minimum additional compensation for the 2015 performance year of $500,000.00.

**ANSWER:**

BP admits that Plaintiff's Offer Letter states: "subject to you remaining eligible to participate in the IST Trader and Originator Bonus Plan (the "Plan"), and the conditions outlined below, you will be eligible for a minimum bonus for the 2015 performance year (January 1st to December 31st 2015) in the amount of $500,000." BP admits that the Offer Letter further states: "This potential bonus amount, which is provided at the sole discretion of BP, is strictly subject to the requirements of the Plan. Please note that the Plan is discretionary and all awards under the

Plan are at the absolute discretion of BP. The Plan can be varied or withdrawn at any time, including part way through the performance year. . . . you will lose your eligibility for this bonus opportunity if, in the sole discretion of BP, you: Fail to comply with any of BP Policies, the BP Code of Conduct, BP Trading Guidelines, and any Federal or state laws or regulations; Fail to achieve the deliverables outlined in your MyPlan and other relevant performance documentation (as determined in the sole discretion of BP management); Your performance is rated as "Below Expectations" for the 2015 performance year; Otherwise fail to meet BP's expectations. BP reserves the right to make you no award or a bonus award of less than that stated above . . . if, in the absolute discretion of BP, you fail to meet the conditions outlined in this agreement." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶66:**

In or about March of 2016, Ms. Ragan received her 2015 additional compensation in the form of $415,000.00 in cash and $85,000.00 worth of deferred, restricted stock.

**ANSWER:**

BP admits that in or about March of 2016, Plaintiff received 2015 variable pay in the form of a $415,000.00 cash bonus and an $85,000.00 Integrated Supply and Trading-Deferred Annual Bonus award in the form of restricted stock units. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶67:**

The deferred stock portion of Ms. Ragan's 2015 additional compensation does not vest until January of 2019.

**ANSWER:**

BP admits that one-third of the $85,000.00 deferred annual bonus in the form of restricted share units was not scheduled to vest until January of 2019. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶68:**

According to BP's restricted stock plan, all unvested, restricted stock units are generally forfeited by an employee if the employee's employment with BP is terminated before the vesting date.

**ANSWER:**

BP admits that the BP p.l.c. Restricted Share Plan II Prospectus states "Generally, if you cease to be an employee of BP before the vesting date then you will forfeit your R[estricted] S[hare] U[nit]s," and that the BP p.l.c. Restricted Share Plan II Prospectus also states "The general rule is that if you terminate employment with BP during the restricted period you will forfeit your RSUs." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶69:**

However, the restricted stock plan also provides that unvested shares are not forfeited if an employee is terminated more than twelve months after the grant date because of "involuntary termination of employment" that is not due to conduct or performance.

**ANSWER:**

BP admits that the BP p.l.c. Restricted Share Plan II Prospectus states "However, if your employment with BP terminates for any of the following exceptional reasons before the vesting date then you will not forfeit all of your RSUs, and a proportion of the RSUs may continue to vest according to the original terms: a. Termination more than twelve (12) months after the start of the Restricted Period as a result of . . . "involuntary termination of employment" with any member of the Group, other than due to your conduct or performance." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶70:**

Ms. Ragan was pretextually terminated by BP on December 14, 2016 based on purported issues that were unrelated to her current position as a client originator. Those purported issues occurred as far back as October 15, 2015 and at the time of each incident, BP determined that Ms. Ragan should not be terminated.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶71:**

Ms. Ragan complied with the terms of her employment contract with BP.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶72:**

BP elected to attribute Ms. Ragan's termination to purported performance issues to avoid paying Ms. Ragan the remaining $85,000.00 deferred stock portion of her earned compensation for the 2015 performance year.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶73:**

Despite demand having been made, BP has failed and refused to provide Ms. Ragan with the remainder of her 2015 bonus.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**Count IV: Specific Performance**
**(Alternate Count to Count II)**

**COMPLAINT ¶74:**

Plaintiff incorporates Paragraphs 1-31 as though fully stated in this Paragraph 74.

**ANSWER:**

BP incorporates its answers to Paragraphs 1 through 31 of the First Amended Complaint as its answer to Paragraph 74 of the First Amended Complaint.

**COMPLAINT ¶75:**

Ms. Ragan had a valid and enforceable employment agreement with BP.

**ANSWER:**

BP admits the allegations contained in this paragraph.

**COMPLAINT ¶76:**

The Offer Letter provides that Ms. Ragan would be granted restricted stock units valued at $500,000.00 at the time of grant. This grant was separate from, and in addition to, the minimum additional compensation for 2015 referred to above.

**ANSWER:**

BP admits that the Offer Letter states "you will also be granted Restricted Stock Units ("RSUs") representing BP plc American Depositary Shares ("ADSs") valued at $500,000 at the time of grant. . . . all awards are subject to the terms of the plan under which they are granted." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶77:**

The paragraph entitled "Restricted Stock Units" contained in the Offer Letter makes no mention of the Restricted Stock Units being discretionary.

**ANSWER:**

BP denies the allegations in this paragraph.

**COMPLAINT ¶78:**

Twenty-five percent of these restricted stock units vested two years after the grant date, and the remaining seventy-five percent vested three years after the grant date.

**ANSWER:**

BP admits that the Offer Letter states "25% of the grant will vest 2 years after the grant date and the remaining 75% of the grant will vest 3 years after the grant date." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶79:**

These restricted stock units were granted to Ms. Ragan in June of 2015, and therefore twenty-five percent would vest in June of 2017 and seventy-five percent would vest in February 2018.

**ANSWER:**

BP admits that these restricted stock units were granted to Plaintiff in 2015, that twenty-five percent would vest in 2017, and that seventy-five percent would vest in February 2018. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶80:**

According to BP's restricted stock plan, all unvested restricted stock units are generally forfeited by an employee if the employee's employment with BP is terminated before the vesting date. This term of BP's restricted stock plan was not listed in the Offer Letter.

**ANSWER:**

BP admits that the BP p.l.c. Restricted Share Plan II Prospectus states "Generally, if you cease to be an employee of BP before the vesting date then you will forfeit your R[estricted] S[hare] U[nit]s," and that the BP p.l.c. Restricted Share Plan II Prospectus also states "The general rule is that if you terminate employment with BP during the restricted period you will forfeit your RSUs." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶81:**

The terms of BP's restricted stock plan were not explicitly incorporated by reference into the Offer Letter.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶82:**

However, the restricted stock plan also provides that unvested shares are not forfeited if an employee is terminated more than twelve months after the grant date because of "involuntary termination of employment" that is not due to conduct or performance.

**ANSWER:**

BP admits that the BP p.l.c. Restricted Share Plan II Prospectus states "However, if your employment with BP terminates for any of the following exceptional reasons before the vesting date then you will not forfeit all of your RSUs, and a proportion of the RSUs may continue to

vest according to the original terms: a. Termination more than twelve (12) months after the start of the Restricted Period as a result of . . . "involuntary termination of employment" with any member of the Group, other than due to your conduct or performance." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶83:**

Ms. Ragan was pretextually terminated by BP on December 14, 2016 based on purported issues that were unrelated to her current position as a client originator. Those purported issues occurred as far back as October 15, 2015, and at the time of each incident, BP determined that Ms. Ragan should not be terminated.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶84:**

By inaccurately characterizing Ms. Ragan's termination as based on her conduct or performance, BP avoided both vesting dates of Ms. Ragan's restricted stock units.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶85:**

BP elected to attribute Ms. Ragan's termination to performance issues to avoid the upcoming vesting dates for at least $500,000.00 of earned compensation.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶86:**

Additionally, Ms. Ragan's ability to vest her equity and secure her bonus was solely within BP's power and discretion.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶87:**

Ms. Ragan's termination was not based on any conduct or performance issues and was not for cause. BP is using purported issues with Ms. Ragan as a pretext to terminate Ms. Ragan for cause. BP unilaterally caused the forfeiture of earned, unvested equity that would not have been forfeited if the termination was not for cause.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶88:**

Ms. Ragan has complied with the terms of her employment contract with BP.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶89:**

Despite demand having been made, BP has failed and refused to perform under Ms. Ragan's employment contract with BP and provide Ms. Ragan with the $500,000.00 in restricted stock units not including interest, dividends, and increase in value of those shares since Ms. Ragan's termination.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**Count V: Violation of the Illinois Wage Payment Collection Act**
**820 ILCS 115/1 et seq.**

**COMPLAINT ¶90:**

Plaintiff incorporates Paragraphs 1-89 as though fully stated in this Paragraph 90.

**ANSWER:**

BP incorporates its answers to Paragraphs 1 through 89 of the First Amended Complaint as its answer to Paragraph 90 of the First Amended Complaint.

**COMPLAINT ¶91:**

BP is an employer as defined in 820 ILCS 115/2.

**ANSWER:**

BP admits that BP Products North America Inc. is an employer as defined in 820 ILCS 115/2 but denies that BP America Inc. is an employer as defined in 820 ILCS 115/2.

**COMPLAINT ¶92:**

Ms. Ragan had a valid and enforceable employment agreement with BP.

**ANSWER:**

BP admits the allegations contained in this paragraph.

**COMPLAINT ¶93:**

Ms. Ragan's Offer Letter states that Ms. Ragan is eligible for minimum additional compensation for the 2015 performance year of $500,000.00.

**ANSWER:**

BP admits that Plaintiff's Offer Letter states: "subject to you remaining eligible to participate in the IST Trader and Originator Bonus Plan (the "Plan"), and the conditions outlined below, you will be eligible for a minimum bonus for the 2015 performance year (January 1st to December 31st 2015) in the amount of $500,000." BP admits that the Offer Letter further states: "This potential bonus amount, which is provided at the sole discretion of BP, is strictly subject to the requirements of the Plan. Please note that the Plan is discretionary and all awards under the Plan are at the absolute discretion of BP. The Plan can be varied or withdrawn at any time, including part way through the performance year. . . . you will lose your eligibility for this bonus opportunity if, in the sole discretion of BP, you: Fail to comply with any of BP Policies, the BP Code of Conduct, BP Trading Guidelines, and any Federal or state laws or regulations; Fail to achieve the deliverables outlined in your MyPlan and other relevant performance documentation (as determined in the sole discretion of BP management); Your performance is rated as "Below Expectations" for the 2015 performance year; Otherwise fail to meet BP's expectations. BP

reserves the right to make you no award or a bonus award of less than that stated above . . . if, in the absolute discretion of BP, you fail to meet the conditions outlined in this agreement." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶94:**

In or about March of 2016, Ms. Ragan received her 2015 additional compensation in the form of $415,000.00 in cash and $85,000.00 worth of deferred, restricted stock.

**ANSWER:**

BP admits that in or about March of 2016, Plaintiff received 2015 variable pay in the form of a $415,000.00 cash bonus and an $85,000.00 Integrated Supply and Trading-Deferred Annual Bonus award in the form of restricted stock units. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶95:**

The deferred stock portion of Ms. Ragan's 2015 additional compensation does not vest until January of 2019.

**ANSWER:**

BP admits that one-third of the $85,000.00 deferred annual bonus in the form of restricted share units was not scheduled to vest until January of 2019. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶96:**

According to BP's restricted stock plan, all unvested, restricted stock units are generally forfeited by an employee if the employee's employment with BP is terminated before the vesting date.

**ANSWER:**

BP admits that the BP p.l.c. Restricted Share Plan II Prospectus states "Generally, if you cease to be an employee of BP before the vesting date then you will forfeit your R[estricted] S[hare] U[nit]s," and that the BP p.l.c. Restricted Share Plan II Prospectus also states "The

general rule is that if you terminate employment with BP during the restricted period you will forfeit your RSUs." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶97:**

However, the restricted stock plan also provides that unvested shares are not forfeited if an employee is terminated more than twelve months after the grant date because of "involuntary termination of employment" that is not due to conduct or performance.

**ANSWER:**

BP admits that the BP p.l.c. Restricted Share Plan II Prospectus states "However, if your employment with BP terminates for any of the following exceptional reasons before the vesting date then you will not forfeit all of your RSUs, and a proportion of the RSUs may continue to vest according to the original terms: a. Termination more than twelve (12) months after the start of the Restricted Period as a result of . . . "involuntary termination of employment" with any member of the Group, other than due to your conduct or performance." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶98:**

Ms. Ragan was pretextually terminated by BP on December 14, 2016 based on purported issues that were unrelated to her current position as a client originator. Those purported issues occurred as far back as October 15, 2015 and at the time of each incident, BP determined that Ms. Ragan should not be terminated.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶99:**

BP elected to attribute Ms. Ragan's termination to purported performance issues to avoid paying Ms. Ragan the remaining $85,000.00 earned compensation for the 2015 performance year.

**ANSWER:**

BP admits that it terminated Plaintiff's employment for performance and conduct. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶100:**

In other words, although BP promised Ms. Ragan that her minimum additional compensation for 2015 would be $500,000.00, BP paid Ms. Ragan only $415,000.00 in cash and granted $85,000.00 in restricted stock, one-third of which vested prior to Ms. Ragan's departure.

**ANSWER:**

BP admits that in March of 2016, Plaintiff received 2015 variable pay in the form of a cash bonus of $415,000.00 and an $85,000.00 Integrated Supply and Trading-Deferred Annual Bonus award in the form of restricted share units, one-third of which vested in January 2017, one-third of which would have vested in January 2018, and one-third of which would have vested in January 2019. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶101:**

Ms. Ragan is still due final compensation for the remainder of her 2015 bonus.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**Count VI: Violation of the Illinois Wage Payment and Collection Act**
**820 ILCS 115/1 et seq.**

**COMPLAINT ¶102:**

Plaintiff incorporates Paragraphs 1-101 as though fully stated in this Paragraph 102.

**ANSWER:**

BP incorporates its answers to Paragraphs 1 through 101 of the First Amended Complaint as its answer to Paragraph 102 of the First Amended Complaint.

**COMPLAINT ¶103:**

BP is an employer as defined in 820 ILCS 115/2.

**ANSWER:**

BP admits that BP Products North America Inc. is an employer as defined in 820 ILCS 115/2 but denies that BP America Inc. is an employer as defined in 820 ILCS 115/2.

**COMPLAINT ¶104:**

Ms. Ragan had a valid and enforceable employment agreement with BP.

**ANSWER:**

BP admits the allegations contained in this paragraph.

**COMPLAINT ¶105:**

The Offer Letter provides that Ms. Ragan would be granted restricted stock units valued at $500,000.00 at the time of grant. This grant was separate from, and in addition to, the minimum additional compensation for 2015 referred to above.

**ANSWER:**

BP admits that the Offer Letter states "you will also be granted Restricted Stock Units ("RSUs") representing BP plc American Depositary Shares ("ADSs") valued at $500,000 at the time of grant. . . . all awards are subject to the terms of the plan under which they are granted." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶106:**

The paragraph entitled "Restricted Stock Units" contained in the Offer Letter makes no mention of the Restricted Stock Units being discretionary.

**ANSWER:**

BP denies the allegations in this paragraph.

**COMPLAINT ¶107:**

Twenty-five percent of these restricted stock units vested two years after the grant date, and the remaining seventy-five percent vested three years after the grant date.

**ANSWER:**

BP admits that the Offer Letter states "25% of the grant will vest 2 years after the grant date and the remaining 75% of the grant will vest 3 years after the grant date." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶108:**

These restricted stock units were granted to Ms. Ragan in June of 2015, and therefore twenty-five percent would vest in June of 2017 and seventy-five percent would vest in February 2018.

**ANSWER:**

BP admits that these restricted stock units were granted to Plaintiff in 2015, that twenty-five percent would vest in 2017, and that seventy-five percent would vest in February 2018. BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶109:**

According to BP's restricted stock plan, all unvested restricted stock units are generally forfeited by an employee if the employee's employment with BP is terminated before the vesting date. This term of BP's restricted stock plan was not listed in the Offer Letter.

**ANSWER:**

BP admits that the BP p.l.c. Restricted Share Plan II Prospectus states "Generally, if you cease to be an employee of BP before the vesting date then you will forfeit your R[estricted] S[hare] U[nit]s," and that the BP p.l.c. Restricted Share Plan II Prospectus also states "The general rule is that if you terminate employment with BP during the restricted period you will forfeit your RSUs." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶110:**

The terms of BP's restricted stock plan were not explicitly incorporated by reference into the Offer Letter.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶111:**

However, the restricted stock plan also provides that unvested shares are not forfeited if an employee is terminated more than twelve months after the grant date because of "involuntary termination of employment" that is not due to conduct or performance.

**ANSWER:**

BP admits that the BP p.l.c. Restricted Share Plan II Prospectus states "However, if your employment with BP terminates for any of the following exceptional reasons before the vesting date then you will not forfeit all of your RSUs, and a proportion of the RSUs may continue to vest according to the original terms: a. Termination more than twelve (12) months after the start of the Restricted Period as a result of . . . "involuntary termination of employment" with any member of the Group, other than due to your conduct or performance." BP denies the remaining allegations contained in this paragraph.

**COMPLAINT ¶112:**

Ms. Ragan was pretextually terminated by BP on December 14, 2016 based on purported issues that were unrelated to her current position as a client originator. Those purported issues occurred as far back as October 15, 2015, and at the time of each incident, BP determined that Ms. Ragan should not be terminated.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶113:**

By inaccurately characterizing Ms. Ragan's termination as based on her conduct or performance, BP avoided both vesting dates of Ms. Ragan's restricted stock units.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶114:**

BP elected to attribute Ms. Ragan's termination to performance issues to avoid the upcoming vesting dates for at least $500.000.00 of earned compensation.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶115:**

Additionally, Ms. Ragan's ability to vest her equity and secure her bonus was solely within BP's power and discretion.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶116:**

In other words, BP owes Ms. Ragan $500,000.00 in unpaid compensation.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶117:**

Ms. Ragan's termination was not based on any conduct or performance issues and was not for cause. BP is using purported issues with Ms. Ragan as a pretext to terminate Ms. Ragan for cause. BP unilaterally caused the forfeiture of earned, unvested equity that would not have been forfeited if the termination was not for cause.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**COMPLAINT ¶118:**

Ms. Ragan is due final compensation for the earned $500,000.00 restricted stock units.

**ANSWER:**

BP denies the allegations contained in this paragraph.

**JURY DEMAND**

**COMPLAINT ¶119:**

Plaintiff requests a trial by jury on all claims triable by jury.

**ANSWER:**

BP admits that Plaintiff requests a trial by jury on all claims triable by jury.

BP denies that Plaintiff is entitled to any relief. BP denies every remaining allegation in the First Amended Complaint that has not been separately and specifically admitted.

**AFFIRMATIVE AND OTHER DEFENSES**

1. Plaintiff's claims are barred based on the doctrine of after-acquired evidence, as subsequent to Plaintiff's termination from employment, BP learned that Plaintiff engaged in inappropriate conduct toward one of her colleagues during her employment, which violated Defendant's policies.

2. Plaintiff's claim for the $85,000.00 Integrated Supply and Trading-Deferred Annual Bonus award in the form of restricted share units, one-third of which vested in January 2017, one-third of which would have vested in January 2018, and one-third of which would have vested in January 2019 (plus interest, dividends, and increase in value of those shares since her termination) is barred by the doctrine of accord and satisfaction, as Plaintiff agreed to receive that amount in the form of restricted share units.

BP reserves the right to amend its Answer and to assert any additional defenses and affirmative defenses as may become available or apparent during the course of this litigation, in accordance with applicable Court rules and orders.

WHEREFORE, BP denies that Plaintiff is entitled to any relief and requests that Plaintiff's First Amended Complaint be dismissed in its entirety with prejudice, that judgment be entered in BP's favor, and that BP be awarded such other relief as this Court deems appropriate.

**COUNTERCLAIM AGAINST KATHLEEN RAGAN**

Pursuant to Federal Rule of Civil Procedure 13, BP Products North America Inc. ("BP Products North America") and BP America Inc. ("BP America") (collectively, "BP"), for their Counterclaim against Kathleen Ragan, state as follows:

**PARTIES**

**COUNTERCLAIM ¶ 1**

BP Products North America is a corporation organized under the laws of the state of

Maryland, and BP America is a corporation organized under the laws of the state of Delaware.

**COUNTERCLAIM ¶ 2**

On information and belief, Kathleen Ragan ("Ragan") is a resident of New York, New York. On information and belief, at all times relevant to this lawsuit, Ragan was a resident of Cook County, Illinois.

**JURISDICTION AND VENUE**

**COUNTERCLAIM ¶ 3**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). This is an action between a citizen of New York and a citizen of Maryland and Texas. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

**COUNTERCLAIM ¶ 4**

Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to the claims occurred in Cook County, Illinois.

**FACTUAL BACKGROUND**

**COUNTERCLAIM ¶ 5**

Around April 2015, BP entered into negotiations with Ragan to hire Ragan as an Emissions Trader for BP's Marketing and Origination Group.

**COUNTERCLAIM ¶ 6**

On April 23, 2015, BP America Inc. sent Ragan a letter with BP's written offer of employment ("Offer Letter") (attached here as Exhibit A.)

**COUNTERCLAIM ¶ 7**

Ragan's Offer Letter described the terms of BP America Inc.'s offer to Ragan for employment as an Emissions Trader in BP Products North America's Marketing & Origination

Group.

**COUNTERCLAIM ¶ 8**

One of the terms included in the Offer Letter was titled "Sign-on Payment." This provision stated:

Should you accept this offer, you are eligible to receive a one-time payment of $200,000 . . . this will be earned and paid to you on your first regular paycheck . . . You agree to pay 100% of this Sign-on Payment to BP if you resign or your employment is terminated with cause (e.g. breaching or non-compliance with the company's policies, guidelines, code of conduct, or not meeting performance requirements due to misbehaviours or willful disregards of BP rules or procedures) at any time within 24 months from the commencement of this employment. In this case, the amount of the bonus must be fully repaid in cash in gross at least one day prior to the last date of employment.

(See Exh. A, p. 1.)

**COUNTERCLAIM ¶ 9**

On April 27, 2015, Ragan accepted BP America Inc.'s offer contained in the Offer Letter and signed the Offer Letter.

**COUNTERCLAIM ¶ 10**

In June of 2015, Ragan began working for BP Products North America Inc.

**COUNTERCLAIM ¶ 11**

BP paid Ragan the $200,000 Sign-on Payment pursuant to the terms of the Offer Letter.

**COUNTERCLAIM ¶ 12**

On December 14, 2016, BP terminated Ragan's employment with cause as defined in the Offer Letter.

**COUNTERCLAIM ¶ 13**

Despite Ragan's agreement with BP to repay the $200,000 Sign-on Payment if her employment was terminated with cause within 24 months of the commencement of her employment, Ragan did not repay BP the $200,000 Sign-on Payment.

**COUNT I - BREACH OF CONTRACT**

**COUNTERCLAIM ¶ 14**

BP incorporates Counterclaim Paragraphs 1-13 as though fully restated here.

**COUNTERCLAIM ¶ 15**

BP America's Offer Letter to Ragan contained the terms of BP's offer of employment to Ragan.

**COUNTERCLAIM ¶ 16**

When Ragan signed the Offer Letter, she accepted BP's offer contained in the Offer Letter.

**COUNTERCLAIM ¶ 17**

Ragan's Offer Letter was a valid and enforceable contract with BP.

**COUNTERCLAIM ¶ 18**

The terms of Ragan's contract with BP included an agreement that BP would pay Ragan a $200,000 Sign-on Payment.

**COUNTERCLAIM ¶ 19**

The terms of Ragan's contract with BP included an agreement that Ragan would repay BP the $200,000 Sign-on Payment if Ragan's employment was terminated with cause within 24 months of the commencement of Ragan's employment.

**COUNTERCLAIM ¶ 20**

BP performed its obligations under the terms of the Offer Letter when it paid Ragan the $200,000 Sign-on Payment.

**COUNTERCLAIM ¶ 21**

On December 14, 2016, BP terminated Ragan's employment, within 24 months of the commencement of her employment.

**COUNTERCLAIM ¶ 22**

BP terminated Ragan's employment with cause.

**COUNTERCLAIM ¶ 23**

Ragan failed to repay BP the $200,000 Sign-on Payment.

**COUNTERCLAIM ¶ 24**

Ragan breached her contract with BP when she failed to repay BP the $200,000 Sign-on Payment.

**COUNTERCLAIM ¶ 25**

BP has been damaged in the amount of $200,000.00, plus interest and costs since Ragan's termination.

**JURY DEMAND**

**COUNTERCLAIM ¶ 26**

BP requests a trial by jury on all claims triable by jury.

WHEREFORE, BP Products North America Inc. and BP America Inc. respectfully request that this Court enter judgment in their favor and against Kathleen Ragan on their Counterclaim, award them $200,000.00 plus interest and costs, and grant them all other relief that this Court deems just and proper.

**DATED: August 17, 2018**

Respectfully submitted,

BP Products North America Inc. and
BP America Inc.

By: s/ Katherine F. Mendez
One of Its Attorneys

Katherine F. Mendez
kmendez@seyfarth.com
Ashley K. Laken
alaken@seyfarth.com

SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on August 17, 2018, she caused a true and correct copy of the foregoing DEFENDANTS' ANSWER AND DEFENSES TO KATHLEEN RAGAN'S FIRST AMENDED COMPLAINT AND COUNTERCLAIM AGAINST KATHLEEN RAGAN to be presented to the Clerk of the Court for filing and uploading to the CM/ECF system, which will send notification of such filing to all attorneys of record in this matter.

s/ Katherine Mendez
Katherine F. Mendez