IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Kathleen Ragan, | |
|    Plaintiff/Counter-Defendant, | Case No. 1:17-cv-09208 |
| v. | Judge Marvin E. Aspen |
| BP Products North America, Inc. and BP America, Inc., | Magistrate Judge Jeffrey T. Gilbert |
|    Defendants/Counter-Plaintiffs. | |

**DEFENDANTS'/COUNTER-PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**Nature Of The Case**

In 2015, BP hired Kathleen Ragan as an Emissions Trader to support BP's Global Environmental Products trading book and to trade in the Regional Greenhouse Gas Initiative market (SOF[1] ¶¶ 10, 25). Ragan's compensation was reflected in an April 27, 2015 signed offer letter providing that: (a) she was *eligible* for a $500,000 bonus for 2015, subject to the terms of BP's IST Trader and Originator Bonus Plan; (b) part of her bonus for 2015 may be subject to deferral under BP's IST Deferred Annual Bonus Plan (collectively, "the Bonus Plans"); and (c) she would receive a $500,000 grant of restricted share units ("RSUs"), subject to the terms of the Restricted Share Plan II ("the Share Plan") (SOF ¶¶ 10-11, 18). Regarding the RSUs, 25% were scheduled to vest in 2017 and 75% were scheduled to vest in 2018 (SOF ¶¶ 18, 39).

Ragan began working for BP in June 2015 (SOF ¶ 25). In March 2016, BP awarded her a $500,000 bonus for 2015 (SOF ¶ 36). Under the terms of BP's Bonus Plans, the $500,000 consisted of $415,000 in cash and $85,000 in RSUs, with one-third of the $85,000 scheduled to vest in early 2017, one-third in 2018, and one-third in 2019 (SOF ¶¶ 15-16, 36, 38).

Ragan experienced systemic conduct and performance problems at BP. She admits she repeatedly breached her Delegations of Authority and soft limits (limits under which traders are allowed to trade and which must not be breached) (SOF ¶¶ 28-29, 41, 45-46, 49, 54). One of these Delegation of Authority breaches was a Category A incident, the most serious kind of compliance incident at BP (SOF ¶¶ 52, 58). On multiple occasions Ragan failed to timely approve her profit and loss statements, repeatedly entered trade deal details incorrectly in BP's deal entry system, and repeatedly failed to follow BP's requirement to check CredEx before trading with a counterparty, which was a Category B incident (the second most serious

---

[1] BP is filing contemporaneously its Rule 56.1 Statement of Material Facts as to Which There is No Genuine Dispute in Support of Their Motion for Summary Judgment, referred to herein as "SOF."

compliance violation at BP) (SOF ¶¶ 30, 42-44, 51-53). Consequently, in May 2016 – less than one year after starting – based on her unacceptable performance, BP removed Ragan from her trader position, removed her trading Delegations of Authority, and reassigned her to a customer origination position (SOF ¶ 59).

As an originator, Ragan failed to meet goals she and her supervisor set (*see* SOF ¶¶ 71-72). Then, in August 2016, Ragan committed a serious lapse of judgment. She invested personally in a company that operated in the same market as BP and that BP was planning to partly purchase (SOF ¶¶ 63-65). Ragan never told BP that she was going to invest in this company (SOF ¶ 64). When BP learned of Ragan's actions, BP investigated because of the compliance issues it raised (SOF ¶ 69). It found that Ragan exercised extremely poor judgment, but her actions did not violate BP's Conflict of Interest policy (SOF ¶ 70). In December 2016, based on Ragan's serious lapse of judgment and her history of failing to adhere to BP's compliance and other policies, BP informed Ragan her employment was being terminated, and she was terminated in March 2017, after a three-month garden leave (SOF ¶¶ 73-79). In early 2017, one third of Ragan's $85,000 deferred bonus vested and was paid (SOF ¶ 79). Under the express terms of the Bonus Plans and Share Plan, Ragan forfeited her remaining unvested RSUs.

Ragan claims that: (1) BP breached her contract and violated the Illinois Wage Payment and Collection Act ("IWPCA") by failing to pay her $500,000 for her unvested RSUs; and (2) BP breached her contract and violated the IWPCA by failing to pay her the unvested portion of her 2015 deferred bonus. BP asserts a counterclaim against Ragan for failing to repay a $200,000 sign-on payment, which she agreed to repay if BP terminated her employment for cause within 24 months of the date her employment commenced.

### Reasons Why Ragan's Claims Fail As A Matter of Law

This is a straightforward case. The express terms of Ragan's offer letter, the Bonus Plans,

and the Share Plan provide that Ragan is not entitled to the value of her unvested RSUs. Ragan's signed offer letter expressly provides that her bonus and RSUs were governed by BP's Bonus Plans and Share Plan. Both the offer letter and the applicable Plans provide that employees may not retain unvested RSUs if they are no longer employed on the vesting date. The applicable Plans provide carve-outs for employees who are not employed on the vesting date due to disability, death, or an involuntary termination not due to conduct or performance (SOF ¶¶ 16, 20). The Plans make explicit that terminations for conduct or performance result in the forfeiture of unvested benefits (SOF ¶¶ 16, 20). Moreover, the applicable documents give BP sole and absolute discretion in making eligibility determinations (*see* SOF ¶¶11, 15-16, 20). Here, BP's decision to terminate Ragan's employment is supported by overwhelming evidence, largely Ragan's own admissions. Furthermore, BP's decision certainly is not arbitrary or capricious.

Ragan may not like the terms of her agreement. She may disagree with BP's judgment that her conduct and performance justified her termination. However, she cannot erase those terms or substitute her judgment for BP's. Consequently, her claims fail as a matter of law.

## Argument

### I. Ragan's Claim For The RSUs Fails As A Matter Of Law

Ragan's claims that the forfeiture of $500,000 in RSUs constituted a breach of contract and violated the IWPCA fail because her signed offer letter and the terms of the Share Plan, incorporated into her offer letter, explicitly provide that she is not entitled to her unvested RSUs.

#### A. Ragan's Claim For The RSUs Fails Under A Breach Of Contract Theory

"Contract cases … are often prime candidates for summary judgment because contract interpretation is a question of law." *Hanover Ins. Co. v. Northern Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014). Moreover, "[t]he terms of an agreement, if not ambiguous, should be generally

3

enforced as they appear, and those terms will control the rights of the parties." *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998).

### 1. The Unambiguous Terms Of Ragan's Contract Foreclose Her RSUs Claim

Ragan's contract claim fails because the operative documents explicitly provide that they do not create any contractual right for any purpose. Where a document states that it does not create any contractual rights for any plan participant, a contract claim cannot be made. *Curran v. JP Morgan Chase, N.A.*, 633 F. Supp. 2d 639, 644-45 (N.D. Ill. 2009) (unpaid bonus breach of contract claim dismissed where the document at issue stated that it did not create any contractual rights for any plan participant). BP's Share Plan (which was incorporated into Ragan's signed offer letter) provides explicitly that participating in the Plan "shall not form any contractual right for any purpose" (SOF ¶ 20). It also provides that each RSU represented a *conditional* entitlement; that participation in the Plan was "at BP's discretion"; and that the Plan was "operated in the sole discretion of BP" (SOF ¶ 20). This pellucidly clear language establishes, as a matter of law, that Ragan has no contractual right to her unvested RSUs.

Even if there were a contract, there is no breach because the terms of Ragan's signed offer letter and the incorporated Share Plan provide that she must be employed on the vesting date for her RSUs to vest. Ragan's signed offer letter states: "In general, in order for the RSUs to vest, you must be employed by BP on the vesting date," and "all awards are subject to the terms of the plan under which they are granted" (SOF ¶ 18). In turn, the Share Plan provides: "The main terms and conditions for this grant or award are your continued employment with BP until the end of the restricted period…" and "if your employment with BP ends before the vesting date then, with the exception of certain special circumstances, you will forfeit your RSUs" (SOF ¶

4

20)[2]. Further, it provides "[g]enerally, if you cease to be an employee of BP before the vesting date then you will forfeit your RSUs" (SOF ¶ 20). Ragan's employment with BP ended on March 16, 2017 (SOF ¶¶ 1, 79). The RSUs were not scheduled to begin vesting until June 2017 (*see* SOF ¶¶ 18, 39). Therefore, Ragan is not entitled to the unvested RSUs.

        **2.        The Decision To Terminate Ragan's Employment Because Of Systemic Conduct And Performance Problems Is Not Arbitrary Or Capricious**

Ragan attempts to escape the Share Plan's terms by relying on its provision that RSUs will not be forfeited if an employee is involuntarily terminated other than due to conduct or performance (*see* Dkt. 30 ¶¶ 54, 82, 111). The proper focus in this inquiry is whether BP reasonably exercised its contractual discretion in determining that Ragan was terminated due to her performance and conduct. *McLaughlin v. Sternberg Lanterns, Inc.*, 917 N.E.2d 1065, 1072-73 (Ill. App. Ct. 2009) (a party with contractual discretion must exercise that discretion reasonably and not arbitrarily or capriciously; employer "reasonably exercised its contractual discretion in determining that the plaintiff's termination was for 'substantial cause'"). In *Bearden v. Humana Health Plan. Inc.*, No. 92-cv-4019, 1992 WL 245604, at *4 (N.D. Ill. Sept. 23, 1992) the court rejected the plaintiff's claim that Humana violated an employment agreement because Humana had no cause to fire him. *Id.* at *3. The court explained that the employment agreement provided that Humana could terminate the agreement whenever, in the sole discretion of the medical director, plaintiff failed to satisfactorily perform his contractual duties. Under that provision, whether Humana had cause to fire the plaintiff was "irrelevant so long as it made a cause determination and that determination was not made in bad faith." *Id.*

---

[2]     The special circumstances under the Share Plan are termination as a result of disability, involuntary termination of employment *other than due to the employee's conduct or performance*, termination in the event of the employee's death, and termination by mutual agreement between the employee and BP (SOF ¶ 20).

The implied covenant of good faith and fair dealing, referenced by Ragan in her First Amended Complaint (*see* Dkt. 30 ¶¶ 1, 44, 61), simply requires that a party exercise discretion reasonably and with proper motive; not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. "[T]he determination as to whether an expectation is reasonable is an objective … determination," not a subjective one. *Wilson v. Career Educ. Corp.*, 844 F.3d 686, 689-91 (7th Cir. 2016) (affirming dismissal of breach of contract claim where employer exercised discretion to terminate bonus plan before regulations prohibiting such bonuses went into effect, thereby depriving plaintiff of bonuses that were "in the pipeline"); *see also Tatom v. Ameritech Corp.*, 305 F.3d 737, 745-46 (7th Cir. 2002) (affirming dismissal of breach of contract claim where employer exercised discretion to cancel stock options of employee who accepted job with competitor); *Rakos v. SkyTel Corp.*, 954 F. Supp. 1234, 1239-40 (N.D. Ill. 1996) (rejecting claim that defendant breached implied covenant of good faith and fair dealing, where plaintiff knew the terms of the compensation plan which stated the Vice President could determine, at his discretion, whether unique large orders represented excessive credit in relation to the participant's effort).

Ragan's employment was terminated due to her systemic conduct and performance issues. Ragan admits that compliance is of utmost importance to BP and simultaneously admits to continually violating BP's compliance and other policies (SOF ¶¶ 26, 29, 41-58, 61). Among other performance failures (*see* SOF ¶¶ 41-58), Ragan violated BP's Global Trading Guidelines by repeatedly breaching her Delegations of Authority, resulting in a Category A incident (the most serious category at BP), and failing to check CredEx before trading with a counterparty, resulting in a Category B incident (the second most serious incident at BP) (SOF ¶¶ 51-52, 54, 58). Ragan admits to engaging in these and all of her additional documented performance

6

problems (*see* SOF ¶¶ 42-45, 48-49, 51-54, 57-58). Because of her performance problems, in May 2016, BP revoked Ragan's trading Delegations of Authority, removed her from her trader position, and reassigned her to a customer origination position (SOF ¶ 59). Ragan knew that her transfer to the origination role was not a clean start and that BP might terminate her employment if she continued to use poor judgment (SOF ¶¶ 60-61).

Ragan did not perform well in her origination role (SOF ¶¶ 71-72). Then, shortly after she was moved to that role, Ragan personally invested in a company that operated in the same small biogas market as BP, yet she did not disclose to BP that she was going to be making the investment, an omission that reflected extremely poor judgment (SOF ¶¶ 63-67, 70). As a result of the systemic conduct and performance issues, BP terminated Ragan's employment in December 2016 (SOF ¶¶ 73-78).

This case is analytically indistinguishable from *Schneider v. Gallagher Bassett Services, Inc.*, No. 13-cv-6108, 2015 U.S. Dist. LEXIS 133184 (N.D. Ill. Sept. 30, 2015). In *Schneider*, the plaintiff sued for breach of contract after his unexercised, vested stock options were extinguished upon his termination for poor communication and leadership. *Id.* at *28. The applicable plan had provisions similar to those in this case, and the employer also provided employees documents stating that they would lose their stock options if terminated for cause. *Id.* at *3-4. In dismissing the plaintiff's claim, the court found that, because there was evidence supporting the employer's judgment regarding the plaintiff's poor performance, the employer did not abuse its discretion under the plan or breach any implied covenant of good faith and fair dealing. *Id.* at *5-6, 28-32.

Here, the Share Plan expressly provides that ceasing to be employed before the vesting date would generally result in forfeiture of RSUs, unless the employment termination was other than due to conduct or performance. BP's assessment of Ragan's conduct and performance is

7

supported by overwhelming evidence, especially Ragan's own admissions (SOF ¶¶ 41-78). It certainly is not arbitrary or capricious. For these reasons, Ragan's claim fails. *See Kalush v. Deluxe Corp.*, 171 F.3d 489, 493 (7th Cir. 1999) (affirming dismissal of breach of contract claim because plaintiff "has not persuaded [the court] that a reasonable trier of fact could conclude that Deluxe did not terminate her for poor performance").

### B. Ragan's Claim For The RSUs Fails Under The IWPCA

The $500,000 in RSUs does not meet the definition of "compensation" under the IWPCA. The IWPCA requires an employer to pay "the final compensation of separated employees." 820 ILL. COMP. STAT. 115/5. The IWPCA provides that "[p]ayments to separated employees shall be termed 'final compensation' and shall be defined as wages...and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILL. COMP. STAT. 115/2. The Illinois Administrative Code defines "compensation" for purposes of the IWPCA as "remuneration or compensation an employee receives *in return for services rendered* to an employer." 56 ILL. ADM. CODE tit. 56, § 300.504 (2014) (emphasis added). The $500,000 in RSUs that BP granted to Ragan does not meet this definition because Ragan did not receive those RSUs in return for services rendered to BP; rather, Ragan received them in connection with BP's recruitment of her to join BP. Ragan's IWPCA claim related to the $500,000 in RSUs therefore fails on this basis alone.

Additionally, a claim under the IWPCA requires an unequivocal promise. *See, e.g., Hess v. Bresney*, 784 F.3d 1154, 1162 (7th Cir. 2015); *McLaughlin*, 917 N.E.2d at 1071. Ragan has no evidence of an "unequivocal promise" to allow her to retain her unvested RSUs upon leaving BP's employment. To the contrary, her signed offer letter explicitly provides that, "[i]n general, in order for the RSUs to vest, you must be employed by BP on the vesting date" (SOF ¶ 18).

8

Ragan was not employed by BP on the vesting date, so her IWPCA claim fails. *See Hess*, 784 F.3d at 1162-63.

Moreover, Ragan's signed offer letter states in the paragraph related to the RSUs that "all awards are subject to the terms of the plan under which they are granted," and the Share Plan provides: (1) that each RSU represented a "conditional" entitlement; (2) the main terms and conditions for grants were continued employment with BP; (3) generally, if a participant ceased to be employed before the vesting date they would forfeit their RSUs; (4) participation in the Plan was "at BP's discretion"; (5) the Plan was "operated in the sole discretion of BP"; and (6) the benefit of participating in the Plan "shall not form any contractual right for any purpose" (SOF ¶¶ 18, 20). These terms establish that the grant of RSUs to Ragan was *conditional* and forecloses any claim that BP unequivocally promised Ragan that she could retain unvested RSUs if her employment terminated before the vesting date. Ragan's IWPCA claim for the $500,000 in RSUs fails on this additional basis. *See McLaughlin*, 917 N.E.2d at 1071 (the IWPCA requires employers to pay an employee only compensation that they "unequivocally promised" to pay).

Even if there were an unequivocal promise to pay Ragan for her unvested RSUs (which there was not), that promise would be governed by the parties' agreement that unvested RSUs are forfeited if the employee is terminated for conduct or performance. For the reasons already discussed, Ragan has no evidence that BP acted in bad faith in terminating her employment. Whether an employer reasonably exercised its contractual discretion in determining that the termination of a plaintiff's employment was for a disqualifying reason turns on whether anything suggests the employer "acted in bad faith" in making that determination. *McLaughlin*, 917 N.E.2d at 1066, 1072-73. In *McLaughlin*, the applicable document provided that employees would receive separation pay "unless the company has determined your termination is for

9

substantial cause." *Id.* at 1066. The contract language provided the employer with discretion to determine whether the termination was for substantial cause and the plaintiff was terminated for failure to improve his interpersonal relationships and failure to comply with a direct order from his superior. *Id.* at 1072-73. The court granted summary judgment on the plaintiff's IWPCA claim, holding that there was nothing in the record to suggest that the employer acted in bad faith in determining that the plaintiff's employment was terminated for substantial cause. *Id.* at 1073. It also bears mentioning that "unpaid future compensation for the remainder of a terminated contract where there is a question as to whether the employee was terminated for cause does not fall under the [IWPCA]'s definition of 'final compensation.'" *Majmudar v. House of Spices (India), Inc.*, 1 N.E.3d 1207, 1216 (Ill. App. Ct. 2013).

## II.     Ragan's Bonus Claim Fails As A Matter Of Law

The express terms of Ragan's offer letter and the Bonus Plans foreclose Ragan's claim for the unvested portion of her 2015 bonus that was granted in RSUs.

### A.     Ragan's Bonus Claim Fails Under A Breach Of Contract Theory

The terms of Ragan's signed offer letter expressly foreclose her claim that BP was contractually required to allow her to retain the unvested portion of her 2015 bonus granted in RSUs. Where contract language establishes that a bonus was discretionary, the plaintiff has no enforceable contract right to the bonus. *See, e.g., Lillien v. Peak6 Investments, L.P.*, 417 F.3d 667, 668-70 (7th Cir. 2005). Ragan's signed offer letter included the following statements:

- "[Y]ou are *eligible* to earn an annual bonus in accordance with the BP Trader and Originator Bonus Plan."
- "Annual bonuses … *may be subject to deferral* under the IST Deferred Annual Bonus Plan."
- "*[S]ubject to* you remaining eligible to participate in the IST Trader and

10

> Originator Bonus Plan (the "Plan"), *and the conditions outlined below*,³ you will be *eligible* for a minimum bonus for the 2015 performance year … in the amount of $500,000."

- "This *potential* bonus amount, which is provided *at the sole discretion of BP*, is *strictly subject to* the requirements of the Plan. Please note that the Plan is *discretionary* and all awards under the Plan are at *the absolute discretion of BP*."

- "[Y]ou will lose your eligibility for this bonus *opportunity* if, *in the sole discretion of BP*, you … fail to meet BP's expectations."

- "BP reserves the right to make you no award or a bonus award of less than that stated above … if, *in the absolute discretion of BP*, you fail to meet the conditions outlined in this agreement …"

(SOF ¶ 11; emphasis added). These terms establish that Ragan's bonus was within BP's discretion and is not enforceable as a breach of contract claim. *See Lillien*, 417 F.3d at 668-70 (rejecting claim that employer breached employment contract by firing plaintiff without giving him a "guaranteed" bonus, reasoning that offer letter described bonus as "discretionary").

Ragan's signed offer letter also notes that the Trader and Originator Bonus Plan could be varied or withdrawn at any time (SOF ¶ 11). Where a plan contains language giving the employer the right to modify or cancel the plan at any time, "[s]uch a statement is an effective disclaimer to negate any possible promissory intent." *Rakos*, 954 F. Supp. at 1237-38 (dismissing breach of contract claim for bonus "[b]ecause the Plan reserved for defendant the right and discretion to cancel the Plan at any time for any reason, it did not...create an enforceable contract right to a bonus").

Further, BP's Bonus Plans provide that they are discretionary and do not create any contractual rights (SOF ¶¶ 16-17, 20), foreclosing Ragan's breach of contract claim. *See Tatom*, 305 F.3d at 742-44; *see also Rakos*, 954 F. Supp. at 1238 (plan which gave employer discretion to withhold bonus resulted in plaintiff having no contractual right to bonus); *Webster v. Elec.*

---

³ These conditions included Plaintiff's compliance with BP's policies and trading guidelines (SOF ¶ 11).

11

*Data Sys. Corp.*, No. 03-cv-3002, 2005 WL 1563217, at *5 (N.D. Ill. June 28, 2005) (dismissing breach of contract claim because "by its own terms, the [bonus plan] is not an enforceable contract. The Description provides that it is a discretionary plan[.]").

In *Tatom*, the Seventh Circuit affirmed summary judgment on a former employee's breach of bonus contract claim because the applicable documents did not establish a promise to pay the bonus. 305 F.3d at 742-44. The Court of Appeals noted that although the total compensation statement given to the plaintiff identified a target bonus, it also stated that the bonus could be more or less than the target amount, and the compensation program booklet stated that the employer reserved the right to decide all questions and issues arising under the compensation program and the program did not create any contractually enforceable rights. *Id.* at 743. Likewise, Ragan's signed offer letter stated that BP reserved the right to make her no award or a bonus award of less than that stated, and the incorporated Deferred Annual Bonus ("DAB") Plan stated that the designated corporate officer's decision on the interpretation of the DAB Plan or in any dispute relating to awards would be final and conclusive and that the benefit of participating in the DAB Plan "shall not form any contractual right for any purpose" (SOF ¶¶ 11, 14, 16-17).

If Ragan argues she had a contract that "guaranteed" her a $500,000 bonus for 2015 (she did not), her claim still fails because Ragan was, in fact, awarded a $500,000 bonus for 2015, part of which she agreed could be deferred as RSUs according to BP's Bonus Plans (SOF ¶¶ 11, 14-16, 36). Ragan forfeited the unvested RSUs pursuant to the unambiguous terms of her offer letter and the incorporated DAB Plan, which provides that unvested RSUs will be forfeited if an employee is terminated for conduct or performance (SOF ¶¶ 11, 16, 79). As already discussed, BP acted reasonably and in good faith in terminating Ragan's employment for conduct and

12

performance. Consequently, Ragan lost her unvested RSUs. *See Schneider*, 2015 U.S. Dist. LEXIS 133184, *28; *Kalush*, 171 F.3d at 493; *Webster*, 2005 WL 1563217 at *5 ("[E]ven if the [Bonus Plan] was an enforceable contract...Defendants properly exercised their discretion to deny Plaintiff a bonus."); *Tatom*, 305 F.3d at 745 (finding that after plaintiff went to work for a competitor, employer "was within its rights" to invoke the forfeiture provision related to his stock options).

### B.     Ragan's Bonus Claim Fails Under The IWPCA

Ragan's bonus claim fails under the IWPCA because she has no evidence of an unequivocal promise that obligated BP to allow her to retain the unvested portion of her 2015 bonus. The right to a bonus must be "unequivocal" for it to be considered an "earned bonus" under the IWPCA. *See McLaughlin*, 917 N.E.2d at 1071; *see also Hess*, 784 F.3d at 1162 (rejecting plaintiff's IWPCA claim for a bonus and noting that the applicable document stated that plaintiff "will be eligible to receive as a bonus," reasoning that "[e]ligibility, of course, is no guarantee" and that this did not constitute an unequivocal promise); *O'Leary v. Accretive Health, Inc.*, No. 09-cv-1428, 2010 U.S. Dist. LEXIS 3810, at *17-18 (N.D. Ill. Jan. 19, 2010) (granting summary judgment on IWPCA bonus claim; plaintiff was not unequivocally promised a bonus because offer letter stated he was *eligible* for a discretionary bonus).

Regarding her bonus, Ragan's signed offer letter uses the terms "eligible," "conditions," "potential," "strictly subject to," "discretionary," and "absolute discretion" (SOF ¶ 11), making inarguable that the bonus is discretionary. Because Ragan cannot show an unequivocal promise to receive her bonus, her IWPCA claim fails.

Additionally, "[d]iscretionary bonuses do not entitle an employee to a bonus under the IWPCA." *Tank v. Deutsche Telekom, AG*, No. 11-cv-4619, 2013 U.S. Dist. LEXIS 56096, *29 (N.D. Ill. Apr. 19, 2013) (IWPCA claim dismissed where plan provided that bonuses were at the

13

employer's "sole discretion" and were not earned until paid); *see also* 56 ILL. ADM. CODE tit. 56, § 300.500 (2014) (no jurisdiction over discretionary bonuses for purposes of IWPCA). Ragan's signed offer letter states that her 2015 bonus "is provided at the sole discretion of BP" and that "all awards under the [Trader and Originator Bonus] Plan are at the absolute discretion of BP."[4] The Trader and Originator Bonus Plan likewise provides that it is a "discretionary" plan, the amount of awards are "in sole judgement and discretion of the Company," that awards are "purely [d]iscretionary," and award amounts subject to the DAB Plan "are not accrued, earned or vested unless the conditions of the [DAB] Plan are met" (SOF ¶ 15).

To the extent Ragan had an unequivocal agreement to pay her a $500,000 bonus for 2015 (which she did not), her claim still fails because BP awarded Ragan that bonus and she agreed it could be deferred as RSUs according to BP's Bonus Plans (SOF ¶¶ 11, 14-16, 36). Ragan forfeited the unvested RSUs under the unambiguous language of the applicable documents, which provide that unvested RSUs will be forfeited if an employee is terminated for conduct or performance (SOF ¶¶ 11, 16, 79). BP reasonably and in good faith exercised its discretion in determining that Ragan's conduct and performance warranted and justified her employment termination.

Here, Ragan's 2015 deferred bonus is not an earned bonus because it is conditional and dependent on a number of considerations, including that Ragan meet BP's expectations and not be terminated for her conduct or performance, as determined by BP in its sole discretion.

## III. Ragan's Specific Performance Claims Fail

Ragan brings two claims for specific performance in Counts III and IV (*see* Dkt. 35). Specific performance is a remedy, not an independent cause of action. *LaSalle Nat'l Bank v.*

---

[4] In referring to Ragan's 2015 bonus, her signed offer letter uses the terms "sole discretion" and "absolute discretion" no less than five times (SOF ¶ 11).

*Metro. Life Ins. Co.*, 18 F.3d 1371, 1376 (7th Cir. 1994). Moreover, "[s]pecific performance is an exceptional remedy and is normally available only when damages constitute an inadequate remedy." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 637 (7th Cir. 2007); *see also Ajax Eng'g Corp. v. Sentry Ins.*, 491 N.E.2d 947, 950 (Ill. App. Ct. 1986). In any event, "to state a cause of action for specific performance of a contract, it is necessary that an enforceable contract exist." *Chicago Invest. Corp. v. Dolins*, 418 N.E.2d 59, 62 (Ill. App. Ct. 1981). As established above, no contract exists under which BP was required to allow Ragan to retain her unvested RSUs. Ragan's specific performance claim should be dismissed.

### III. BP Is Entitled To Summary Judgment On Its Breach Of Contract Counterclaim

BP is entitled to summary judgment on its breach of contract counterclaim for the $200,000 sign-on payment that BP paid to Ragan. Ragan's signed offer letter provides: "You agree to repay 100% of this Sign-on Payment to BP if...your employment is terminated with cause (e.g. breaching or non-compliance with the company's policies, guidelines, code of conduct, or not meeting performance requirements due to misbehaviours or willful disregards of BP rules or procedures) at any time within 24 months from the commencement date of this employment" (SOF ¶ 23).

The undisputed record establishes that Ragan's employment was terminated for cause within 24 months from the commencement of her employment. However, Ragan has not repaid the sign-on payment (SOF ¶ 80). Accordingly, BP should be granted summary judgment on its breach of contract counterclaim. *See Viad Corp. v. Houghton*, No. 08-cv-6706, 2010 U.S. Dist. LEXIS 17447, at *19 (N.D. Ill. Feb. 26, 2010).

### Conclusion

Based on the foregoing: (1) Ragan's claims should be dismissed with prejudice; and (2) judgment should be entered in favor of BP in the amount of $200,000 on its counterclaim.

15

**DATED: June 27, 2019**  Respectfully submitted,

BP Products North America Inc. and
BP America Inc.

By:   s/ *Katherine Mendez*
      One of Their Attorneys

Katherine F. Mendez
kmendez@seyfarth.com
Ashley K. Laken
alaken@seyfarth.com
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on June 27, 2019, she caused a true and correct copy of the foregoing **DEFENDANTS'/COUNTER-PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** to be presented to the Clerk of the Court for filing and uploading to the CM/ECF system, which will send notification of such filing to all attorneys of record in this matter.

                                                 s/ *Katherine Mendez*
                                                 Katherine Mendez