**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Kathleen Ragan, | |
| Plaintiff/Counter-Defendant, | Case No. 1:17-cv-09208 |
| v. | Judge Marvin E. Aspen |
| BP Products North America, Inc. and BP America, Inc., | Magistrate Judge Jeffrey T. Gilbert |
| Defendants/Counter-Plaintiffs. | |

**DEFENDANTS'/COUNTER-PLAINTIFFS' RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants/Counter-Plaintiffs, BP Products North America Inc. and BP America Inc. (together referred to as "BP"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, submit this statement of material facts as to which there is no genuine dispute in support of their motion for summary judgment.[1]

**I.      The Parties**

1.      Kathleen Ragan is a former Emissions Trader for BP Products North America Inc. ("BPPNA"), and she was employed with BPPNA from June 8, 2015 to March 16, 2017 (Ans. to Am. Compl., Dkt. 35, at ¶¶ 12, 31; Ragan 110:21-23, 288:16-19[2]).

---

[1]      All factual statements contained herein and in BP's accompanying memorandum of law are set forth for purposes of BP's motion for summary judgment only, are not admissions by BP, and may not be used for any purpose other than BP's motion for summary judgment, including without limitation any other proceeding in this lawsuit.  Deposition testimony is cited herein as "([witness name] [page:line])" and deposition exhibits are cited as "([witness name] Ex. [#], p. [#] (if applicable))."  All materials cited herein are contained in BP's Appendix of Materials in Support of Their Motion for Summary Judgment, filed contemporaneously herewith.

[2]      For purposes of this motion only, BP accepts as true Ragan's deposition testimony.

2.      BPPNA is a corporation organized under the laws of the State of Maryland (Dkt. 35 ¶ 3).  BP America Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in Houston, Texas (Dkt. 35 ¶ 4).

## II.      Jurisdiction And Venue

3.      This Court has original jurisdiction over Ragan's claims pursuant to 28 U.S.C. § 1332(a)(1), as this is an action between a citizen of New York and citizens of Delaware, Maryland, and Texas, and the amount in controversy exceeds $75,000, exclusive of interest and costs (Dkt. 35 ¶ 5).  BP has brought its counterclaim pursuant to Federal Rule of Civil Procedure 13, and this Court has original jurisdiction over BP's counterclaim pursuant to 28 U.S.C. § 1332(a)(1), as this is an action between a citizen of New York and citizens of Maryland and Texas, and the amount in controversy exceeds $75,000, exclusive of interest and costs (Ans. to Counterclaim, Dkt. 25, at ¶ 3).

4.      Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) (Dkt. 25 ¶ 4, Dkt. 35 ¶ 6).

## III.      Ragan's Employment Terms And Conditions

5.      In March 2015, Ragan, who had been a senior emissions or environmental products trader at Shell since October 2012, applied for the position of Emissions Trader at BP (Ragan 14:1-16).

6.      When she was employed at Shell, Ragan received deferred bonus compensation and shares of Shell stock, which were subject to the terms of Shell's stock plan (Ragan 21:3-23:23).  Ragan forfeited her unvested bonus compensation and unvested Shell shares when she left Shell before the applicable vesting dates (Ragan 21:3-23:23).

7.      On April 17, 2015, Daniel Barry, then-Global Commodity Head of the Global

Environmental Products ("GEP") group at BP had a telephone call with Ragan to discuss an offer of employment and compensation at BP (Ragan 25:1-15). After that call, Barry sent Ragan an email stating, in part, the following:

> Thanks for the call just now, here is the offer we discussed.
>
> I have laid out the 'buyout' section to show how this is built up to mirror your deferred benefits at Shell.
>
> The minimum bonus is to make sure you feel comfortable that you aren't leaving anything behind with respect to the 2015 financial year and we of course hope you will be able to do well enough to exceed that anyway!
>
> Lastly the cash bonus is payable immediately and is a sweetener to say we think you'd be a great fit here and we'd love to have you in the team! ...

| | |
|---|---|
| Box **6** Base | $165,000 |
| **Buyout** | |
| RSUs [Restricted Share Units] vesting 2017 (200% of 2014 deferred cash) | $120,000 |
| RSUs vesting 2018 (200% of 2015 deferred cash) | $230,000 |
| RSUs vesting 2018 ($50k RSU buyout) | $50,000 |
| RSUs vesting 2018 ($80k pension buyout) | $80,000 |
| Rounding | $20,000 |
| **Total RSUs** | $500,000 |
| **Minimum Bonus subject to My plan**[3] | $500,000 |
| **Sign-on Bonus** | $200,000 |
| **Total Sign-on (RSUs, Guarantee, and Cash)** | $1,200,000 |

(Ragan 24:14-25:22; Ragan Ex. 3; Barry 19:1-21:24).

8.     The idea of deferred compensation and share vesting schedules was not new to

---

[3] "My Plan" is a performance evaluation (Ragan 180:9-14).

3

Ragan; she understood what it meant to have a share vesting schedule and the meaning of RSUs

to mean restricted share units (Ragan 23:24-24:6, 25:2-22, 83:2-5). Ragan also understood that

the RSUs described in this email would not vest until 2017 and 2018 respectively (Ragan 26:7-

27:16).

9.     On April 20, 2015, Ragan responded to Barry's April 17, 2015 email, stating, in

part, the following:

> ... Thanks for sending me this on Friday. I had some time to think about it over the
> weekend and I am definitely interested. However, I still have a few questions.
> 1. When specifically does everything vest?
> 2. Is there a specific minimum book payout you can give me in writing? ...
> 3. Is there a relocation package and what does that cover? ...

(Ragan 24:14-23; Ragan Ex. 3). At no point did Ragan respond to Barry's April 17, 2015 email

to say "yes, I accept this offer" (Ragan 53:12-23).

10.     On April 23, 2015, BP sent Ragan a written offer letter for her to work as an

Emissions Trader for the Integrated Supply and Trading ("IST") group at BP, which Ragan

signed on April 27, 2015 (Dkt. 35 ¶¶ 9-10; Ragan 41:19-42:16; Ragan Ex. 4). Ragan read the

offer letter, understood it, and agreed to its terms when she signed it (Ragan 42:10-21). Ragan

agrees that the April 27, 2015 signed offer letter is the contract that set forth the terms and

conditions of her employment at BP (Ragan 51:24-52:7; Ragan Ex. 4; Dkt. 35 ¶¶ 9-10, 34, 48).

**A.     Ragan's Agreement Regarding Her Bonus**

11.     Ragan's April 27, 2015 signed offer letter stated the following:

**Trader and Originator Bonus Plan**

> As part of your compensation package, you are eligible to earn an annual bonus in
> accordance with the BP Trader and Originator Bonus Plan. ... Annual bonuses are
> typically payable on or before March 15th following each performance year, and
> may be subject to deferral under the IST Deferred Annual Bonus Plan ...

> This offer letter confirms that, subject to you remaining eligible to participate in
> the IST Trader and Originator Bonus Plan (the "Plan"), and the conditions

outlined below, you will be eligible for a minimum bonus for the 2015 performance year (January 1st to December 31st 2015) in the amount of $500,000.

This potential bonus amount, which is provided at the sole discretion of BP, is strictly subject to the requirements of the Plan. Please note that the Plan is discretionary and all awards under the Plan are at the absolute discretion of BP. The Plan can be varied or withdrawn at any time, including part way through the performance year. ...

The determination of any bonus you receive is linked to an assessment of your performance as measured against BP's performance and behavioral expectations. In particular and without prejudice to the rules of the Plan, you will lose your eligibility for this bonus opportunity if, in the sole discretion of BP, you:

● Fail to comply with any of BP Policies, the BP Code of Conduct, BP Trading Guidelines, and any Federal or state laws or regulations;
● Fail to achieve the deliverables outlined in your MyPlan and other relevant performance documentation (as determined in the sole discretion of BP management);
● Your performance is rated as "Below Expectations" for the 2015 performance year;
● Otherwise fail to meet BP's expectations.

BP reserves the right to make you no award or a bonus award of less than that stated above ... if, in the absolute discretion of BP, you fail to meet the conditions outlined in this agreement ...

(Ragan Ex. 4; *see also* Ragan 46:11-21, 49:19-24, 55:19-58:11).

12.     When Ragan signed her April 27, 2015 offer letter, she agreed that her bonus would be strictly subject to the requirements of the Trader and Originator ("T&O") Bonus Plan (Ragan 48:1-4, 55:15-18).  Ragan also understood that the T&O Bonus Plan was discretionary and that all awards under the T&O Bonus Plan were at the absolute discretion of BP (Ragan 55:19-23).  It was Ragan's understanding from her experience with prior companies that "any bonus is always at the sole discretion of the company" (Ragan 55:12-14).

13.     Ragan understood and agreed that the T&O Bonus Plan could be varied or withdrawn at any time, including part way through the performance year, and that the

determination of any bonus she would receive would be linked to an assessment of her performance as measured against BP's performance and behavioral expectations (Ragan 55:24-56:11). Ragan agreed that she would lose her eligibility for a bonus if, at the sole discretion of BP, she failed to comply with any BP policies, the BP Code of Conduct or BP Trading Guidelines, or she otherwise failed to meet BP's expectations (Ragan 56:12-57:23).

14. Ragan understood and agreed that BP reserved the right to make her no award or a bonus of less than that stated if, in the absolute discretion of BP, she failed to meet the conditions outlined in the offer letter (Ragan 57:24-58:11). Ragan understood that the bonus was conditional and knew that it was a potential bonus (Ragan 47:16-24, 54:12-18). Ragan also knew that her bonus could be subject to deferral under the Deferred Annual Bonus ("DAB") Plan (Ragan 49:19-50:9, 54:3-5). Ragan understood what it meant to have a deferred bonus (Ragan 24:4-6).

15. The T&O Bonus Plan referred to in Ragan's signed April 27, 2015 offer letter contained the following provisions:

> ➤ The BP Trader and Originator Bonus Plan is a discretionary annual incentive bonus plan.
>
> ➤ "Discretionary[.]" Eligibility for an Award and amount of any Award is in the sole judgement and discretion of the Company up to and including Bonus Payment Date;
>
> ➤ 4.1.3 Nothing in this Plan or fact or circumstances of it being in operation shall entitle any Participant or other person to any claim or right to an Award under this Plan ...
>
> ➤ 5.2.1 Awards are purely Discretionary ...
>
> ➤ 5.3.2 Where applicable, some payments ... shall be deferred and paid subject to the IST Deferred Annual Bonus Plan ... Award amounts subject to the IST Deferred Annual Bonus Plan are not accrued, earned or vested unless the conditions of the IST Deferred Annual Bonus Plan are met. For details of the current deferral rates please refer to Appendix IV.

> ➢    Appendix IV[.]  Bonus awards of $200,000 or greater ... are subject to and governed by the IST DAB Plan. ...

> The current rates of deferral for Performance Year 2013 and onwards are as follows:

| Deferral rates | |
| --- | --- |
| **Band** | **Deferral Rate** |
| Up to $100,000 | 0% |
| $100,000 to $250,000 | 15% |
| $250,000 to $1,500,000 | 25% |
| $1,500,000 to $5,000,000 | 35% |
| Above $5,000,000 | 50% |

(Ragan Ex. 8 at BP 1593-1594, BP 1597, BP 1600-1601, BP 1607; *see also* Ragan 83:6-12, 85:17-87:4, 88:3-18, 89:22-92:9).

16.    The DAB Plan referred to in Ragan's signed April 27, 2015 offer letter contained the following statements in its Prospectus:

> ➢    Your participation in the Plan is subject to the rules of the Plan ... Please note that the Plan is a discretionary plan ...

> ➢    The main terms and conditions for this grant are your continued employment with BP until the end of the restricted period ...

> ➢    The IST-DAB provides for a portion of your annual bonus award, if it is determined to be $200,000 or more, to be deferred in RSUs ... The IST-DAB provides for an original grant of RSUs based upon the portion of the annual bonus award deferred ...

> ➢    The restricted period for one-third of the original grant ends on the first anniversary of the grant date ... The restricted period for the remaining two thirds of the original grant ends on the second and third anniversaries of the grant date respectively.

> ➢    Until the vesting date, RSUs remain subject to certain risks of forfeiture ...

➢ Generally, if you cease to be an employee of BP before the vesting date then you will forfeit your RSUs. Forfeited RSUs cannot vest ...

➢ However, if your employment with BP terminates for any of the following exceptional reasons before the vesting date then you will not forfeit all of your RSUs, and a proportion of the RSUs will continue to vest according to the original terms: ... Termination as a result of "Disability" or "involuntary termination of employment" with any member of the Group, other than due to your conduct or performance. ... Termination in the event of your death ... Termination by mutual agreement between you and BP ...

➢ Your participation in the Plan does not constitute or form a part of any contract of employment and is strictly governed by the Plan Rules. ... You have no right to compensation for any loss in relation to the IST-DAB, on termination of your employment or otherwise.

➢ The Plan is operated in the sole discretion of BP ...

➢ The benefit to you of participating in the IST-DAB shall not form any contractual right for any purpose ...

➢ Frequently Asked Questions and Answers about the Plan ... 1. How much of my bonus award for the 2015 performance year will be deferred and when will I know how much of my bonus award will be deferred? ... If the amount of your bonus award ... is $200,000 or more, you will be required to defer a portion of your bonus in RSUs. Deferral rates for bonuses are as follows:

| Bonus Award | Deferral Rate |
|---|---|
| Up to $100,000 | 0% |
| $100,000-$250,000 | 15% |
| $250,000-$1.5 million | 25% |
| $1.5 million-$5 million | 35% |
| Above $5 million | 50% |

For example, if it is determined that your bonus award for a performance year is $500,000, the first $100,000 of the bonus award would not be subject to deferral. For the amount of the bonus award between $100,000 and $250,000, 15% or $22,500 would be deferred. For the amount of the bonus award between $250,000 and $1.5 million, 25% or $62,500 would be deferred. ... Therefore, the total amount deferred in RSUs would be $85,000 and $415,000 would be received in cash. ... Deferral rates are subject to change.

➢ No employee is entitled to compensation for any loss in relation to the Plan, including:

– Any loss or reduction of any rights or expectations under the IST-DAB in any circumstances or for any reason (including termination of employment).

– Any exercise of discretion or a decision taken in relation to RSUs or to the IST-DAB, or any failure to exercise discretion or make a decision. ...

(Ragan Ex. 9 at BP 523, BP 525-527, BP 530-531, BP 544; *see also* Ragan 92:24-97:11, 97:22-107:10).

17.     The DAB Plan's Rules contained the following provisions:

➢     12.1.5  The benefit to an Employee of participating in the Plan shall not form any contractual right ...

➢     12.1.8  No employee has any right to compensation for any loss in relation to the Plan, including: ... any exercise of a discretion or a decision taken in relation to Awards or to the Plan, or any failure to exercise a discretion or take a decision ...

➢     12.1.9  Participation in the Plan is permitted only on the basis that the Participant accepts all the provisions of its rules, including in particular this rule.  By participating in the Plan, an employee waives all rights under the Plan, other than the right to acquire shares subject to and in accordance with the express terms of the Plan and the Conditions, in consideration for, and as a condition of, the grant of Awards under the Plan.

➢     13.2  Decisions are final and binding[.]  The decision of the Designated Corporate Officer and where relevant the Plan Administrator on the interpretation of the Plan or in any dispute relating to Awards, including their grant, Vesting, and Release, or any matter relating to the Plan will be final and conclusive.

(Ragan Ex. 9 at BP 548, BP 563-564; *see also* Ragan 107:11-110:20).

**B.     Ragan's Agreement Regarding Her Restricted Share Units**

18.     With respect to restricted share units, Ragan's signed April 27, 2015 offer letter stated:

**<u>Restricted Stock [Share] Units</u>**

In addition to the other elements of your compensation package, you will also be granted Restricted Stock [Share] Units ("RSUs") representing BP plc American

9

Depositary Shares ("ADSs") valued at $500,000 at the time of grant. Your grant will be issued in the quarter following your start date with BP, and will vary in amount with the price of BP's stock [shares] over time. 25% of the grant will vest 2 years after the grant date and the remaining 75% will vest 3 years after the grant date, both calculated at the then-current value of the stock [shares]. In general, in order for the RSUs to vest, you must be employed by BP on the vesting date. ... all awards are subject to the terms of the plan under which they are granted. You will receive ... a link to the plan prospectus, which you should read in its entirety.

(Ragan Ex. 4; *see also* Ragan 59:11-17, 60:12-24).

19.     Ragan understood that her participation in the share plan, which is titled the "BP p.l.c. Restricted Share Plan II" ("Share Plan"), was subject to and governed by the rules of that Share Plan (Ragan 60:22-24; 70:1-16, 75:4-14; Ragan Ex. 7).  Ragan recalls seeing the Share Plan at some point in 2015, and she continued her employment with BP after she looked at the Share Plan (Ragan 61:3-20).

20.     The Share Plan's Prospectus included the following terms:

➢     Each RSU represents a conditional entitlement to receive one BP American Depositary Share ("ADS" or "share") at a date in the future, *provided* that the specified terms and/or conditions are met.

➢     The main terms and conditions for this grant or award are your continued employment with BP until the end of the restricted period and the satisfaction of conditions specified at the time of the grant or award, either in this document, the Plan Rules or in a separate grant letter you would have received.

➢     If your employment with BP ends before the vesting date then, with the exception of certain special circumstances, you will forfeit your RSUs.

➢     Generally, if you cease to be an employee of BP before the vesting date then you will forfeit your RSUs. Forfeited RSUs cannot vest ...

➢     However, if your employment with BP terminates for any of the following exceptional reasons before the vesting date, then you will not forfeit all of your RSUs, and a proportion of the RSUs will continue to vest according to the original terms: ... Termination ... as a result of "Disability" or "involuntary termination of employment" with any member of the Group, other than due to your conduct or performance. ... Termination in the event of your death ... Termination by mutual agreement between you and BP ...

10

> ➤ Participation in the Plan is at BP's discretion.

> ➤ Your participation in the Plan does not constitute or form a part of any contract of employment and is strictly governed by the Plan Rules. ... You have no right to compensation for any loss in relation to the [Share Plan], on termination of your employment or otherwise.

> ➤ The Plan is operated in the sole discretion of BP ...

> ➤ The benefit to you of participating in the [Share Plan] shall not form any contractual right for any purpose ...

> ➤ Frequently Asked Questions and Answers about the Plan ... 13. What if I terminate employment with BP during a restricted period? The general rule is that if you terminate employment with BP during the restricted period you will forfeit your RSUs. ...

(Ragan Ex. 7 at BP 170 (emphasis in original), BP 172-173, BP 175-176, BP 179; *see also* Ragan 71:2-78:4).

21. The Share Plan's Rules included the following terms:

> ➤ If a US Participant ceases to be employed by any Member of the Group more than 12 months after the start of the Restricted Period ... and before the end of the Restricted Period for any of the reasons set out below, his Awards do not lapse and will Vest and will be Released after the end of the Restricted Period. The reasons are: ... (2) A US Participant's involuntary termination of employment with any Member of the Group, *other than due to such Participant's conduct or performance*. For avoidance of doubt, the following circumstances will be considered an involuntary termination of employment: (A) termination of a US Participant's employment by his or her employer, or a termination considered by the Designated Corporate Officer to have been initiated by the US Participant's employment, *in both cases where the termination is not based on the US Participant's conduct or performance* ...

(Ragan Ex. 7 at BP 191, BP 212-213 (emphasis added); *see also* Ragan 78:13-81:15).

22. Ragan knew that the RSUs she was granted would be subject to vesting (Ragan 59:11-17). Ragan also knew, understood, and agreed that, in general, she had to be employed by BP on the vesting date in order for the RSUs to vest (Ragan 60:12-17). Ragan understood that

the Share Plan was discretionary, and that she would forfeit her unvested shares if she was terminated due to performance or conduct (Ragan 74:2-75:3, 80:13-81:19).

### C.    Ragan's Agreement Regarding Her Sign-On Payment

23.    Ragan's signed April 27, 2015 offer letter stated:

**<u>Sign-on Payment</u>**

Should you accept this offer, you are eligible to receive a one-time sign-on payment of $200,000 (gross). ... You agree to repay 100% of this Sign-on Payment to BP if you resign or your employment is terminated with cause (e.g. breaching or non-compliance with the company's policies, guidelines, code of conduct, or not meeting performance requirements due to misbehaviours or willful disregards of BP rules or procedures) at any time within 24 months from the commencement date of this employment. In this case, the amount of the bonus must be fully repaid in cash in gross at least one day prior to the last date of employment. Your signature on this letter indicates your consent for BP to deduct the full or any remaining unpaid amounts of the Sign-on Payment (if owed under the terms of this letter agreement) from any wages, payments, bonuses, vacation, etc., that would have otherwise been paid to you at the time of termination.

(Ragan Ex. 4; *see also* Ragan 45:19-46:10).

24.    Ragan agrees that when she signed the April 27, 2015 offer letter, she agreed to repay 100% of the $200,000 sign-on payment to BP if her employment was terminated for cause at any time within 24 months from the commencement date of her employment (Ragan 45:16-46:10; 319:13-22).  BP paid Ragan the $200,000 sign-on payment when she accepted employment at BP (Ragan 45:16-18; Dkt. 25 ¶ 11).

## IV.    BP's Compliance Culture And Policies And Ragan's Compliance Training

25.    Ragan's first day at BP was June 8, 2015 (Ragan 110:21-23).  Ragan reported to Trading Manager Stephanie Curulewski, who reported to Barry (Ragan 156:4-6; Barry 44:13-14; Curulewski 30:11-12).  Ragan was hired to develop BP's capability to trade in the regional greenhouse gas initiative ("RGGI") market, and she supported BP's Global Environmental

Products ("GEP") trading book, trading North American emissions for BP (Ragan 43:7-17, 44:19-45:1). Ragan was the primary lead in the RGGI market (Ragan 45:4-11).

26.     Ragan understood that as a trader, she was required to comply with all legal, regulatory, operational, risk and compliance requirements (Ragan 148:12-17). Ragan knew that compliance, and her adherence to compliance standards, were of utmost importance to BP, and she understood that IST's license could be revoked if she failed to adhere to BP's compliance rules (Ragan 182:6-8, 143:3-6, 144:15-19). Ragan also understood that any breaches of her compliance obligations would erode IST's reputation of integrity and honesty and would be regarded very seriously (Ragan 143:7-13).

27.     When Ragan started her employment as a trader at BP, she had to go through training before she could begin trading (Ragan 119:2-24; Ragan Ex. 12). Ragan understood that the IST culture in which she worked had a very strong control and compliance framework around it, and that if she failed to apply the knowledge that she learned in her compliance training to her role as a trader, she could be disciplined, up to termination of her employment (Ragan 140:12-7, 147:9-16).

28.     As part of that initial training, Ragan received training with respect to Delegations of Authority ("DOAs") (Ragan 121:1-17, 126:10-21; *see also* Ragan Ex. 12 at BP 429). DOAs are limits that BP sets under which traders are allowed to trade (Ragan 121:21-24). Traders at BP have DOAs specific to each commodity that they are trading in, and they are not allowed to exceed those DOAs (Ragan 122:6-15). Ragan understood that before she traded, she was required to make sure that her trade was within her DOA and her book limits (Ragan 141:15-19). Ragan also understood that one of the requirements of her as a trader was to act only within the

DOA that she was given (Ragan 148:3-7). Ragan knew that preapproval was necessary to exceed her DOA limits (Ragan 172:13-16).

29.     BP has "soft limits," which are when a trader is close to their delegation of authority (Ragan 158:10-17). Ragan understood that she was supposed to let her manager know if she was trading close to her soft limit, and that she was not supposed to breach her soft limit without getting approval ahead of time (Ragan 158:18-159:3).

30.     Ragan took and completed a "CredEx for Traders" class on June 19, 2015, and a "One Credit Portal (CredEx) for Traders" class on June 21, 2015 (Ragan 130:1-7). Ragan understood that she was required to check CredEx before closing a deal with a counterparty to make sure the counterparty had the appropriate amount of credit before she closed the deal (Ragan 149:11-14, 194:13-16, 197:1-21; *see also* Ragan 123:20-124:12).

31.     Ragan received training on BP's Code of Conduct (Ragan 122:16-123:2, 126:1-4; Ragan Ex. 12). Ragan read and understood the Code of Conduct, and she was required to adhere to the Code of Conduct during her employment with BP (Ragan 132:15-133:17; Ragan Ex. 14). The Code of Conduct included the following statements:

> ➢     Because no code of conduct can cover every possible situation BP relies on you to use good judgement and to speak up when you have questions or concerns.

> ➢     Be proactive and manage conflicts of interest[.] A conflict of interest may occur when your interests or activities affect your ability to make objective decisions for BP.

> ➢     Be aware of the many different ways in which conflicts of interest can occur. For example: ... Investments ... which might influence or appear to influence your judgment.

> ➢     Disclose situations to your line manager that might create a conflict, or even the appearance of a conflict.

(Ragan Ex. 14 at BP 5, BP 9-10, BP 21; *see also* Ragan 133:18-135:18, 135:22-136:8, 137:13-138:18).

32.     Ragan knew that she was required by BP to use good judgment, and that the Code of Conduct required her to be proactive and manage conflicts of interest (Ragan 135:19-21, 137:14-17). Ragan also understood that BP considered it a violation of the Code of Conduct and a conflict of interest if she had investments that might even appear to influence her judgment, and that the Code of Conduct required her to disclose any situation to her line manager that might create a conflict or even the appearance of a conflict (Ragan 138:2-18).

33.     Ragan received training on BP's Global Trading Guidelines, including out of office/hours dealing (Ragan 126:22-127:3, 127:14-128:3; Ragan Ex. 12). Ragan read and understood BP's Global Trading Guidelines & Requirements (Ragan 138:19-139:22; Ragan Ex. 15 & 16). The Global Trading Guidelines & Requirements included the following statements:

> ➢ A strong control and compliance framework remains at the heart of IST's culture[.]

> ➢ [B]efore you trade, be clear that ... it is within your Delegation of Authority and book limits and that the counterparty is approved by the Credit and Account Opening Teams in your specific region.

> ➢ IST will only continue to exist so long as it is built on a solid foundation of compliance – compliance at all levels of the organization with the Code, BP Requirements, including IST's Policies and Procedures, and all applicable regulatory requirements. Should we fail to comply with these requirements, BP or its regulators could revoke IST's 'licence to operate.'

> ➢ Any breaches of your compliance obligations will erode IST's reputation of integrity and honesty and will be regarded very seriously.

> ➢ You are expected to comply with the Code, BP Requirements, including this document and IST's Policies and Procedures applicable to you at all times. Failure to do so will be considered a breach of BP and IST's control framework, and as such will be addressed through the appropriate disciplinary process.

> ➢ Recognize and manage conflicts of interest appropriately.

> ➢ [Y]ou shall complete, in a timely manner, all required compliance training and apply that knowledge to your role. Failure to do so is likely to lead to disciplinary action which may result in the termination of your employment.

- ➢ Act only within your delegation of authority ... If necessary, seek clarification from your line manager.

- ➢ Understand and comply with all relevant legal, regulatory, operational, risk and compliance requirements.

- ➢ Be aware of, and adhere to, position limits. Any extension to the limits shall be requested and approved prior to trading.

- ➢ Before trading with a counterparty, verify that the counterparty is approved and that there are no trading or credit restrictions.

- ➢ When transacting out of office comply with the requirements of the IST Deal Management Policy and Procedure and confirm the transaction with the counterparty using an Approved Channel.

- ➢ The Code of Conduct and Conflict of Interests Policy require you to disclose all situations that might create a conflict, or even the appearance of a conflict, to your Line Manager.

- ➢ Consult your line manager or Ethics & Compliance - IST if you are unsure as to what instruments you may or may not trade on your own account.

(Ragan Ex. 15 & 16 at BP 218-220, BP 222, BP 230, BP 239, BP 241, BP 1031-1033, BP 1035, BP 1043, BP 1052, BP 1054; *see also* Ragan 140:2-11, 141:4-14, 142:8-144:11, 145:21-24, 146:7-149:3, 150:6-151:15, 153:12-154:4).

34. Ragan took a conflicts of interest class on July 20, 2015, and she was trained on, read, and understood BP's Conflicts of Interest Policy (Ragan 128:17-20, 154:20-155:4; Ragan Ex. 17). The Conflicts of Interest Policy included the following statements:

- ➢ BP Employees should avoid any actual or apparent conflict between their own personal interests and the interests of BP.

- ➢ BP Employees shall disclose situations to their line manager that might create a Conflict of Interest, or even the appearance of a Conflict of Interest.

- ➢ Breaches of this Policy may be regarded as grounds for disciplinary actions up to and including dismissal.

(Ragan Ex. 17 at BP 2196-2917; *see also* Ragan 155:5-156:3).

35.     Ragan understood that she was required to avoid any actual or apparent conflict between her own personal interests and the interests of BP, and that she was required to disclose situations to her line manager that might create a conflict of interest, or even the appearance of a conflict of interest (Ragan 151:11-15, 155:9-18).  Ragan understood that she was required to consult with her line manager or Ethics & Compliance - IST if she was unsure what instruments she may or may not trade on her own account (Ragan 153:14-19).

**V.     Ragan's March 2016 Bonus**

36.     Around early March 2016, Ragan received a Reward Statement showing that for 2015, she was being awarded a $500,000 bonus, with $415,000 being a cash bonus payable in March 2016, and $85,000 being awarded in the form of an IST-DAB (Deferred Annual Bonus) Award (Ragan 111:10-112:4; Ragan Ex. 10).

37.     The Reward Statement provided, and Ragan understood, that "IST Bonuses are discretionary," "[a]ll IST awards are subject to the relevant plan documents," and "[t]his payment is discretionary, [and] does not create any future contractual entitlement" (Ragan 112:5-18, 113:10-114:1; Ragan Ex. 10).  With respect to the $85,000 awarded in the form of an IST DAB, the Reward Statement provided, and Ragan understood, that "IST DAB grants are discretionary and subject to the [DAB] Plan Rules and applicable documentation" (Ragan 112:19-113:9; Ragan Ex. 10).

38.     The Reward Statement provided, under the "Detailed Outstanding Deferred Awards Schedule," that the grant date for Ragan's $85,000 IST-DAB Award was March 2016 and that the final vest date was January 2019 (Ragan Ex. 10; Ragan 114:21-115:6).

39.     The Reward Statement provided, under the "Detailed Outstanding Deferred Awards Schedule," that Ragan had a "3Q RSP II Grant Award" in the amount of $500,000 that had a grant date of June 2015, and that its final vest date was June 2018 (Ragan Ex. 10; Ragan

117:1-10).  This was the $500,000 in RSUs that Ragan had been granted in connection with her

signed April 27, 2015 offer letter (Ragan 117:3-7).

40.     The Reward Statement provided: "All deferred awards are subject to the terms

and conditions of the respective governing Plan document as amended from time to time"

(Ragan Ex. 10).

**VI.     Ragan's Repeated Performance Failures And Compliance Violations**

41.     On August 19, 2015, Commodity Risk Analyst Chris Walters sent Barry an email,

advising Barry that Ragan had breached her soft limit: "Please be advised that we have a soft

limits breach for GEP today against the CCA [California Carbon Allowances] short limit. Below

shows the final outright positions by product against the limit, highlighting a short position of -

2.7mt [metric tons] against a short limit of -1mt CCAs" (Ragan 159:4-161:9, 162:6-10; Ragan

Ex. 18).

42.     As a trader, Ragan was expected to timely approve her daily and month-end

profits and losses ("P&Ls") (Ragan 170:3-7).  In November of 2015, Ragan was late in signing

off on three different P&L statements (Ragan 170:8-11, 171:11-15).

43.     In early 2016, Ragan failed again to timely approve her P&L statements (Ragan

175:6-177:2).  On February 3, 2016, Curulewski sent Ragan an email marked as high importance

in which she asked Ragan: "Is there a reason that you did not approve your month end P&L?"

(Ragan 175:6-19; Ragan Ex. 21).  Ragan responded "No I thought that I did" (Ragan 176:2-10;

Ragan Ex. 22).  Ragan admits that there is no reason why she did not approve her month-end

P&Ls (Ragan 176:24-177:2).

44.     Ragan believed that, at this time, Curulewski was frustrated with her repeated

failure to approve her month-end P&Ls (Ragan 17:3-13).

45.     In January 2016, Ragan breached her Delegation of Authority on a deal (Ragan 172:20-174:16; Ragan Ex. 20).  On January 29, 2016, Commodity Risk Analyst Alexey Beliakov sent Ragan an email, copying Curulewski and others, in which he stated: "we have a breach" (Ragan 172:20-174:3; Ragan Ex. 20 at BP 500).

46.     On February 9, 2016, at Curulewski's request, Ragan and Curulewski met (Ragan 177:19-178:5).  During their meeting, Curulewski discussed Ragan's breaches of her Delegations of Authority and her RGGI soft limits (Ragan 178:18-24).  Curulewski told Ragan something like she thought this reflected poorly on Ragan's performance (Ragan 179:1-7).  Ragan testified:

Q.     At this point did you believe that Ms. Curulewski was concerned with your job performance at BP?

A.     I can't speculate on what how [Curulewski] was feeling.

Q.     What did you think? Did you think she was concerned about your performance?

A.     Yes.

(Ragan 179:11-18).

47.     Every month, futures deals expire on the Intercontinental Exchange; when that happens, traders need to enter the deal in BP's deal entry system, which is called NextGen (Ragan 183:22-184:4).  In late January or early February 2016, there was an issue with Ragan repeatedly entering the deal details into NextGen incorrectly (Ragan 184:5-9).

48.     Curulewski spoke to Ragan about her repeatedly entering incorrect information in the NextGen system and reiterated to Ragan that deals have to be entered in the system correctly (Ragan 185:9-21).  Ragan testified as follows:

Q.     ... did you think that [Curulewski] was frustrated with you because you were repeatedly entering information incorrectly in the system?

A.     Yeah. Yes.

(Ragan 186:14-18).

49.     On February 12, 2016, Ragan again executed a trade that breached her soft limits (Ragan 179:19-180:5).

50.     Around this time, the RGGI trading activity, for which Ragan was the primary lead, resulted in losses of $5 million over two days; Ragan considered this to be a large loss (Ragan 45:4-11, 187:3-188:18, 233:1-22).  Curulewski spoke with Ragan around this time about Ragan's "lacking or reduced levels of confidence" (Ragan 191:16-192:4).

51.     In February 2016, Ragan failed to follow BP's compliance rules when she executed a deal with a counterparty, Dynegy, without first checking CredEx (Ragan 194:2-16; 198:21-199:5).  On February 29, 2016, Debbie Martin, a member of BP's Operational Excellence Team, emailed Ragan, copying Curulewski: "I have captured an incident related to the failure to check credit terms for the Dynegy deal in January 2016" (Ragan 193:11-194:7; Ragan Ex. 26 at BP 682).  Ragan knew that she was supposed to check CredEx before doing a deal with any counterparty (Ragan 194:13-16).  Ragan's failure to check CredEx could have cost BP $100,000 (Ragan 194:17-195:15).

52.     This Dynegy incident resulted in what BP termed a "Category B" compliance incident for Ragan, which is one of two categories of incidents at BP, with "Category A" incidents being the worst (Ragan 198:21-199:5, 213:15-22; Bordignon 77:19-78:9).  A review of this incident revealed that Ragan had checked CredEx for only three of her last 50 deals (Ragan 199:6-10).

53.     On May 2, 2016, Curulewski sent Ragan another in a long chain of warnings about Ragan's failure to approve her P&Ls (Ragan 202:8-203:6).  Curulewski sent Ragan an email with the subject "Missing PNL Approvals," stating: "We have had an embarrassing number of these this month.  What is the cause of the missed approvals?  Is there a reason that

20

you are not able to consistently approve on time?" (Ragan 201:14-202:14; Ragan Ex. 28 at BP 778). Ragan understood Curulewski was talking about missed P&L approvals (Ragan 202:7-9). Ragan does not dispute that her P&L approvals were late (Ragan 202:15-22).

54.     Also on May 2, 2016, BP's Commodities Risk Manager Connie Griggs sent Ragan an email, informing Ragan that on April 29, 2016, she had breached her Delegations of Authority (Ragan 200:2-13; Ragan Ex. 27 at BP 76). This was Ragan's second Delegation of Authority breach in three months, and came on the heels of several warnings about Ragan's failure to adhere to BP's compliance standards (Ragan 200:10-16, 201:5-10).

55.      On May 9, 2016, Ragan met with Curulewski at Curulewski's request (Ragan 203:20-205:5; *see also* Ragan Ex. 29). During their meeting, Curulewski discussed Ragan's Delegation of Authority breach and missing P&L approvals (Ragan 205:6-23). Curulewski told Ragan that she was concerned about Ragan's performance, that Ragan had violated BP's compliance policies, and that she was frustrated or upset that Ragan continued to miss her P&L approvals (Ragan 205:6-23). Curulewski warned Ragan that she had to improve and that she could not keep violating BP's compliance policies (Ragan 206:4-9). Ragan understood that her job might be at risk (Ragan 206:10-12).

56.     On May 13, 2016, Curulewski sent Ragan an email to follow up on their May 9, 2016 meeting (Ragan 206:16-207:8; Ragan Ex. 30). In it, Curulewski told Ragan that she needed to make immediate improvements, and gave Ragan a list of expectations and actions that she had to follow; Ragan believed that the consequences would be her employment termination if she did not follow those actions (Ragan 207:14-19, 209:8-10).

57.     Ragan assumed that Curulewski was questioning her judgment and understood that Curulewski was concerned that Ragan did not always know her position as a trader (Ragan

207:20-208:1, 208:23-209:2).  Ragan considered Curulewski's email to be a warning that she might lose her job if she again breached BP's compliance policies or if she continued to use poor judgment (Ragan 210:3-14).

58.     BP categorized Ragan's April 29, 2016 Delegation of Authority breach as a Category A incident, which is the most serious kind of trading incident at BP (Ragan 213:11-22). Ragan believed that her DOA breach was a "major setback" for her (Ragan 231:5-17).

59.     Around May 23, 2016, Curulewski and Barry met with Ragan to let her know that her trading Delegations of Authority were being revoked; in other words, BP was revoking Ragan's ability or authority to trade on BP's behalf (Ragan 214:19-22, 215:14-17).  Curulewski and Barry also told Ragan that she was being moved out of a trading position and into an origination role, which is a more relationship driven role where she would be negotiating long-term deals or establishing relationships with current parties (Ragan 216:1-5, 218:1-8).  Ragan understood that this move was being expedited because Barry and Curulewski had lost confidence in Ragan's judgment as a trader (Ragan 223:1-5).  In this new role, Zach Scott was going to be Ragan's supervisor (Ragan 218:9-11).  Ragan considered the move to the origination position to be a disciplinary action (Ragan 220:14-16).

60.     On May 25, 2016, Curulewski sent Ragan an email, copying Barry, in which she told Ragan that there had been multiple issues that resulted in Ragan's move to the origination role and that the move would not be a "clean start" for Ragan (Ragan 221:22-222:1, 223:15-22; Ragan Ex. 35).  Ragan testified:

> Q.     You understood that ... moving you into the origination role didn't start your slate fresh?
>
> A.     Yes, I understood that.
>
> Q.     You understood that you were still going to be under scrutiny from them?

A.    Yes.

Q.    And you understood that with the litany of issues they had had with your failure to comply with BP's compliance regulations wouldn't be forgotten at that point?

A.    Yes. That it's not a clean slate.

Q.    Did you understand that if you continued to use poor judgment that they may terminate your employment?

A.    Yes.

(Ragan 223:18-224:10).

61.    At this point, Ragan "had a hill to climb to repair [her] reputation" at BP, and she understood that she needed to have a relentless focus on compliance and proactively communicate with Compliance (Ragan 226:2-6, 230:2-17). Ragan also had to behave in an ethical and compliant manner that reinforced her own and BP's commitment to doing the right thing (Ragan 230:24-231:4). Ragan understood that BP might terminate her employment if she continued to use poor judgment or she did not perform well in her role as an originator (Ragan 224:7-20). Ragan also understood that any other failures with respect to following compliance rules would not be tolerated by BP:

Q.    Did you understand by your mid-year [2016] review that any other failures with respect to following Compliance rules would not be tolerated by BP?

A.    Yes.

Q.    Did you understand from that that you might be terminated if you didn't?

A.    Repeated failures and, yes, at this point I understood that they could have terminated me after this.

(Ragan 234:17-235:2).

62.    Ragan was aware that whenever she was working out of the office, she was required to include Ethics & Compliance on any transactions or at least inform them on the day

23

the deal is transacted  (Ragan 248:13-18, 254:4-7).  In October 2016, while working out of office, Ragan executed a transaction but did not notify Ethics & Compliance that she had completed the transaction until after she had executed it and after she had been reminded to include Ethics & Compliance on deals (Bordignon 6:22-7:8, 139:11-140:7).

## VII.    Ragan's Serious Lapse Of Judgment In Making Stock Purchases Without Notice Or Authorization

63.    Clean Energy Fuels is a biofuels company; Clean Energy Fuels and BP both operated in the biogas market (Ragan 255:19-256:14).  The biogas market is smaller than other markets and is smaller than the crude market (Ragan 261:20-262:10).

64.    From August 22, 2016 through September 19, 2016, Ragan bought shares in Clean Energy Fuels for her  personal account; ultimately buying a total of approximately 10,500 shares (Ragan 263:2-11).  Before she purchased shares in Clean Energy Fuels, Ragan did not disclose to anyone at BP that she was planning to purchase shares in a company that operated in the same small biogas market as BP (Ragan 263:12-18, 268:3-6).

65.    At the time Ragan purchased the shares in Clean Energy Fuels, BP was working on a deal with Clean Energy Fuels to potentially purchase a portion of Clean Energy Fuels' renewable natural gas business (Ragan 268:22-269:6).

66.    Purchasing shares in a company that operates in the same markets as BP could give rise to a potential conflict of interest (Ragan 266:4-9).  Ragan knew it was possible that Clean Energy Fuels and BP had transacted with each other in the biogas market and that it was possible that Clean Energy Fuels was a customer of BP, but Ragan did not check to see if BP and Clean Energy had transacted with each other in that market before she bought stock in Clean Energy Fuels (Ragan 257:3-258:2, 259:4-13).  Ragan thinks now that she should have checked before she bought stock in Clean Energy Fuels to learn whether it was a customer of BP and

whether the two companies had previously transacted with each other in the market (Ragan 260:13-23).

67.     The reason for such prior notification is to find out whether Ragan would have been precluded from trading with a company that traded in a very small biogas market with BP (Ragan 266:20-268:6).

68.     In October 2016, Senior Vice President of Marketing and Origination Sean Reavis told Ragan that BP was working with Clean Energy Fuels to potentially purchase a portion of Clean Energy Fuels (Ragan 271:3-8; Reavis 10:1-12).  During that conversation, Ragan told Reavis that she had purchased shares of Clean Energy Fuels (Ragan 274:15-16).

69.     BP's Ethics & Compliance group was made aware of Ragan's purchase of shares of Clean Energy Fuels and conducted an investigation to determine if Ragan's actions were a potential conflict of interest and/or constituted insider dealing (Ragan 276:5-13; Weimer 41:7-42:7, 58:23-59:2).  In November 2016, members of BP's Ethics & Compliance group interviewed Ragan about her Clean Energy Fuels share purchases (Ragan 292:18-22).

70.     The Ethics & Compliance group's investigation ultimately concluded that there was no evidence of a breach or wrongdoing by Ragan (Mendes 114:24-115:8).  However, BP thought that her failure to disclose her purchase of shares in Clean Energy Fuels was poor judgment (Ragan 276:14-277:7).

## VIII.   Ragan's Poor Performance In Her Origination Role

71.     In early August 2016, Ragan laid out for Zach Scott her plan for the second half of the year, which included targeting certain specific companies to sell them offset credits or allowances for RINs and carbon, transacting D3 product structures, and selling a blended compliance instrument structure comprised of 92% allowances and 8% offsets (Ragan 277:11-

278:14, 278:20-22, 280:22-281:2; Ragan Ex. 43 at BP 1108).

72.     Ragan did not sell any offsets or allowances to the companies she had identified to Scott, she did not successfully transact any D3 product structures, and she did not sell any of the blended compliance instrument structure that she had intended to sell (Ragan 278:15-279:5, 280:22-281:5).

## IX.     BP's Decision To Terminate Ragan's Employment For Conduct And Performance

73.     At year-end, BP looks at its marketing and origination employees to see whether people have had isolated incidents or whether a concerning trend is happening (Mendes 108:2-9.) Around this time, Carey Mendes, who was head of BP's North American oil trading business, received a report along with verbal feedback highlighting that Ragan was a significant compliance risk (Mendes 109:1-4.)

74.     Mendes put together all of Ragan's weak signals, some of which he was not previously aware; once Mendes put all of Ragan's weak signals together, he thought it was "hugely alarming" (Mendes 109:1-10).  Therefore, in early to mid-December, BP decided to terminate Ragan's employment (Mendes 109:11-13, 118:3-119:10).  Mendes testified:

> [O]ne of the things that was very much on my mind was do a number of weak signals end up becoming a train wreck in the future that a regulator would look at me, as the decision maker, and say, you know, you had a number of weaknesses and something bad happened.  How come you didn't do anything about it? The more weak signals, the harder it becomes for me to put my hand up and say, you know, I did my job.  So at year end you look at are these an accumulation of weak signals or do people just have a one-off.  That feeds in as we talked about in the performance evaluation and, then, ultimately, into deciding whether they would stay with BP or not as the ultimate kind of sanction.  . . . [a]nd given that kind of culture and compliance concern, we reached the decision to let her go.

(Mendes 108:10-109:13).

75.     Mendes also testified:

> I found the judgment with someone who's actually quite intimate with the

industry, quite knowledgeable with the industry and counter parties to buy a stock
of a competitor and a close competitor at that stage without even telling her line
manager, it's different than buying an unrelated stock, an Amazon or something
we don't deal with.  Based on the training that she got, I just found the judgment
to be poor. . . . that's me making an opinion as a manager . . . to say is this another
example of poor judgment even though there was no technical breach of the
policy.  So it would have been a factor in all of the or things that she had done and
the list of pros and cons and the weak signals ...

... we have given her a lot of chances, including chances we never typically give
to most people.

(Mendes 117:4-20, 121:22-24).

76.     On December 14, 2016, Barry and Renee Gomez from Human Resources met

with Ragan and informed her that her employment was being terminated because of ongoing

performance, compliance, and lack of judgment issues that Ragan had demonstrated over the

prior 18 months (Ragan 284:6-23; Barry 162:5-15; Dkt. 35 ¶ 31).  They told Ragan that: (a) the

prior 18 months of compliance issues highlighted concerns they had with her ability to adhere to

BP's compliance expectations, (b) given Ragan's experience as a trader, the purchase of shares

in a biofuels company that trades in the same market as BP without prior disclosure showed poor

judgment on her part; (c) they had seen little progress in her origination role in building key

relationships in the marketplace, and (d) her lack of progress on relationships was concerning

(Ragan 285:24-287:3, 288:4-7).

77.     Ragan testified "I understood that I was being terminated based on my job, you

know, based on what happened over the last 18 months" (Ragan 285:12-14).  Ragan also

testified:

Q.     ... your purchase into Clean Energy Fuels ... Could it have been the straw
       that broke the camel's back that caused them to say we do not have any
       faith in her judgment and she has to be terminated?

...

27

A.     I think they could have used that as a reason to fire me, to terminate me, yes.

(Ragan 294:10-295:11).

78.     Ragan's employment was terminated for her performance, and Ragan understood that her employment was terminated for cause (Ragan 319:23-321:5).

79.     Ragan was placed on a garden leave, which is when a company continues to pay an employee for them to stay at home and not go into the office, until March 16, 2017 (Ragan 288:16-20; Barry 22:9-19).  One-third of Ragan's $85,000 deferred annual bonus vested in early 2017 so she received one-third of the $85,000 in 2017 (Ragan 97:8-21).  As a result of her employment termination, Ragan did not receive the remaining unvested balance of her $85,000 deferred bonus or her $500,000 of unvested RSUs (Ragan 311:5-11).

80.     Ragan has not repaid any of the $200,000 sign-on payment (Ragan 321:6-8; Dkt. 25 ¶¶ 13, 23).

**DATED: June 27, 2019**

Respectfully submitted,

BP Products North America Inc.
and BP America Inc.


By:  *s/ Katherine Mendez*
     One of Their Attorneys

Katherine F. Mendez
kmendez@seyfarth.com
Ashley K. Laken
alaken@seyfarth.com

SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois  60606-6448
Telephone:    (312) 460-5000
Facsimile:    (312) 460-7000

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney hereby certifies that on June 27, 2019, she caused a true and correct copy of the foregoing **DEFENDANTS'/COUNTER-PLAINTIFFS' RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** to be presented to the Clerk of the Court for filing and uploading to the CM/ECF system, which will send notification of such filing to all attorneys of record in this matter.

        *s/ Katherine Mendez*
        Katherine Mendez