## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Kathleen Ragan, an individual. | ) | |
| | ) | |
| Plaintiff/Counterdefendant, | ) | |
| | ) | |
| v. | ) | **Case No. 1:17-cv-09208** |
| | ) | |
| BP Products North America, Inc., | ) | |
| a Maryland corporation; | ) | Judge: Honorable Marvin E. Aspen |
| BP America, Inc., | ) | |
| a Delaware corporation; | ) | |
| | ) | Jury Trial Demanded |
| Defendants/Counterplaintiffs. | ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ........................................................................................................................ 1

ADDITIONAL BACKGROUND ................................................................................................ 2

ARGUMENT ................................................................................................................................ 5

1. Defendants' claimed rationale for Ms. Ragan's termination creates questions of fact .......................................................................................................... 6

    A. Defendants' divergent actions towards Ms. Ragan and other similarly situated employees creates a genuine issue of fact. ........................................ 6

    B. Ms. Ragan's "judgment" is a classic genuine issue of fact ........................... 7

    C. The timing of Ms. Ragan's termination presents an issue of fact ................ 9

2. Defendants' Offer Letter omitted key terms—policies that Ms. Ragan was supposedly required to follow—and as a result, the parties did not agree to those terms ........................................................................................................... 10

3. Ms. Ragan justifiably understood her 2015 bonus and RSU grant to be guaranteed compensation, as stated in Dan Barry's email and referenced in the Offer Letter ..................................................................................................... 11

4. Ms. Ragan's IWPCA claims survive because Defendants provided her the RSU grant and her 2015 performance bonus more than a year before her termination ............................................................................................................ 12

CONCLUSION ........................................................................................................................... 15

## TABLE OF AUTHORITIES

### Cases

*Apex Digital, Inc. v. Sears, Roebuck, & Co.*,
   735 F.3d 962 (7th Cir. 2013) ............................................................................................... 10

*Bank of Ravenswood v. Polan*,
   628 N.E.2d 194 (Ill. App. Ct. 1993) ...................................................................................... 6

*C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*,
   715 N.E.2d 778 (Ill. App. Ct. 1999) ...................................................................................... 5

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................................... 7

*Farm Credit Bank of St. Louis v. Whitlock*,
   581 N.E.2d 664 (Ill. 1991) ................................................................................................... 12

*Hess v. Bresney*,
   784 F.3d 1154 (7th Cir. 2015) ............................................................................................. 14

*Ill. Tool Works, Inc. v. Abdel-Ghaffar*,
   No. 12-CV-5812, 2016 WL 3453653 (N.D. Ill. June 20, 2016) ............................................ 8

*Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.*,
   225 F.3d 876 (7th Cir. 2000) ................................................................................................. 7

*Majmudar v. House of Spices (India), Inc.*,
   1 N.E.2d 1207 (Ill. App. Ct. 2013) ...................................................................................... 15

*McCleary v. Wells Fargo Sec., L.L.C.*,
   29 N.E.3d 1087 (Ill. App. Ct. 2015) ............................................................................ 8, 9, 12

*McLaughlin v. Sternberg Lanters, Inc.*,
   917 N.E.2d 1065 (Ill. App. Ct. 2009) .................................................................................. 14

*Nichols v. Ill. Dept. of Trans.*,
   152 F. Supp. 3d 1106 (N.D. Ill. 2016) ................................................................................. 10

*Parise v. Integrated Shipping Solution, Inc.*,
   292 F. Supp. 3d 801 (N.D. Ill. 2017) ................................................................................... 14

*Poulous v. Lutheran Soc. Serv. of Ill., Inc.*,
   728 N.E.2d 547 (Ill. App. Ct. 2000) .................................................................................. 8, 9

*Sylvester v. SOS Children's Villages Ill. Inc.*,
   453 F.3d 900 (7th Cir. 2006) ............................................................................................... 10

*Tatom v. Ameritech Corp.*,
 305 F.3d 737 (7th Cir. 2002) .................................................................................................. 15

*Tatom v. Ameritech Corp.*,
 No. 99-C-683, 2000 WL 1648931 (N.D. Ill. Sept. 28, 2000) ................................................... 15

*Tektel, Inc. v. Maier*,
 813 F. Supp. 1331 (N.D. Ill. 1992) ............................................................................................ 7

*Wilson v. Career Educ. Corp.*,
 729 F.3d 665 (7th Cir. 2013) ..................................................................................................... 7

**Rules**

Fed. R. Civ. P. 56(e) ........................................................................................................................ 6

## INTRODUCTION

All the issues raised in Defendants' Motion are quintessentially factual. The representations that Defendants' made to recruit Ms. Ragan to join BP, her acceptance and understanding of the terms of the parties' agreement regarding her employment and compensation, Ms. Ragan's purported violations of various BP codes and guidelines, and Defendants' motivation and actual reason for terminating Ms. Ragan are fact-intensive, precluding disposition by summary judgment.

This Court should deny Defendants' Motion for four reasons. First, a genuine issue of material fact exists regarding why Defendants terminated Ms. Ragan and whether their articulated reasons were pretextual. Defendants say they terminated Ms. Ragan because she violated ill-defined codes and guidelines, yet the evidence also shows that other similarly situated BP employees violated the same policies that Ms. Ragan did but did not suffer any adverse employment action. Defendants' claim that they terminated Ms. Ragan for her judgment is a classic jury question because it is so vague and subject to interpretation. Moreover, Ms. Ragan was not terminated after any violation; rather, she was terminated almost six months later and less than two months before Defendants were required to pay her approximately $132,000 in unvested stock. These facts call into question Defendants' motivation for terminating her.

Second, Defendants' Offer Letter omits key terms that would support Defendants' notion that they were permitted to terminate Ms. Ragan without paying her already-granted RSUs and bonus. While the Offer Letter obliquely references various policies and codes, they were not provided with the Offer Letter, they were not all identified by name, and Ms. Ragan lacked access to them before accepting Defendants' offer. Ms. Ragan could not agree to these terms, and a question of fact thus exists regarding what the parties had, in fact, agreed to.

Third, because the parties have differing interpretations of their agreement because of the Offer Letter's ambiguity, review of extrinsic evidence necessary. This evidence makes clear that Defendants aggressively recruited Ms. Ragan and assured her that she would not lose out on unvested stock that she possessed with her then-current employer. Indeed, the head of Global Environmental Products ("GEP") of the BP trading group sent a recruitment email to Ms. Ragan days before she received the Offer Letter, which stated that her 2015 bonus was "guarantee[d]," and made no mention that she would lose her RSU grant should she be terminated before they vest. Consistently, the Letter does not state that her RSU grant was discretionary or could be forfeited if she were terminated. Ms. Ragan consequently understood her $500,000 2015 bonus to be guaranteed and she did not think her $500,000 RSU grant was conditional or subject to forfeiture.

Fourth, Ms. Ragan's claims under the IWPCA should proceed because the deferred portion of her 2015 bonus and her entire $500,000 RSU grant were not bonuses as Defendants argue but were paid inducements to join BP that Defendants were required to honor. Even if the bonus and RSU grant were bonuses, Ms. Ragan had fully earned them by March 2016, making them earned compensation, not prospective bonuses, that were subject to the IWPCA. Defendants' Motion should be denied in its entirety.

## ADDITIONAL BACKGROUND

In 2015 Defendants sought to expand their trading into new markets, specifically the Regional Greenhouse Gas Initiative ("RGGI") carbon trading market, so they recruited Ms. Ragan because she had specialized knowledge and experience in that market. (Pl.'s L.R. 56.1(b)(3) Statement of Additional Fact ("SOAF") ¶ 1.) After a series of promising interviews with BP personnel, Ms. Ragan was deemed an attractive candidate and Defendants began discussing her potential employment, as well as her compensation. (*Id.* ¶ 2.) BP's Head of Global Environmental Products, Dan Barry, had multiple conversations with Ms. Ragan, and during one such call, he

2

itemized the various elements of her compensation should she accept BP's offer, which he noted was only conditional on a background screening and drug test. (*Id.* ¶ 2.) Mr. Barry later sent her an email memorializing this conversation on April 17, 2015. (*Id.* ¶¶ 2–4.) Mr. Barry's email noted that Ms. Ragan would receive a 2015 "guarantee[d]" bonus of $500,000. (*Id.* ¶ 4.) His email also stated that Ms. Ragan would receive additional compensation of $500,000 in the form of restricted stock units ("RSUs"), but the email did not note that the RSU grant would supposedly be forfeited if Defendants terminated her before the RSUs vested. (*Id.*)

BP's IST Partnerships and Trading Manager, Stephanie Curulewski, sent Ms. Ragan a letter further describing her potential compensation (the "Offer Letter") if she joined BP. (*Id.* ¶¶ 6.) The Offer Letter referenced and "outlined" various BP plans that *could* apply to portions of Ms. Ragan's compensation, and policies that governed her behavior and performance. (*Id.* ¶ 6.) Defendants have described these policies as "principle based." In other words, they lack delineation. Ms. Ragan did not possess or have access to any of the policies other than BP's Code of Conduct, and she thus did not have the opportunity to review BP's IST Deferred Annual Bonus Plan (the "DAB Plan") or the BP Trader and Originator Bonus Plan (the "Bonus Plan") that Defendants contend governed her 2015 bonus. (*Id.* ¶ 7.) While Ms. Ragan understood the concept of deferred compensation and unvested stocks generally, she did not understand her $500,000 performance bonus to be subject to deferred compensation when she signed the Offer Letter, as she thought it were guaranteed as explained in Dan Barry's email. (*Id.* at ¶¶ 8–9.)

Nor did Ms. Ragan possess or have access to the Restricted Share Plan II ("the Share Plan"), which Defendants contend governed Ms. Ragan's $500,000 RSU grant, at the time she received or signed the Offer Letter. (*Id.* ¶ 10.) She therefore could not know at the time she signed the Offer Letter that the Share Plan stated that if she were terminated before her RSUs

3

vested they would be forfeited, because the Offer Letter did not reference this term and Mr. Barry (or anyone else) did not inform her of this supposed term. (*Id.* ¶¶ 11–12.) Additionally, the Offer Letter, prepared by Defendants, did not contradict Mr. Barry's representations, nor did it state that the entirety of Defendants' offer was contained solely in the Letter, or that all prior statements, offers, or representations by BP were not part of the parties' agreement. (*Id.* at ¶ 13.)

After Defendants determined that Ms. Ragan breached her DOA, they moved her from trading to origination in June 2016 because they were still confident that she could be a valuable member of the team and they thought the origination role would better suit Ms. Ragan's skillset and interests. (*Id.* ¶¶ 16–17.) In fact, Mr. Barry told Ms. Ragan in September 2016 that he was encouraged that she was establishing new potential clients, which her predecessors had not been able to do, and that she had recently executed her first deal as an originator. (*Id.* ¶ 18.)

The origination role does not have the same compliance risk as a trader because an originator cannot trade on BP's behalf, and for the approximate six months Mr. Ragan remained in the role, she did not violate any BP rule or policy.[1] (*Id.* ¶¶ 19–20.) While there was an investigation to determine whether Ms. Ragan violated any BP policy for purchasing stock in Clean Energy Fuels after she self-reported the potential conflict, Defendants concluded that she had not. (*Id.* ¶¶ 21–23.) Nonetheless, Defendants terminated Ms. Ragan a month later in December 2016 (approximately six months since her last violation), and she was officially terminated three months later after her garden leave ended, less than two months before approximately $132,000 of her RSUs would have vested. (*Id.* ¶ 24.)

---

[1] Defendants note (Defs.' SOF ¶ 62) that Ms. Ragan notified Ethics and Compliance late on a single transaction in October 2016, but their Rule 30(b)(6) witness never identified this supposed issue, and further, Defendants never argue in their Memorandum that this contributed to her termination.

4

Defendants claim that Ms. Ragan was not terminated for any one of her claimed violations of BP's policies, codes, and guidelines; instead, they terminated her because Defendants questioned her judgment following her supposed violations. (*Id.* ¶ 25.) Defendants lacked any policy explaining how many violations will lead to an adverse employment action, or what circumstances they consider in the "totality of the circumstances" when determining whether any action should be taken. (*Id.* ¶ 26.) Other BP traders violated many of the same policies that Ms. Ragan did (some leading to Category A and B incidents), yet they suffered no adverse employment action. (*Id.* ¶¶ 27–32.)

## ARGUMENT

Defendants first argue (Defs.' Mem. 3–4, Doc. 68) that the Offer Letter is not a contract. Untrue. Under the terms of the Offer Letter, BP promised to pay Ms. Ragan certain compensation (salary, sign-on bonus, etc.), including the $500,000 RSU grant, and in exchange Ms. Ragan had to perform her job as stated and expected under the contract. Defendants therefore could not terminate Ms. Ragan for a benign reason, like a department-wide reduction in staff, and not pay her the agreed-upon bonus and RSUs. They could only do so if Ms. Ragan violated the clear and unambiguous terms of the Offer Letter. Defendants' Memorandum further belies their argument there is no contract because they repeatedly call the Offer Letter a contract—including in one of their *headings*. (Defs.' Mem. 4.) They also reference their "contractual discretion" when determining whether to terminate Ms. Ragan. The Offer Letter is an enforceable contract.

Defendants then argue that even if the Offer Letter is a contract, summary judgment is proper because contract interpretation is a question of law. But that is so only if the terms of the contract are unambiguous and the facts surrounding the parties' obligations are clear and undisputed. *C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*, 715 N.E.2d 778, 782 (Ill. App. Ct. 1999) (noting that "where the contract is ambiguous, evidence outside the document may be considered

5

to discern the parties' intent"). Here, the Offer Letter's lack of clarity regarding under what circumstances Defendants could terminate Ms. Ragan and supposedly withhold her bonus creates substantial ambiguity, particularly considering Mr. Barry's guarantee that preceded it. More ambiguity exists because the Offer Letter never states that Ms. Ragan's RSU grant was subject to rescission should Defendants terminate her. Because material facts regarding the parties' intent are in dispute,[2] summary judgment is improper. *See id.*; *see also Bank of Ravenswood v. Polan*, 628 N.E.2d 194, 198 (Ill. App. Ct. 1993) ("But if the ambiguity [in a contract] can only be resolved by resort to facts in dispute, then the contract must be construed by the trier of fact."). This is particularly true because all material facts and their justifiable inferences must be drawn in Ms. Ragan's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**1.      Defendants' claimed rationale for Ms. Ragan's termination creates questions of fact.**

**A.      Defendants' divergent actions towards Ms. Ragan and other similarly situated employees creates a genuine issue of fact.**

Defendants claim they were justified in terminating Ms. Ragan because she violated various BP policies and codes of conduct. Their claim is contradicted by the fact that Ms. Ragan was not terminated shortly after any violation, and Defendants did not terminate or take any adverse action against other employees in Ms. Ragan's trading group who committed the same violations—including those violations deemed Category A and B violations. (Pl.'s SOAF ¶¶ 27–32.) That Defendants belatedly terminated Ms. Ragan supposedly for policy violations, when she had not had a violation in approximately six months, along with Defendants' acceptance of violations

---

[2] Defendants claim that they did not act arbitrarily and capriciously in terminating Ms. Ragan and thus not releasing her unvested RSUs promised under the Offer Letter because they claim she violated the terms of the Offer Letter first. (Defs.' Mem. 5–8.) That is one possibility. Another is that Defendants conjured up the reason that they terminated her to pocket $132,000 in unvested RSUs in 2017 and another $375,000 in RSUs in 2018.

6

by other BP traders are "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also* Fed. R. Civ. P. 56(e). Whether Defendants arbitrarily or capriciously terminated Ms. Ragan must be resolved by the finder of fact.

### B.   Ms. Ragan's "judgment" is a classic genuine issue of fact.

Defendants also claim (Defs.' Mem. 2, 7) that they terminated Ms. Ragan not for any one alleged violation of their policies, but because they questioned her judgment when they considered her purported violations in the aggregate (Pl.'s SOAF ¶¶ 25–26). Defendants' reliance on the nebulous term "judgment," presents a jury question because it lacks any objective measure and is not defined or referenced in the Offer Letter. This is particularly true here where there is irrefutable evidence that other BP traders exercised similar judgment but were not subject to any adverse employment action.

Defendants seek to avoid this pitfall by arguing that whether to terminate Ms. Ragan was contractually within their sole discretion, and that they cannot be second-guessed by Ms. Ragan or the trier of fact. Defendants are wrong. The "implied covenant of good faith and fair dealing requires a party vested with discretion to exercise that discretion reasonably, with proper motive and in a manner consistent with the reasonable expectations of the parties." *Tektel, Inc. v. Maier*, 813 F. Supp. 1331, 1335 (N.D. Ill. 1992) (citing *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1444 (7th Cir. 1992)). The Offer Letter's reference to Defendants' general discretion does not remove the issue from the trier of fact, because the fact that "the Plan gave [Defendants] discretion to terminate [Ms. Ragan] without paying unearned bonuses does not mean that [Defendants] [are] necessarily incapable of abusing that discretion." *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 675 (7th Cir. 2013); *accord Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 884 (7th Cir. 2000) (discretion must be exercised reasonably and with proper motive, and not arbitrarily, capriciously or in a manner inconsistent with the reasonable

expectations of the parties.); *McCleary v. Wells Fargo Sec., L.L.C.*, 29 N.E.3d 1087, 1095 (Ill. App. Ct. 2015) (noting that "[w]hether defendant's decision was a reasonable exercise of its discretion is a question of fact to be resolved by the trier of fact"). Whether Defendants here reasonably and properly exercised their discretion in terminating Ms. Ragan for her judgment is a quintessential question of fact requiring resolution by the trier of fact. *See Ill. Tool Works, Inc. v. Abdel-Ghaffar*, No. 12-CV-5812, 2016 WL 3453653, at *3 (N.D. Ill. June 20, 2016); *see also Poulous v. Lutheran Soc. Serv. of Ill., Inc.*, 728 N.E.2d 547, 558 (Ill. App. Ct. 2000) (stating that it is for the jury to determine whether circumstances establish cause for termination).

Defendants' related argument that any bonus or additional compensation that Ms. Ragan could receive was discretionary and conditional is also fatally flawed. The Offer Letter, which was solely drafted by BP, is ambiguous and self-contradictory. While the Offer Letter notes that Ms. Ragan's potential bonus was "discretionary" and could be "varied or withdrawn," it also states that if Ms. Ragan complied with BP's policies, codes, and guidelines and met BP's performance expectations, she would receive "a *minimum* bonus…of $500,000" for 2015. (Pl.'s SOAF ¶¶ 6) (emphasis added.) Defendants could not award her less. Other language in the Offer Letter further points to the 2015 bonus not being subject to Defendants' discretion. The Offer Letter notes that Defendants were "under no obligation to make *any further minimum bonus awards available to*" Ms. Ragan for "years 2016 and onwards." (*Id.*) (emphasis added.) If the 2015 bonus were purely discretionary as Defendants contend, there would have been no need for them to note that they were not obligated to provide bonuses to Ms. Ragan for any other year.

Interpreting the Offer Letter to give Defendants the untrammeled discretion they now seek would vitiate the "minimum bonus" language in the Offer Letter. The issues of Defendants' true motivation for terminating Ms. Ragan and whether the Offer Letter permitted them to do so

8

for such reasons are questions of fact that must go to a jury. *See Poulous*, 728 N.E.2d at 558; *see also McCleary*, 2015 IL App (1st) 141287, ¶ 30 (even though the defendant had "absolute discretion" under the bonus plan, "whether defendant's decision [to terminate the plaintiff] was a reasonable exercise of its discretion is a question of fact to be resolved by the trier of fact").

### C. The timing of Ms. Ragan's termination presents an issue of fact.

Defendants also claim that Ms. Ragan lacks any evidence that they acted in bad faith. (Mem. 9.) In addition to the evidence noted above, the suspicious timing of Ms. Ragan's termination casts further doubts on Defendants' purported rationale and raises a fact question.

Defendants' concede that all Ms. Ragan's claimed violations occurred by May 2016, including her Category A incident. (Defs.' SOF ¶¶ 41–43, 45, 47, 49, 51–54, 58, Doc. 69.) But Ms. Ragan was not terminated then. She was transferred to an origination role that Defendants thought was more suited to Ms. Ragan's interests and strengths. (Pl.'s SOAF ¶¶ 17–18.) After she was transferred from trading to origination in May 2016, she never violated any BP principle-based code, policy, guideline, or procedure. (*Id.* ¶¶ 20–21). Defendants recognize this hole in their story because they then point to Ms. Ragan's purchase of stock from another company in a market that BP was *potentially* operating in. (Defs.' Mem. 2, 7.) This shows the utter infirmity in Defendants' position, and after their own investigation in November 2016, *Defendants themselves* found that Ms. Ragan had not violated any policy. (Defs.' SOF ¶¶ 69–70.)

Even then, Defendants did not terminate Ms. Ragan until nearly one month later, December 14, 2016, despite receiving encouraging reviews in her origination role from her superiors and violation free for approximately six months. (Pl.'s SOAF ¶¶ 19, 21.) Ms. Ragan was officially terminated in March 2017 due to her garden leave—only two months before 25% of her RSUs valued at approximately $132,000 were scheduled to vest. (*Id.* ¶¶ 24.) Defendants' odd rationale that they terminated Ms. Ragan for her judgment even though she had satisfactory

9

performance reviews in her origination role, coupled with the suspicious timing of her termination shortly before Defendants were required to release a large portion of RSUs creates a genuine issue of material fact making summary judgment improper, particularly because all facts and reasonable inferences must be construed in Ms. Ragan's favor. *Anderson*, 477 U.S. at 255; *Apex Digital, Inc. v. Sears, Roebuck, & Co.*, 735 F.3d 962, 965 (7th Cir. 2013).

In the end, the numerous issues Ms. Ragan raises—Defendants' disparate treatment of other employees, the nebulous justification that judgment was the cause of Ms. Ragan's termination, and the odd timing of the termination itself—on their own and especially when combined raise genuine issues of material fact that, at minimum, indicate that Defendants did not terminate Ms. Ragan for their articulated (and thus pretextual) reasons, but for others not permitted under the Offer Letter. *See Sylvester v. SOS Children's Villages Ill. Inc.*, 453 F.3d 900, 903 (7th Cir. 2006); *accord Nichols v. Ill. Dept. of Trans.*, 152 F. Supp. 3d 1106, 1126 (N.D. Ill. 2016).

**2.     Defendants' Offer Letter omitted key terms—policies that Ms. Ragan was supposedly required to follow—and as a result, the parties did not agree to those terms.**

Defendants claim (Defs.' Mem. 3–4) the Offer Letter references various BP plans and guidelines that were "expressly" incorporated into the Letter by reference and that Ms. Ragan was thus subject to them. Specifically, Defendants assert that Ms. Ragan's unvested RSUs from her 2015 bonus and RSU grant were subject to BP's "Share Plan II" under the Offer Letter. Two problems exist. First, Ms. Ragan lacked access to all but one of the policies referenced in the Offer Letter, including the Share Plan, and she could not review and accept the terms before signing the Offer Letter. (Pl.'s SOAF ¶¶ 7, 10–11.) Second, the "Share Plan" is not referenced or even identified in the Offer Letter, nor are its "pellucidly clear" terms described at all. (*Id.* ¶ 11.) Most importantly, the Share Plan's term regarding Ms. Ragan's forfeiture of unvested shares if BP terminated her was not included or even obliquely referenced in the Offer Letter. (*Id.*)

As for the $500,000 RSU grant, the Offer Letter states that Ms. Ragan would receive the RSUs in the quarter following her start date. (*Id.* ¶ 6.) The Offer Letter is silent whether Defendants had discretion to rescind the RSUs for performance or policy violations. It merely states that "[*i*]*n general*, in order for the RSUs to vest, you must be employed by BP on the vesting date." (*Id.*) (emphasis added.) Such ambiguous language stands in stark contrast to the Offer Letter's explicit admonition that Ms. Ragan's $200,000 sign-on payment was subject to forfeiture and her repayment should she "resign or [her] employment is terminated with cause…." (*Id.*) Nowhere does the Offer Letter state that the $500,000 RSU grant was conditional or subject to the discretion or satisfaction of BP. Defendants' claims to the contrary create fact issues.

**3. Ms. Ragan justifiably understood her 2015 bonus and RSU grant to be guaranteed compensation, as stated in Dan Barry's email and referenced in the Offer Letter.**

Defendants claim that the Offer Letter contains the entirety of the parties' agreement. Elsewhere, Defendants take the opposite position when they argue that the various BP policies and codes not part of the Offer Letter are nonetheless "incorporated" into the Offer Letter and control here. (Defs.' Mem. 4) Defendants cannot simultaneously claim that the Offer Letter contains the entirety of the parties' agreement and that various unidentified codes, plans, and policies are also part of their agreement.

Due to the Offer Letter's ambiguity and omissions regarding various policies, extrinsic evidence is necessary to determine the parties' agreement. Shortly before receiving the Offer Letter, Ms. Ragan received an email from Dan Barry, BP's Head of Global Environmental Products, that summarized Defendants' offered compensation and bonus package. (Pl.'s SOAF ¶¶ 2–4.) The email followed a telephone call between Ms. Ragan and Mr. Barry where they discussed the terms of Ms. Ragan's compensation. (*Id.* ¶ 2.) Mr. Barry's email specified that her grant of RSUs was a "buyout" to alleviate any concerns that Ms. Ragan might have concerning her

11

leaving her employer without receiving unvested shares she possessed. (*Id.*) The email also notes that her "minimum" year-end bonus would be $500,000, and that it was a "guarantee." (*Id.* ¶ 4.)

Defendants cannot contend that Mr. Barry's email is not part of the parties' agreement because the Offer Letter does not contain any language or reference that the terms in the Offer Letter are BP's exclusive and complete offer. (*Id.* ¶ 13.) Nor does it state that the Offer Letter disclaims all prior communications or representations that could be construed as an offer. (*Id.*) Moreover, the Letter states that Ms. Ragan's 2015 bonus was simultaneously (and contradictorily) a $500,000 "minimum" bonus that was also "provided at the sole discretion of BP." (*Id.* ¶ 6.) The Offer Letter also states that "in general" her RSU grant would vest if she were employed by BP on the vesting date but is silent regarding whether she would forfeit her RSUs if she were terminated. (*Id.*) The omission creates substantial ambiguity regarding the terms the parties agreed to, particularly when one considers that the Offer Letter *explicitly* told Ms. Ragan that she had to forfeit her sign-on bonus if she were terminated within two years of her start date. (*Id.*) The ambiguity requires the trier of fact to consider extrinsic evidence, including Dan Barry's email and Ms. Ragan's testimony to determine the parties' intent. *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991).

**4.     Ms. Ragan's IWPCA claims survive because Defendants provided her the RSU grant and her 2015 performance bonus more than a year before her termination.**

Claims for violation of the IWPCA are akin to breach of contract actions. *McCleary*, 29 N.E.3d at 1096. As shown above, the parties entered into an agreement regarding Ms. Ragan's employment and her compensation. Specifically, Defendants "unequivocally" promised to pay Ms. Ragan $500,000 in RSUs because the Offer Letter stated that she "will also be granted" RSUs as an additional element of her compensation and that it would be granted to her the first quarter following her start date. (Pl.'s SOAF ¶ 6.) Ms. Ragan therefore earned this compensation

12

under the terms of the Offer Letter near the time she started working for BP. The RSU grant was also unequivocal because it was not based on Ms. Ragan's performance and Defendants had no discretion under the Offer Letter to rescind them or refuse to grant them. (*Id.*) The same holds for the unvested portion of the $85,000 of Ms. Ragan's guaranteed bonus, as the Offer Letter states that Ms. Ragan was entitled to a "minimum bonus" of $500,000 for 2015, and Dan Barry called it a "guarantee." (*Id.* ¶¶ 4, 6.)

Defendants claim that the RSUs were not "compensation" because they were unrelated to services rendered and were merely an inducement in their recruitment effort. (Defs.' Mem. 8.) This claim makes no sense under the facts here. Moreover, Section 300.450 of the Illinois Administrative Code also defines compensation to include "bonuses," which Defendants claim the RSUs were. 56 ILL. ADMIN. CODE. tit. 56, § 300.450. Defendants' claim is also belied by the Offer Letter's own language, which refers to the RSU grant as an "other element[] of your *compensation* package." (Pl.'s SOAF ¶ 6) (emphasis added.)

Defendants' withholding of the undisbursed portion of Ms. Ragan's 2015 bonus is similarly problematic. This portion was part of Ms. Ragan's earned 2015 bonus, the majority of which was paid in 2016. (Defs.' SOF ¶¶ 36, 79.) Defendants still owe the unpaid portion because it is a bonus and compensation for work performed by Ms. Ragan in 2015. Dan Barry characterized the $500,000 bonus as "guarantee[d]" in his April 23 email, and the Offer Letter characterized it as a "minimum bonus" of $500,000. (Pl.'s SOAF ¶¶ 4, 6.) Because Defendants only paid Ms. Ragan approximately $443,000 of her 2015 bonus, they violated the terms of the Offer Letter and thus the IWPCA. *Cf. Musick v. Omnicare, Inc.*, No. 14-CV-2281, 2016 WL 8814357 (C.D. Ill. July 21, 2016). At minimum, these facts present a question of fact that must be determined by the trier of fact. *See Parise v. Integrated Shipping Solution, Inc.*, 292 F. Supp. 3d 801,

13

806 (N.D. Ill. 2017) (denying summary judgment on plaintiff's IWPCA claim because genuine issue of fact existed whether defendants acted in good faith in terminating plaintiff when factual disputes existed whether plaintiff was performing to the defendants' expectations).

The cases cited by Defendants provide them no support. (Defs.' Mem. 8–9.) Defendants argue that *McLaughlin v. Sternberg Lanters, Inc.*, controls, but the facts there were vastly different. The plaintiff sued his ex-employer, claiming he was owed a pro rata share of his yearly performance bonus referred to in the parties' agreement that he would have received had he not been terminated for cause. 917 N.E.2d 1065, 1068 (Ill. App. Ct. 2009). The court found that the plaintiff was not entitled to the bonus because it was "dependent on whether sales…increased over the previous year," because it was not guaranteed to be paid, and because if the court granted the plaintiff's request it would have to order the defendant to violate the IWPCA by failing to pay the plaintiff within two weeks after his termination because the bonus could not be calculated until the year's end. *Id.* at 1071. None of these considerations exist here. Similarly, in *Hess v. Bresney*, the plaintiff sought compensation for the revenue he claimed to have generated that his employer did not receive until *after* his termination, but the court found that such compensation was not required under the parties' agreement. 784 F.3d 1154, 1159 (7th Cir. 2015). Conversely to *McLaughlin* and *Hess*, Ms. Ragan had earned the RSUs "in the quarter following [her] start date with BP"—more than a year before her termination. (Pl.'s SOAF ¶ 6.)

Defendants' other cited cases fare no better. Their reliance on *Tatom v. Ameritech Corp.*, is misplaced because the plaintiff sued under a breach of contract and violation of the IWPCA for an unpaid bonus. (Defs.' Mem. 12.) The difference, however, was that the plaintiff had *voluntarily* ended his employment with the defendant and joined a competitor, which was also expressly prohibited by the defendant's incentive program. *Tatom v. Ameritech Corp.*, 305 F.3d

14

737, 745 (7th Cir. 2002). The court also found the plaintiff's IWPCA claim lacking because it had already held that the plaintiff did not have a contractual right under the defendant's compensation plan—a prerequisite for such a claim. *Id.* at 742; *see also Tatom v. Ameritech Corp.*, No. 99-C-683, 2000 WL 1648931, at *9 (N.D. Ill. Sept. 28, 2000).

Last, Defendants cite to *Majmudar v. House of Spices (India), Inc.*, for the proposition that "unpaid future compensation for the remainder of a terminated contract…for cause does not fall under" the IWPCA. (Defs.' Mem. 10.) *Majmudar* is irrelevant here. The plaintiff in *Majmudar* entered into a five-year employment agreement with the defendant and he subsequently sued seeking his unpaid and *unearned salary* for the remaining 35 months after being terminated for cause. *Majmudar*, 1 N.E.2d 1207, 1208 (Ill. App. Ct. 2013). The facts here are far different. Ms. Ragan is not seeking any future salary that she would have been paid had she remained a BP employee. Instead, she is only seeking payment of the RSUs and unvested stock that Defendants granted her when she started her employment with BP and that she had earned a year before her termination.

## CONCLUSION

Kathleen Ragan requests this Honorable Court deny Defendants' Motion for Summary Judgment in its entirety and grant her all other relief deemed just and proper.

September 3, 2019　　　　　　　　　　　　　　Respectfully submitted,
　　　　　　　　　　　　　　　　　　　　　　Kathleen Ragan

　　　　　　　　　　　　　　　　　　　　　　*/s/ Joseph L. Kish*_____
　　　　　　　　　　　　　　　　　　　　　　One of her Attorneys

Joseph L. Kish – jkish@smsm.com
Matthew D. Kelly – mkelly@smsm.com
Segal McCambridge Singer & Mahoney Ltd.
233 South Wacker Drive, Suite 5500
Chicago, Illinois 60606
(312) 645-7800

## CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing paper was served upon all counsel of record electronically through CM/ECF on September 3, 2019.

                                            Respectfully submitted,

                                            By/s/ *Joseph L. Kish*

Joseph L. Kish – jkish@smsm.com
Matthew D. Kelly – mkelly@smsm.com
Segal McCambridge Singer & Mahoney Ltd.
233 S. Wacker Dr.
Suite 5500
Chicago, IL 60606
(312) 645-7800