IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Kathleen Ragan, an individual. | ) | |
| | ) | |
| Plaintiff/Counterdefendant, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-09208 |
| | ) | |
| BP Products North America, Inc., | ) | |
| a Maryland corporation; | ) | Honorable Marvin E. Aspen |
| BP America, Inc., | ) | Magistrate Judge Jeffrey T. Gilbert |
| a Delaware corporation; | ) | |
| | ) | Jury Trial Demanded |
| Defendants/Counterplaintiffs. | ) | |

**KATHLEEN RAGAN'S LOCAL RULE 56.1(b)(3)
STATEMENT OF ADDITIONAL MATERIAL FACTS IN SUPPORT OF HER
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1. Defendants (collectively "BP") sought to expand into the Regional Greenhouse Gas Initiative ("RGGI") carbon trading market in which they did not have experience, and consequently they recruited Ms. Ragan to join BP in 2015 because she had particular knowledge and experience in these trading markets. (Dep. of Stephanie Curulewski 12:10–18, 13:10–18, attached as **Ex. 1**; Daniel Barry Dep. 37:11–39:16, 42:21–43:10, attached as **Ex. 2**.)

2. After multiple BP personnel interviewed Ms. Ragan and she was deemed an attractive candidate, Dan Barry, BP's Head of Global Environmental Products, sent an email to Ms. Ragan on April 17, 2015, after they had a telephone conversation that itemized the various elements of her compensation should she accept BP's offer. (Kathleen Ragan Dep. 24:14–30:16, attached as **Ex. 3**; Ragan Dep. Ex. 3, attached as **Ex. 4**; Declaration of Kathleen Ragan, ¶¶ 2–3, attached as **Ex. 5**; Dan Barry Dep. 37:11–38:5, 44:9–21, 54:14–55:21.) Mr. Barry stated that her initial employment was conditional on a background screening and drug test, but he never stated that any element of her compensation was conditional. (Ragan Decl. ¶ 2.)

3. Mr. Barry's April 17, 2015, email states that Ms. Ragan would receive $500,000 in Restricted Stock Units (RSUs) so that she would "feel comfortable" that she would not lose any compensation from her current employer, Shell, if she were to accept the offer. (Ragan Dep. Ex. 3.)

4. Mr. Barry's email to Ms. Ragan refers to the $500,000 2015 bonus as a "[g]uarantee," and never states that the $500,000 of RSUs in additional compensation would be forfeited if BP terminated her prior to the RSUs vest dates. (*Id.*)

5. Mr. Barry does not recall whether he and Ms. Ragan ever discussed before she began her employment with BP that part of her 2015 bonus would be paid out in some form of cash and another part would be deferred compensation. (Barry Dep. 63:7–25.)

6. Ms. Ragan subsequently received an Offer Letter from Stephanie Curulewski, BP's IST Partnerships and Trading Manager, that laid out additional terms of Ms. Ragan's compensation if she were to join BP. (Ragan Dep. 41:19–23; Ragan Dep. Ex. 4, attached as **Ex. 6**; Ragan Decl. ¶¶ 4–5; Curulewski Dep. 33:2–12.)

7. At the time she received and signed the Offer Letter, Ms. Ragan did not possess or have access to BP's IST Deferred Annual Bonus Plan (the "DAB Plan") or the BP Trader and Originator Bonus Plan (the "Bonus Plan"), which BP contends governed Ms. Ragan's 2015 bonus. (Ragan Dep. 48:1–8, 91:14–23, 101:19–102:3; Ragan Decl. ¶ 6; Curulewski Dep. 34:3–13.)

8. While Ms. Ragan understood at that time the concept of deferred compensation and unvested stocks generally, she did not understand at the time she signed the Offer Letter that the offered annual bonus of $500,000 was supposedly subject to the DAB Plan. (Ragan Dep. 91:14–92:21, 100:24–102:3, 115:7–16; Ragan Decl. ¶¶ 8–9.)

9. Ms. Ragan thought that the offered annual bonus of $500,000 for her 2015 performance was guaranteed, as set out in Dan Barry's email. (Ragan Dep. 46:14–47:10, 52:21–53:11, 67:11–21, 115:7–16; Ragan Decl.¶ 8.)

10. Ms. Ragan did not possess or have access to the Restricted Share Plan II ("the Share Plan")—which BP contends controlled Ms. Ragan's $500,000 RSU grant—or BP's Global Trading Guidelines and Requirements policy at the time she received or signed the Offer Letter. (Ragan Dep. 61:3–12; Ragan Decl. ¶¶ 6–7.)

11. Ms. Ragan did not know at the time she signed the Offer Letter that the Share Plan stated that if she were terminated before her RSUs vested they would be forfeited, as the Offer Letter did not reference this term—nor did the Offer Letter even identify the Share Plan itself. (Ragan Dep. 68:4–69:7, 73:6–20, 74:13–19; Ragan Dep. Ex. 4; Ragan Decl. ¶¶ 6, 12.)

12. Ms. Ragan understood when she signed the Offer Letter that "generally" she had to be employed with BP at the time her RSUs vested to receive them, but she did not believe that the provision would apply to her because of her prior communications with Dan Barry. (Ragan Dep. 73:11–20, 81:20–82:6, 94:7–14; Ragan Decl. ¶¶ 8–10; Ragan Dep. Ex. 4.)

13. The Offer Letter did not state that it contained BP's only or complete offer; nor did it state that any prior BP offer or representation of employment not included in the Offer Letter was not part of the parties' agreement. (Ragan Dep. Ex. 4.)

14. BP did not have a specific policy regarding "soft breaches" in the environmental products division while Ms. Ragan was a BP employee. (Daniel Barry Dep. 92:12–17.)

15. Stephanie Curulewski recalls only discussing with Ms. Ragan one time her exceeding her soft limits. (Curulewski Dep. 69:18–24.)

3

16. After BP determined in May 2016 that Ms. Ragan's breach of her DOA in April was a Category A incident, BP did not consider terminating Ms. Ragan, and she was officially transferred from trading to origination in June 2016. (Ragan Dep. 213:6–214:23, 216:1–5, 242:15–23; Barry Dep. 113:19–114:10.)

17. BP still had confidence in Ms. Ragan, however, and it thought that Ms. Ragan's strengths, interests, and market contacts were better suited for the origination role and that she could have a material positive impact on GEP performance and growth potential. (Ragan Dep. 234:4–16; Ragan Dep. Ex. 38, attached as **Ex. 7**; Barry Dep. 112:18–113:22.)

18. Dan Barry told Ms. Ragan in September 2016 that he had confidence in her new role in origination, and it was encouraging and positive that she was getting new potential clients on board and that she had recently executed her first deal as an originator. (Ragan Dep. 242:24–245:24; 247:3–11.) Ms. Ragan's predecessors, who had the role for years, had been unable to develop relationships during their time in the position. (Ragan Dep. 245:7–22.)

19. The origination role does not have the same compliance risk as a trader because an originator cannot trade on BP's behalf, and therefore cannot overextend BP. (*Id.* at 216:14–218:4; Curulewski Dep. 108:22–109:13, 110:16–22; Barry Dep. 32:4–35:17, 114:5–10.)

20. Ms. Ragan did not violate any BP policy or rule after she was transferred to her origination role. (Defs.' Fed. R. Civ. Proc. 30(b)(6) Dep. of Richie Malone 78:22–79:4 attached as Ex. 8.)

21. The biogas market is not a "small" market, and therefore Ms. Ragan was not required to disclose her 2016 purchases of Clean Energy Fuels stock because it is often difficult to know because of BP's large size whether BP is engaging in potential business with another company. (Ragan Dep. 260:18–262:10, 263:19–264:3, 266:4–21.)

4

22. Upon learning of BP's potential deal with Clean Energy Fuels, Ms. Ragan immediately informed BP of her recent purchases of Clean Energy Fuels stock. (Ragan Dep. 271:3–16, 273:6–12, 274:5–22.)

23. BP's Ethics and Compliance group conducted an investigation and determined that Ms. Ragan did not violate any BP policy, code, or guideline regarding conflicts of interest, and that she did not engage in any wrongdoing. (Malone Dep. 78:22–79:4.)

24. BP advised Ms. Ragan of her termination on December 14, 2016, and that she would be formally terminated after her three-month garden leave—less than two months before approximately $132,000 of her RSUs would vest. (Barry Dep. 162:5–13, 163:2–17, 164:6–17; Ragan Dep. Ex. 4, Ragan Decl. ¶ 14.)

25. Ms. Ragan was not terminated for any one of her claimed violations of BP's policies, codes, and guidelines; rather, Defendants claim that they questioned Ms. Ragan's judgment and terminated her after considering her purported violations in the aggregate. (Malone Dep. 111:10–21; Barry Dep. 95:11–23, 159:1–160:19; James Bordignon Dep. 47:13–48:13, 76:6–77:18, 79:1–21, 113:14–114:7, 116:11–118:8, 119:2–13, attached as **Ex. 9**.)

26. BP did not have a specific policy setting a certain number of violations would lead them collectively being labeled a Category A incident or would lead to an adverse employment action; rather, each employment decision is determined by multiple factors and considered by the totality of the circumstances before such action is possibly taken. (Malone Dep. 69:16–70:3, 115:5–17, 117:21–118:1, 120:20–121:4.)

27. Other BP employees in the IST trading group, Gary Beers and Brian Helm, violated the IST Deal Management subset of BP's Policy & Procedure guide regarding deal information data entry (a policy that Ms. Ragan also supposedly violated and Defendants state was a

5

cause of her termination), but neither Beers' nor Helm's employment was adversely affected for violating it. (Malone Dep. 34:2–35:5, 36:1–5, 138:12–23.)

28. Messrs. Beers and Helm violated the IST Deal Management policy requiring traders be accountable for dealer entry at all times even when input is delegated, but neither Beers' nor Helm's employment was adversely affected for violating it. (*Id.* 36:6–37:3.)

29. During the time of Ms. Ragan's employment, BP investigated another trader in the GEP group, Jim Benson, and determined that he breached his delegation of authority ("DOA") on an occasion, but BP determined was a Category B incident and Mr. Benson was not terminated for this breach of his DOA. (Malone Dep. 49:15–50:17, 60:20–62:20, 63:3–16; Ragan Dep. Ex. 15, attached as **Ex. 10**.)

30. During the time of Ms. Ragan's employment, BP investigated GEP trader Brian Helm and determined that he failed to verify that a counterparty had the appropriate credit clearance before trading with them, which BP determined was a Category B incident, but Mr. Helm suffered no adverse employment action for this failure. (Malone Dep. 60:2–11, 63:22–24, 65:2–10; Ragan Dep. Ex. 15.)

31. During the time of Ms. Ragan's employment, BP investigated Gary Beers and determined that he had failed to enter transactions accurately on four separate transactions over the course of four or five weeks, and they were collectively categorized as a Category A incident, but Mr. Beers suffered no adverse employment action. (Malone Dep. 65:24–68:20, 67:10–68:20; Ragan Dep. Ex. 15.)

32. During the time of Ms. Ragan's employment, BP investigated Brian Helm (originally misidentified by Defendants' Rule 30(b)(6) deponent as Jim Benson) and determined that

he too had failed to enter a transaction accurately on one occasion, but Ms. Helm suffered no adverse employment action. (Malone Dep. 68:21–69:5, 138:12–23.)

33. When Ms. Ragan was informed of her termination, she asked Dan Barry if she would still receive all of her unvested RSUs that BP had granted her to make whole for what she had received at Shell, and Mr. Barry responded that she would receive all of her RSUs. (Ragan Dep. 288:21–290:19.)

    Respectfully submitted,

    Kathleen Ragan
    */s/ Joseph L. Kish*_____
    One of her Attorneys

Joseph L. Kish – jkish@smsm.com
Matthew D. Kelly – mkelly@smsm.com
Segal McCambridge Singer & Mahoney Ltd.
233 South Wacker Drive, Suite 5500
Chicago, Illinois 60606
(312) 645-7800

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing paper was served upon all counsel of record electronically through CM/ECF on September 3, 2019.

Respectfully submitted,

By:/s/ *Joseph L. Kish*

Joseph L. Kish – jkish@smsm.com
Matthew D. Kelly – mkelly@smsm.com
Segal McCambridge Singer & Mahoney Ltd.
233 S. Wacker Dr.
Suite 5500
Chicago, IL 60606
(312) 645-7800