# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KATHLEEN RAGAN,            )
                                        )
      Plaintiff and Counter-Defendant,  )
                                          )    No. 1:17 C 9208
     v.                                )    Hon. Marvin E. Aspen
                                          )
BP PRODUCTS NORTH AMERICA, INC. )
and BP AMERICA, INC.            )
                                          )
      Defendant and Counter-Plaintiff.   )

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Presently before us is Defendants BP Products North America, Inc.'s and BP America, Inc.'s (collectively "BP") motion for summary judgment as to the entirety of Plaintiff Kathleen Ragan's ("Ragan") complaint, and summary judgment as to their counterclaim for repayment of a signing bonus from Ragan. (Def. Mot. for Summary Judgment (Dkt. No. 68); Def. Mem. in Resp. to Pl.'s Cross-Mot. for Summary Judgment ("Def. Resp. Mem.") (Dkt. No. 87.)) Also before us is Ragan's motion for summary judgment on Defendant's counterclaim for repayment of her signing bonus. (Pl. Mot. for Summary Judgment ("Pl. MSJ") (Dkt. No. 72.)), cross-motion for summary judgment as to BP's liability on her breach of contract, Illinois Wage Payment and Collection Act ("IWCPA"), and declaratory relief claims. (Pl. Cross-Mot. for Summary Judgment ("Pl. Cross-MSJ") (Dkt. No. 46.)) Parties both filed Rule 56.1 statements of material facts. (Def.'s Statement of Material Facts ("Def. SOF") (Dkt. No. 69); Pl.'s Statement of Material Facts ("Pl. SOF") (Dkt. No. 74.)) In addition, each party also submitted a response to the other party's statement of facts. (Def.'s Resp. to Pl.'s Statement of Material Facts ("Def. SOF

Resp.") (Dkt. No. 88); Pl.'s Resp. to Def.'s Statement of Material Facts ("Pl. SOF Resp.") (Dkt. No. 91.))

<strong>BACKGROUND</strong>

The factual record in this case is extensive and many of the particular incidents prior to Plaintiff's termination are disputed. This section will enumerate all of the relevant disputes before turning to the law.

Kathleen Ragan is a current resident of New York, New York who BP Products North America Inc. previously employed as an Emissions trader from June 8, 2015 to March 16, 2017. (Def. SOF ¶ 1; Pl. SOF Resp. ¶ 1.) BP terminated Ragan on December 14, 2016, although she was placed on "Garden Leave" through March 2017, meaning she was compensated for three months following her notice of termination. (Pl. SOF ¶¶ 10–11; Def. SOF ¶¶ 76, 79.) The dispute her largely turns on whether Ragan was fired "for cause."

Prior to joining BP, Ragan worked at Shell as an emissions trader. (Def. SOF ¶ 5.) Shell granted Ragan deferred bonus compensation of Shell stock, which she forfeited before their vesting date when she left Shell for BP. (Def. SOF ¶ 6.) Ragan understood BP's offer of "restricted stock units" ("RSU") to be a buyout of her forfeited, unvested Shell stock. (Pl. SOF Resp. ¶ 7.)

### A. BP's Offer of Employment

The parties dispute the exact nature of BP's offer to Ragan. Daniel Barry, the then-head of the Global Environmental Products ("GEP") group at BP called Ragan on April 17, 2015 to discuss an offer of employment at BP. (Def. SOF ¶ 7.) Barry emailed Ragan following their conversation with a summary of the compensation package BP was offering her. (Def. SOF ¶ 7; Pl. SOF Resp. ¶ 7.) The email refers to three categories of bonus: "Buyout," "Minimum Bonus

2

subject to My plan," and "Sign-on Bonus." (*Id.*) The term "Guarantee" is substituted in the "Total Sign-on" descriptor for the minimum bonus and sign-on bonus. (*Id.*) Ragan did not respond to Barry's email with an acceptance of these terms. (Def. SOF ¶ 9; Pl. SOF Resp. ¶ 9.) On April 23, 2015, BP sent Ragan a written offer letter for her to work as an Emissions Trader for the Integrated Supply and Trading ("IST") group, which Ragan signed on April 27, 2015. (Def. SOF ¶ 10; Pl. SOF Resp. ¶ 10.) The parties dispute whether the offer letter contained all the terms and conditions of Ragan's employment with BP, Ragan's position is that Barry's prior email was incorporated into the agreement. (Def. SOF ¶ 10; Pl. SOF Resp. ¶ 10.) Ragan therefore believes that the April 23rd letter does not constitute the complete offer. (*See* Def. SOF ¶¶ 11–24; Pl. SOF Resp. ¶¶ 11–24.) Ragan also points out that the letter references policies and codes to which she did not have access prior to her employment with BP. (Pl. SOF Resp. ¶¶ 10, 11, 13, 15, 19, 20, 21.)

The terms of the offer letter and the various BP policies referenced within it are undisputed. (*See* Def. SOF ¶¶ 11–24; Pl. SOF Resp. ¶¶ 11–24.) The offer letter stated, in relevant part, the following:

### Trader and Originator Bonus Plan

As part of your compensation package, you are eligible to earn an annual bonus in accordance with the BP Trader and Originator Bonus Plan. . . . Annual bonuses are typically payable on or before March 15th following each performance year, and may be subject to deferral under the IST Deferred Annual Bonus Plan . . .

This offer letter confirms that, subject to you remaining eligible to participate in the IST Trader and Originator Bonus Plan (the "Plan"), and the conditions outlined below, you will be eligible for a minimum bonus for the 2015 performance year (January 1st to December 31st 2015) in the amount of $500,000.

This potential bonus amount, which is provided at the sole discretion of BP, is strictly subject to the requirements of the Plan. Please note that the Plan is discretionary and all awards under the Plan are at the absolute discretion of BP. The Plan can be varied or withdrawn at any time, including part way through the performance year. . . .

The determination of any bonus you receive is linked to an assessment of your performance as measured against BP's performance and behavioral expectations. In particular and without prejudice to the rules of the Plan, you will lose your eligibility for this bonus opportunity if, in the sole discretion of BP, you:

- Fail to comply with any of BP Policies, the BP Code of Conduct, BP Trading Guidelines, and any Federal or state laws or regulations;
- Fail to achieve the deliverables outlined in your MyPlan and other relevant performance documentation (as determined in the sole discretion of BP management);
- Your performance is rated as "Below Expectations" for the 2015 performance year;
- Otherwise fail to meet BP's expectations.

BP reserves the right to make you no award or a bonus award of less than that stated above . . . if, in the absolute discretion of BP, you fail to meet the conditions outlined in this agreement . . . .

.

.

.

### Restricted Stock [Share] Units

In addition to the other elements of your compensation package, you will also be granted Restricted Stock [Share] United ("RSUs") representing BP plc American Depositary Shares ("ADSs") valued at $500,000 at the time of grant. Your grant will be issued in the quarter following your start date with BP, and will vary in amount with the price of BP's stock [shares] over time. 25% of the grant will vest 2 years after the grant date and the remaining 75% will vest 3 years after the grant date, both calculated at the then-current value of the stock [shares]. In general, in order for the RSUs to vest, you must be employed by BP on the vesting date. . . . all awards are subject to the terms of the plan under which they are granted. You will receive . . . a link to the plan prospectus, which you should read in its entirety.

.

.

.

### Sign-on Payment

Should you accept this offer, you are eligible to receive a one-time sign-on payment of $200,000 (gross). . . . You agree to repay 100% of this Sign-on Payment to BP if you resign or your employment is terminated with cause (e.g. breaching or non-compliance with the company's policies, guidelines, code of conduct, or not meeting performance requirements due to misbehaviours or willful disregards of BP rules or procedures) at any time within 24 months from the commencement date of this employment. In this case, the amount of the bonus must be fully repaid in cash in gross at least one day prior to the last date of employment. Your signature on this letter indicates your consent for BP to deduct the full or any remaining unpaid amounts of the Sign-on Payment (if owed under the terms of this letter agreement) from any wages, payments, bonuses, vacation, etc., that would have otherwise been paid to you at the time of termination.

(Def. SOF ¶¶ 11, 18, 23.)

The policies referenced included the Trader and Originator Bonus Plan, which contained the following provisions:

- The BP Trader and Originator Bonus Plan is a discretionary annual incentive bonus plan.
- "Discretionary[.]" Eligibility for an Award and amount of any Award is in the sole judgment and discretion of the Company up to and including Bonus Payment Date;
- 4.1.3 Nothing in this Plan or fact or circumstances of it being in operation shall entitle any Participant or other person to any claim or right to an Award under this Plan . . . .
- 5.2.1 Awards are purely Discretionary . . . .
- 5.3.2 Where applicable, some payments . . . shall be deferred and paid subject to the IST Deferred Annual Bonus Plan . . . Award amounts subject to the IST Deferred Annual Bonus Plan are not accrued, earned or vested unless the conditions of the IST Deferred Annual Bonus Plan are met. For details of the current deferral rates please refer to Appendix IV.
- Appendix IV[.] Bonus awards of $200,000 or greater . . . are subject to and governed by the IST DAB Plan. . . .
- The current rates of deferral for Performance Year 2013 and onwards are as follows:

| Deferral rates | |
| --- | --- |
| Band | Deferral Rate |
| Up to $100,000 | 0% |
| $100,000 to $250,000 | 15% |
| $250,000 to $1,500,000 | 25% |
| $1,500,000 to $5,000,000 | 35% |
| Above $5,000,000 | 50% |

(Def. SOF ¶ 15.) The Deferred Annual Bonus ("DAB") plan included the following language:

- Your participation in the Plan is subject to the rules of the Plan . . . Please note that the Plan is a discretionary plan . . . .
- The main terms and conditions for this grant are your continued employment with BP until the end of the restricted period . . . .
- The IST-DAB provides for a portion of your annual bonus award, if it is determined to be $200,000 or more, to be deferred in RSUs . . . . The IST-DAB provides for an original grant of RSUs based upon the portion of the annual bonus award deferred . . . .

- The restricted period for one-third of the original grant ends on the first anniversary of the grant date . . . The restricted period for the remaining two third of the original grant ends on the second and third anniversaries of the grant date respectively.
- Until the vesting date, RSUs remain subject to certain risks of forfeiture . . . .
- Generally, if you cease to be an employee of BP before the vesting date then you will forfeit your RSUs. Forfeited RSUs cannot vest . . . .
- However, if your employment with BP terminates for any of the following exceptional reasons before the vesting date then you will not forfeit all of your RSUs, and a proportion of the RSUs will continue to vest according to the original terms: . . . Termination as a result of "Disability" or "involuntary termination of employment" with any member of the Group, other than due to your conduct or performance. . . . Termination in the event of your death . . . Termination by mutual agreement between you and BP . . . .
- Your participation in the Plan does not constitute or form a part of any contract of employment and is strictly governed by the Plan Rules . . . . You have no right to compensation for any loss in relation to the IST-DAB, on termination of your employment or otherwise.
- The plan is operated in the sole discretion of BP . . . .
- The benefit to you of participating in the IST-DAB shall not form any contractual right for any purpose . . . .
- Frequently Asked Questions and Answers about the Plan . . . 1. How much of my bonus award for the 2015 performance year will be deferred and when will I know how much of my bonus award will be deferred? . . . If the amount of your bonus award . . . is $200,000 or more, you will be required to defer a portion of your bonus in RSUs. Deferral rates for bonuses are as follows:

| Band | Deferral Rate |
|---|---|
| Up to $100,000 | 0% |
| $100,000 to $250,000 | 15% |
| $250,000 to $1,500,000 | 25% |
| $1,500,000 to $5,000,000 | 35% |
| Above $5,000,000 | 50% |

- For example, if it is determined that your bonus award for a performance year is $500,000, the first $100,000 of the bonus award would not be subject to defer. For the amount of the bonus award between $100,000 and $250,000, 15% or $22,500 would be deferred. For the amount of the bonus award between $250,000 and $1.5 million, 25% or $62,500 would be deferred. . . . Therefore, the total amount deferred in RSUs would be $85,000 and $415,000 would be received in cash . . . . Deferral rates are subject to change.

- No employee is entitled to compensation for any loss in relation to the Plan, including:
    - Any loss or reduction of any rights or expectations under the IST-DAB in any circumstances or for any reason (including termination of employment).
    - Any exercise of discretion or a decision taken in relation to RSUs or to the IST-DAB, or any failure to exercise discretion or make a decision . . . .
- 12.1.5 The benefit of an Employee of participating in the Plan shall not form any contractual right . . .
- 12.1.8 No employee has any right to compensation for any loss in relation to the Plan, including: . . . any exercise of a discretion or a decision taken in relation to Awards or to the Plan, or any failure to exercise a discretion or take a decision . . . .
- 12.1.9 Participation in the Plan is permitted only on the basis that the Participant accepts all the provisions of its rules, including in particular this rule. By participating in the Plan, an employee waives all rights under the Plan, other than the right to acquire shares subject to and in accordance with the express terms of the Plan and the Conditions, in consideration for, and as a condition of, the grant of Awards under the Plan.
- 13.2 Decisions are final and binding[.] The decision of the Designated Corporate Officer and where relevant the Plan Administrator on the interpretation of the Plan or in any dispute relating Awards, including their grant, Vesting, and Release, or any matter relating to the Plan will be final and conclusive.

(Def. SOF ¶ 16–17). The Restricted Share Plan II included the following terms:

- Each RSU represents a conditional entitlement to receive one BP American Depositary Share ("ADS" or "share") at a date in the future, *provided* that the specified terms and/or conditions are met.
- The main terms and conditions for this grant or award are your continued employment with BP until the end of the restricted period and the satisfaction of conditions specified at the time of the grant or award, either in this document, the Plan Rules or in a separate grant letter you would have received.
- If your employment with BP ends before the vesting date then, with the exception of certain special circumstances, you will forfeit your RSUs.
- Generally, if you cease to be an employee of BP before the vesting date then you will forfeit your RSUs. Forfeited RSUs cannot vest . . .
- However, if your employment with BP terminates for any of the following exceptional reasons before the vesting fate, then you will not forfeit all of your RSUs, and a proportion of the RSUs will continue to vest according to the original terms: . . . Termination . . . as a result of "Disability" or "involuntary termination of employment" with any member of the Group, other than due to your conduct or performance. . . . Termination in the event

of your death . . . Termination by mutual agreement between you and BP . . .

- Participation in the Plan is at BP's discretion.
- Your participation in the Plan does not constitute or form a part of any contract of employment and is strictly governed by the Plan Rules . . . . You have no right to compensation for any loss in relation to the [Share Plan], on termination of your employment or otherwise.
- The Plan is operated in the sole discretion of BP . . .
- The benefit to you of participating in the [Share Plan] shall not form any contractual right for any purpose . . .
- Frequently Asked Questions and Answers about the Plan . . . 13. What if I terminate employment with BP during a restricted period? The general rule is that if you terminate employment with BP during the restricted period you will forfeit your RSUs. . . .
- If a US participant ceases to be employed by any Member of the Group more than 12 months after the start of the Restricted Period . . . and before the end of the Restricted Period for any of the reasons set out below, his Awards do not lapse and will Vest and will be Released after the end of the Restricted Period. The reasons are : . . . (2) A US Participant's involuntary termination of employment with any Member of the Group, other than due to such Participant's conduct or performance. For avoidance of doubt, the following circumstances will be considered an involuntary termination of employment: (A) termination of a US Participant's employment by his or her employer, or a termination considered by the Designated Corporate Officer to have been initiated by the US Participant's employment, in both cases where the termination is not based on the US Participant's conduct or performance . . .

(Def. SOF ¶¶ 20–21.) Finally, there is no dispute if Ragan were terminated for cause within 24 months of commencement of her employment that she would be required to repay 100% of the $200,000 sign-on payment. (Def. SOF 24; Pl. SOF Resp. ¶ 24.)

In March of 2016, BP sent Ragan a reward statement showing that BP was awarding her a $500,000 bonus, with $415,000 cash payable immediately and $85,000 awarded as a deferred annual bonus. (Def. SOF ¶ 36.) That statement also provided that IST Bonuses are discretionary and subject to the relevant plan documents and that this bonus does not create any future contractual entitlement to other awards. (Def. SOF ¶ 37; Pl. SOF Resp. ¶ 37.) But Ragan denies that this means her 2015 bonus was discretionary. (*Id.*) The statement also says deferred annual bonuses are discretionary and subject to DAB Plan Rules. (Def. SOF ¶ 37.) The statement further

provided that the grant date for Ragan's $85,000 deferred award was March 2016 and that the final vest date was January 2019. (Def. SOF ¶ 38.) The statement also provided under the "Detailed Outstanding Deferred Awards Schedule" that Ragan had a "3Q RSP II Grant Award" in the amount of $500,000 that had a grant date of June 2015, and a final vest date of June 2018. (*Id.* ¶ 39.) This was the $500,000 in RSUs that Ragan had been granted in connection with her April 27, 2015 offer letter. (*Id.*) Finally, the statement provided: "All deferred awards are subject to the terms and conditions of the respective governing Plan document as amended from time to time." (*Id.* ¶ 40.)

### B.    Termination

The rationale for BP's decision to terminate Ragan is central to this case. The Parties dispute the reason for Ragan's termination: Defendants claim Ragan was terminated for performance issues while Ragan maintains she was terminated without cause to deny her a bonus. (Def. SOF ¶ 78; Pl. SOF Resp. 78; Ragan Dep. (Dkt. No. 91-3) at 306:21–308:1; 311:16–23; 320:3–8; 320:22–321:2.)

Defendants cite three performance issues as their cumulative rationale for terminating Ragan. (Def. SOF ¶ 78.) First, Ragan's history of compliance issues; second, Ragan's arguably poor judgment in purchasing biofuels stock while working in a BP trading group that often operates in the same market without prior disclosure; third, Ragan had not sufficiently progressed in her role as an originator. (Def. SOF ¶ 76.) While Ragan admits she had compliance issues in her role as a trader, (Pl. SOF Resp. ¶¶ 41–62), she denies she performed poorly as an originator or showed poor judgment with her investment decisions. (Pl. SOF Resp. ¶¶ 66–70, 71–72.) Ragan argues she performed as well as other reasonable originators would have because she only failed to move the blended compliance instrument structure that the market was not

generally moving on. (Pl. SOF Resp. ¶ 72.) She further argues she self-reported her potential conflict of interest as soon as she discovered the appearance of a conflict. (Pl. SOF Resp. ¶ 68.) Finally, Ragan contends that BP did not choose to terminate her for her poor compliance record; instead, BP reassigned her to origination. (Pl. SOF Resp. ¶¶ 59–61.)

### 1. Compliance violations

Ragan's role as a trader was to develop BP's capability to trade in the regional greenhouse gas initiative ("RGGI") market, particularly North American emissions. (Def. SOF ¶ 25.) Ragan was the primary lead trader in this market. (*Id.*) Ragan reported directly to Trading Manager Stephanie Curulewski in this role. (*Id.*) Ragan's role required her to comply with all legal, regulatory, operational, risk, and compliance requirements for traders, including BP's compliance rules. (*Id.* ¶ 26.) Ragan understood compliance was important to BP and that breaches of compliance could erode IST's reputation and have serious consequences for her. (*Id.*) Ragan was trained to comply with these policies when she began her employment with BP, before she could begin trading. (*Id.* ¶ 27.) Ragan understood failure to comply with these policies could result in discipline, up to her termination. (*Id.*)

BP sets limits under which traders are allowed to trade, which are called "delegations of authority" ("DOA"). (*Id.* ¶ 28.) Ragan received training about her DOA. (*Id.*) Ragan understood before she made trades that she was required to make sure her trade was within her DOA. (*Id.*) Ragan was aware departure from the DOA required preapproval. (*Id.*)

BP has two forms of compliance limit: "soft limits," when a trader is close to exceeding their delegation of authority, and "hard limits," or the explicitly stated limit in the DOA. (*Id.* ¶ 28–29.) Plaintiff understood she was supposed to inform her manager if she was trading close to the soft limit and was to obtain preapproval before exceeding her soft limit. (*Id.*)

BP requires traders to check "CredEx" before closing a deal with a counterparty to ensure the counterparty has the appropriate amount of credit before completing a trade. (*Id.* ¶ 30.) Ragan received training on checking CredEx prior to completing trades. (*Id.*)

On August 19, 2015, Commodity Risk Analyst Chris Walters sent Barry an email advising Barry that Ragan breached her soft limit on California Carbon Allowances. (Def. SOF ¶ 41.) Ragan denies that she actually breached this limit. (Pl. SOF Resp.; Ragan Dep. at 162:6–163:18, 164:17–23.)

BP required traders to timely approve their daily and month-end profits and losses ("P&L"). (Def. SOF ¶ 42.) In November 2015, Ragan was late in signing off on three P&L statements. (*Id.*) In early 2016, Ragan may have again failed to timely approve her P&L. (*Id.* ¶ 43; Pl. SOF Resp. ¶ 43.) Defendant says Ragan was late, while Plaintiff thought she timely completed her P&L statements. (*Id.* ¶ 43; Pl. SOF Resp. ¶ 43.)

In January 2016, Commodity Risk Analyst Alexey Beliakov sent Ragan an email, copying Curulewski and others, that stated "we have a breach" of Ragan's DOA. (*Id.* ¶ 45.) Ragan denies she breached this limit because she took an offsetting position that had not cleared at the time of the email. (Pl. SOF Resp. ¶ 45; Ragan Dep. at 174:8–13.) BP does not deny that Ragan took an offsetting deal. (*See* Def. SOF ¶ 46–47.) On February 12, 2016, Ragan executed a trade that breached her soft limit. (Def. SOF ¶ 49; Ragan Dep. 179:19–180:5.)

BP requires traders to enter expiration of futures deals on the International Exchange in a system called NextGen. (Def. SOF ¶ 47.) In January and February 2016, Ragan repeatedly entered deal details into NextGen incorrectly. (*Id.*) Curulewski told Ragan her repeated incorrect NextGen entries were an issue; Ragan characterizes Curulewski as frustrated with her repeated failure to properly enter the information. (*Id.* ¶ 48; Ragan Dep. 186:14–18.)

In early 2016, the RGGI portfolio took losses of roughly $5 million over a period of two days, although changes in the CCA portfolio may have accounted for some portion of the loss. (Def. SOF ¶ 50; Pl. SOF Resp. ¶ 50.) Ragan was the primary lead for RGGI trading at this time, although the parties dispute whether the responsibility for the losses were Ragan's or jointly shared among the team. (*Id.*) Curulewski spoke with Ragan about her declining or reduced levels of confidence around this time. (Def. SOF ¶ 50.)

BP claims in February 2016 Ragan failed to follow BP's credit monitoring rules when she failed to check CredEx before a deal with a counterparty (Dynegy). (Def. SOF ¶ 51.) Ragan does not recall the incident. (Pl. SOF Resp. ¶ 51.) Debbie Martin, a member of the BP Operational Excellence Team, emailed Ragan on February 29, 2016 noting the incident. (Def. SOF ¶ 51.) Ragan disputes whether CredEx was the appropriate mechanism to check Dynegy's credit in this case. (Pl. SOF Resp. ¶ 51.) She believed BP already did business with Dynegy and BP has as a separate credit check process for current counterparties. (*Id.*) Ragan does not believe this represented a violation of any BP policy, because the deal was not executed at the time the incident was reported and because she consulted with a member of the Credit Team prior to executing the deal. (*Id.*) BP argues Ragan failed to comply with their credit verification policy, which required Ragan to check CredEx before doing a deal with any counterparty. (Def. SOF ¶ 51.) BP deemed this incident with Dynegy a Category B compliance incident. (Def. SOF ¶ 52.) Category B is the lower of two incident categories, with Category A being worse. (*Id.*) BP reviewed Ragan's history with CredEx following the Dynergy incident and determined Ragan only checked CredEx for three of her last fifty deals. (*Id.*)

On May 2, 2016, Curulewski informed Ragan that she failed to approve her P&L statements on five of the twenty previous occasions. (Def. SOF ¶ 53.) Ragan admits she was late

in approving these statements. (Pl. SOF Resp. ¶ 53.) Curulewski sent Ragan an email stating: "we have had an embarrassing number of [missing PNL approvals] this month. What is the cause of the missed approvals?" (Def. SOF ¶ 53.)

The same day, BP's Commodities Risk Manager, Connie Griggs, sent Ragan an email informing her she breached her DOA for a second time. (Def. SOF ¶ 54.) Ragan disputes that she actually breached her DOA but admits that this would have been her second breach in three months. (Pl. SOF Resp. ¶ 54.) Ragan does not dispute any particular factual detail about the purported DOA breach. (Pl. SOF Resp. ¶ 54.) BP categorized this breach as a "Category A" incident. (Def. SOF ¶ 58.)

On May 9, 2016, Ragan and Curulewski met to discuss both the DOA breach and the missing profit and loss approvals. (Def. SOF ¶ 55.) Curulewski informed Ragan she was concerned with her performance, that Ragan violated BP's compliance policies, and that she was frustrated Ragan continued to fail to approve her profit and loss statements. (Def. SOF ¶ 55.) Curulewski warned Ragan she had to improve or should might be terminated. (Def. SOF ¶ 55; Ragan Dep. 206:10–12.) On May 13, 2016, Curulewski sent Ragan a follow-up email telling Ragan she needed to make immediate improvements and laid out a list of expectations and actions she had to follow. (Def. SOF ¶ 56.) Ragan understood that failure to meet these expectations could result in her termination. (*Id.*) Ragan admits she assumed Curulewski was questioning her judgment and that Ragan did not always understand her position as a trader. (Pl. SOF Resp. ¶ 57; Def. SOF ¶ 57.) Ragan believed her DOA breach was a "major setback" for her and her trading team. (Def. SOF ¶ 58; Ragan Dep. 231:5–17.)

On May 23, 2016, Curulewski and Barry met with Ragan and revoked her DOA. (Def. SOF ¶ 59.) This meant that Ragan was no longer allowed to trade on BP's behalf. (*Id.*) Ragan's

managers told her she was being moved from trading to an origination role. (*Id.*) Originator roles are more relationship-driven where she would negotiate long-term deals or establish relationships with current parties. (Def. SOF ¶ 59.) Ragan understood her transfer to be a disciplinary action and that it was expedited because her managers lost confidence in her judgment as a trader. (*Id.*) On May 25, Curulweski sent a follow-up email, copying Barry that repeated these details and added that the move would not be "a clear start" for Ragan. (Def. SOF ¶ 60; Ragan Dep. 221:22–222:1, 223:15–22.) Ragan testified that she understood at that point that she had a "hill to climb to repair [her] reputation" at BP and that she would need to be proactive in ensuring her compliance in the future. (Def. SOF ¶ 61; Ragan Dep. 226:2–6, 230:2–17.)

Ragan was aware that when she was working out of the office, she had to notify Ethics and Compliance of any transaction that she conducted on the day it was executed. (Pl. SOF Resp. ¶ 62.) In October 2016, Ragan executed a transaction while working out of the office without notifying Ethics & Compliance on the day of the transaction. (Def. SOF ¶ 62; Pl. SOF Resp. ¶ 62; Bordignon Dep. 6:22–7:8, 139:11–140:7; Ragan Dep. 249:2–250:3.) Instead, she says she notified Ethics & Compliance three days after execution of the transaction on the day it was recorded in the system. (*Id.*)

### 2. *Performance as Originator*

Ragan began working in an origination role in mid-2016. (*See* Def. SOF ¶ 71.) In early August 2016, Ragan laid out for her new manager, Zach Scott, her plan for the second half of the year. (*Id.*) She was targeting specific companies to sell them offset credits or allowances for Renewable Identification Numbers ("RINs") and carbon, transacting D3 product structures, and selling a blended compliance instrument structure comprised of 92% allowances and 8% offsets.

(*Id.*; Ragan Dep. 277:11–278:14, 278:20–22, 288:22–281:2.) Ragan did not sell any offsets or allowances to the companies she identified to Scott, did not transact any D3 product structures, and did not sell any of the blended compliance instruments. (Def. SOF ¶ 72.) Ragan claims this reflected the *market*, rather than any measure of her performance. (Pl. SOF Resp. ¶ 72; Ragan Dep. 280:22–281:8.) She also points out that the trader Gary Beers made the market call not to give an offer to the firm she identified to Scott. (Pl. SOF Resp. ¶ 72.) Finally, she points out that D3 structures were not on the market at the time, making the transactions difficult to execute. (*Id.*)

### 3. Potential conflict of interest

BP maintains a Code of Conduct that it requires all employees to adhere to. (*Id.* ¶ 31.) Ragan was trained on this Code of Conduct. (*Id.*) The Code of Conduct is a "principle-based code." (Pl. SOF Resp. 31; Malone Dep. (Dkt. No. 91–8) at 22:3–26:13.) The code requires employees to use "good judgment," which was not defined in the code, to be proactive, and to manage conflicts of interest. (Def. SOF ¶ 32; Pl. SOF Resp. ¶ 32.) Ragan took a class on conflict of interest on July 20, 2015 that trained her on BP's Conflicts of Interest Policy. (Def. SOF ¶ 34; Ragan Dep. 128:17–20; 154:20–155:4.) The parties dispute whether the code required Ragan to disclose any *apparent* conflict of interest that might influence her judgment. (Def. SOF ¶ 32; Pl. SOF Resp. ¶ 32.) BP's policy included the following statements:

- BP Employees should avoid any actual or apparent conflict between their own personal interests and the interests of BP.
- BP Employees shall disclose situations to their line manager that might create a Conflict of Interest, or even the appearance of a Conflict of Interest.
- Breaches of this Policy may be regarded as grounds for disciplinary actions up to and including dismissal.

(Def. SOF ¶ 34.) Ragan understood she was required to avoid any actual or apparent conflicts between her own personal interests and the interests of BP, and that she was required to report any such situations to her line manager should they arise. (*Id.* ¶ 35; Pl. SOF Resp. ¶ 35.)

From August 22, 2016 through September 19, 2016, Ragan bought shares in Clean Energy Fuels ("CEF") for her personal account. (Def. SOF ¶ 64.) She ultimately purchased around 10,500 shares of CEF. CEF is a biofuels company; both BP and CEF operated in the biogas market. (Def. SOF ¶ 63.) Ragan did not disclose her purchase of CEF shares to anyone at BP prior to her purchase. (Def. SOF ¶ 64.)

BP was working on a deal with CEF to potentially purchase a portion of CEF's renewable natural gas business. (Def. SOF ¶ 65.) Ragan denies knowledge of this deal at the time she purchased shares. (Pl. SOF Resp. ¶ 65; Ragan Dep. 268:10–19.) BP claims the biogas market is "small" and therefore Ragan should have known; Ragan denies both claims. (Def. SOF ¶¶ 63–64, Pl. SOF Resp. ¶¶ 63–64; Ragan Dep. 261:20–262:10, 266:4–21.) BP claims Ragan violated its conflict of interest policy because Ragan "knew it was possible" that CEF and BP transacted with each other; Ragan denies this, but concedes that knowing what she knows now she should have checked to see whether the two transacted business together before purchasing the shares for her private account. (Def. SOF ¶ 66; Pl. SOF Resp. ¶ 66.) Ragan believes she did not violate the conflict of interest policy when she purchased the shares, because she did not know or have reason to know of the deal between CEF and BP. (Pl. SOF Resp. ¶ 66.) Ragan might have been precluded from trading purchasing CEF stocks had she predisclosed her desire to purchase the stock. (Def. SOF ¶ 67.)

In October 2016, Senior Vice President of Marketing and Origination Sean Reavis told Ragan that BP was working on a deal with CEF. (Def. SOF ¶ 68.) Ragan immediately disclosed

her purchase of shares in CEF during that conversation. (*Id.*) BP's Ethics and Compliance group was told about Ragan's purchase of the shares and conducted an investigation to consider whether Ragan breached the conflict of interest protocol or engaged in insider trading. (*Id.* ¶ 69.) The Ethics and Compliance group concluded Ragan did not breach either policy; there was no evidence of wrongdoing. (Def. SOF ¶ 70.) BP claims it nonetheless determined Ragan showed poor judgment in failing to predisclose her purchase of CEF shares. (*Id.*) This record contains no evidence Ragan knew or should have known about the CEF deal, besides the disputed claim that the biogas market is "very small." (*See* Def. SOF ¶¶ 68–70; Pl. SOF Resp. 68–70.)

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party is entitled to summary judgment only if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553 (1986). "On cross–motions for summary judgment, the Court assesses whether each movant has satisfied the requirements of Rule 56." *Portalatin v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 125 F.Supp.3d 810, 813 (N.D. Ill. 2015). As with any summary judgment motion, we consider cross–motions for summary judgment "construing all facts, and drawing all reasonable inferences from those facts, in favor of the non–moving party." *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (citing *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008)).

Our jurisdiction is based on diversity of citizenship, so we apply the substantive law of the State of Illinois to determine substantive legal questions. *See Murphy v. Smith*, 844 F.3d 653, 656 (7th Cir. 2016) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817 (1938)).

## ANALYSIS

We first consider the parties' motions on Plaintiff's claims, then turn to the parties' motions on Defendant's counterclaim for repayment of Ragan's signing bonus.

## I. PLAINTIFF'S BREACH OF CONTRACT, SPECIFIC PERFORMANCE, AND STATE WAGE LAW CLAIMS.

Plaintiff argues she is entitled to relief under three claims for both her lost RSUs and her lost bonuses: (1) breach of contract; (2) specific performance; (3) violations of the IWPCA. All three contain roughly the same elements, but we address each in turn.

### A. Breach of Contract

Plaintiff argues defendants breached both the express terms of her offer and the implied covenant of good faith and fair dealing they terminated her because she was terminated opportunistically. (Pl. MSJ Mem. at 7.) Defendants argue their exercise of discretion was transparently reasonable, given Ragan's history of compliance violations. (Def. MSJ Mem. at 5–7.) Ragan points to Defendants' nebulous "totality of the circumstances judgment" to terminate her as proof a genuine issue exists as to the precise reasons Ragan was terminated and whether it was actually a proper exercise of BP's contractual discretion. (*Id.*) For the reasons set forth below, we agree with Plaintiff that we cannot say as a matter of law that no reasonable jury could find a violation of the implied covenant of good faith, although it is a close question.

We begin by reviewing the relevant interpretive principles for breach of contract in Illinois. Under Illinois law, a court looks first to the plain language to interpret the contract. *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011). The primary objective of the court is to give

effect to the intention of the parties. *Id.*; *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). "A contract must be construed as a whole, viewing each provision in light of the other provisions." *Thompson*, 948 N.E.2d at 47. If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning. *Central Illinois Light Co. v. Home Insurance Co.*, 821 N.E.2d 206, 213 (Ill. 2004). However, if the language of the contract is susceptible to more than one meaning, it is ambiguous. *Gallagher*, 874 N.E.2d at 58. "If the contract language is ambiguous, a court can consider extrinsic evidence to determine the parties' intent." *Thompson*, 948 N.E.2d at 47. A contract *is not* ambiguous simply because the parties dispute the meaning of a term. *Id.*

Several of Ragan's claims deal with the implied covenant of good faith, so we review the relevant Illinois law before dealing with its particular application to this case. The implied covenant of good faith is "essentially used as a construction aid in determining parties' intent." *Anderson v. Burton Assocs.*, 578 N.E.2d 199, 203 (Ill. 1991). Breach of the implied covenant of good faith is not a standalone tort claim but included within a breach of contract claim. *Id.* "When one party's contractual obligation is 'contingent upon a condition particularly within the power of that party,' the controlling party's discretion in bringing about the condition is limited by the implied covenant of good faith." *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 675 (7th Cir. 2013) (quoting *Dayan v. McDonald's Corp.*, 466 N.E.2d 958, 971 (Ill. 1984) (collecting cases)). The fact that contractual discretion is express does not limit the application of the covenant. *Id.* "[A]n employer who discharges an at-will employee under the express terms of the contract can still breach the contract if the employer exercised its discretion in a manner contrary to the reasonable expectations of the parties." *Id.* (citing *LaScola v. U.S. Sprint Commc'ns*, 946 F.2d 559, 566 (7th Cir. 1991) ("We recognize . . . that the law seems fairly clear that an

employee at will may not be deprived of commissions (in large part 'earned' prior to separating from the employer) by a discharge made in bad faith and intended to deprive the employee of the commissions." (quotation omitted))); *see also Jordan v. Duff & Phelps, Inc.*, 815 F. 2d 429, 438 (7th Cir. 1987) ("[N]o one . . . doubts that an *avowedly* opportunistic discharge is a breach of contract, although the employment is at-will." (emphasis in original)). Thus, an at-will employer need not "regard the interests of one's contracting partner the same way [they] would regard [their] own"; instead, they must avoid bad faith or arbitrary exercises of their discretion. *Id.*

### 1. Employment Contract

The plain language of the offer letter unmistakably grants BP discretion in executing its bonus awards.[1] The contract is thus given its ordinary meaning. *Central Illinois Light*, 821 N.E.2d at 213. The plan Offer Letter includes language that confers discretion about bonus awards to BP, including the following:

- "you are *eligible* to earn an annual bonus,"
- "subject to you *remaining eligible* . . . you will be eligible for a minimum bonus for the 2015 performance year . . . in the amount of $500,000,"
- "Please note that the Plan is *discretionary* and all awards under the Plan are at the *absolute discretion* of BP,"
- "The Plan can be varied or *withdrawn at any time*, including part way through the performance year . . . .,"
- "you will *lose your eligibility* for this bonus opportunity if, in the sole discretion of BP, you: Fail to comply with any BP Policies, the BP Code of Conduct, BP Trading Guidelines . . . ."

(Def. SOF ¶ 11 (emphasis added).) Importantly, BP reserved discretion to determine whether its employees violated any of its policies. (Def. SOF ¶ 11.) In other words, the agreement's terms vest BP with the discretion to consider whether Ragan violated the Code of Conduct or Trading

---

[1] The parties do not dispute that the Offer Letter constituted a contract when signed, although they dispute whether the Letter included all terms of the contract. (Def. SOF ¶ 10; Pl. SOF Resp. ¶ 10.)

Guidelines in a way that would justify denying her a bonus. (*Id.*) While the contract does grant this discretion to BP, it nevertheless is not without qualifications under the law of the Seventh Circuit on the implied covenant of good faith and fair dealing.

Ragan raises two potential sources of ambiguity about the meaning of the contract: one internal to the Offer Letter and the other based on external communications. A contract is not rendered ambiguous simply because the parties disagree on the meaning. *Central Illinois Light*, 821 N.E.2d at 214. Instead, the court should look to the structure of the document as a whole to determine whether any ambiguity appears. *Id.* at 213. Ragan argues the inclusion of the term "minimum bonus" creates an ambiguity about the extent of BP's discretion. (Pl. MSJ Mem. at 8.) Ragan's argument attempts to remove the "minimum" language from context; the language clearly implies if BP determines a bonus should be awarded, then the minimum total amount will be $500,000. (*See* Def. SOF ¶ 11.)

Ragan's second argument is that her emails with Barry vary the terms of the contract and include a guarantee not otherwise present in the Offer Letter. "The parol evidence rule generally precludes evidence of understandings not reflected in the contract, reached before or at the time of its execution, which would vary or modify its terms." *W.W. Vincent and Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 757, 814 N.E.2d 960, 966 (1st 2004) (citing *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 521, 757 N.E.2d 952, 956 (1st 2001)). In order to determine whether the parol evidence rule bars consideration of extrinsic evidence, the Court first determines whether the *written* contract is an integrated document intended to memorialize the parties' intentions. *See J&B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 642 N.E.2d 1215, 1218–19 (Ill. 1994). If a writing *specifically mentions* another writing to be integrated into the contract, as the Court found in *J&B Steel*, then the court may incorporate extrinsic evidence

because the parties' intent to vary the terms of the writing through extrinsic evidence is clear. *Id.* at 1219–20. If a writing *does not* mention non-contemporaneous discussions, then the writing may evidence an integrated agreement. *See Eichengreen*, 325 Ill. App. 3d at 524, 642 N.E.2d at 958.

Although the Offer Letter makes reference to external policies, demonstrating that the Letter does not include *all* terms of the bonus arrangement, it does not incorporate any language referencing previous discussions between Barry and Ragan about "guaranteed" bonuses. (Def. SOF ¶ 11; BP Offer Letter (Dkt. No. 91–6).) In fact, where BP intended to incorporate other policies or documents, they did so *clearly*. (*See* BP Offer Letter.) For example, the Offer Letter uses language like "[f]ail[ure] to comply with any BP Policies, the BP Code of Conduct, BP Trading Guidelines . . . ." (Def. SOF ¶ 11.)

Unlike *J&B*, where the court allowed extrinsic evidence to vary the meaning of contract terms, BP did not make explicit reference to a previous conversation within the text of the contract. (Def. SOF ¶ 11); *J&B*, 642 N.E.2d at 1220. Here Ragan is attempting to read the word "guarantee" in her email exchange with Barry to vary all discretionary language in the Offer Letter. (Pl. MSJ Mem. at 6.) *Eichengreen* clarifies that Illinois law precludes reading terms from a conversation prior to the final contract to vary explicit terms of the written contract when the conversation is not referenced within the written contract itself. 325 Ill. App. 3d at 524, 757 N.E.2d at 958. Even though extrinsic evidence is obviously incorporated explicitly through the references to BP policies, this does not necessitate consideration of all parol evidence where offered to *vary* the terms of the contract (rather than to supplement them). *J&B*, 642 N.E.2d at 1220. As a result, we will *not* allow extrinsic evidence to vary the terms of the Offer Letter as to whether the bonus is guaranteed. Thus, the Offer Letter between BP and Ragan is a partially

integrated document that precludes incorporation of extrinsic evidence to vary the terms of the contract. Thus, Ragan fails to raise a genuine issue of material fact as to the "guarantee" language in the emails exchanged between Barry and herself.

The implied covenant of good faith and fair dealing limits BP's ability to exercise its discretion; a genuine issue of material fact exists whether BP breached the covenant. "Every contract contains an implied covenant of good faith and fair dealing." *McCleary v. Wells Fargo Securities*, 29 N.E.3d 1087, 1093 (1st 2015). "Disputes involving the exercise of good faith arise when one party is given broad discretion in performing its obligations under the contract." *Id.* "Where a contract specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised 'reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.'" *Id.* (quoting *Resolution Trust Corp. v. Holtzman*, 618 N.E.2d 418 (Ill. 1993).) The *McCleary* plaintiff sought to constrain his former employer's contractual discretion in bonus awards; the Illinois Circuit Court dismissed, but the Appellate Court reversed, holding that contractual terms granting an employer discretion over bonus awards did not *obviate*, but instead *created* the implied covenant term that the employers exercise their discretion in keeping with the parties' expectations. *Id.* Finally, the Court determined "[w]hether defendant's decision was a reasonable exercise of its discretion is a question of fact to be resolved by the trier of fact . . . ." *Id.* at 1097.[2]

---

[2] On the other hand, the court in *McLaughlin v. Sternberg Lanterns, Inc.*, determined whether an employer fired an employee for "substantial cause" did not create a question of material fact where the defendant reasonably exercised its discretion. 917 N.E.2d 1065, 1072 (2nd 2009). First, the bonus contract at issue in that case included *explicit* requirements that were "dependent on whether sales for the defendant increased over the previous year," which limited discretion an employer *could* abuse. *Id.* In contrast, Ragan's less rigid contract bestowed more discretion on BP, which concomitantly increases its potential for abuse of discretion. Second, The *McLaughlin*

Ragan raises a genuine issue of material fact about BP's exercise of its discretion. Although BP can terminate Ragan for cause and thereby disqualify her from participating in the bonus program, there is substantial factual uncertainty whether or not Ragan's termination was for cause within the meaning of her bonus contract. While BP maintains Ragan's history of compliance violations justified her termination, Ragan points to similar violations receiving far less strict punishment. (Pl. MSJ Mem. at 9–10; Malone Dep. 34:9–37:3.) In addition, Ragan points out the timing of her termination seems pretextual, especially given that the event precipitating her firing was questionably a violation of BP's ethics rules. (Ragan Dep. 311:12–312:7.) Finally, Ragan highlights her immediate self-reporting and the results of BP's internal ethics investigation as evidence she did not engage in insider trading or create a conflict of interest. (*Id.* 306:23–307:10.) Whether BP is correct that Ragan violated their "principle-based" conflict of interest policy seems precisely the kind of question of fact a jury should resolve. *See McCleary*, 29 N.E.3d at 1097.

### 2. RSU Contract

The plain language of the RSU contract forecloses Ragan's breach of contract claim under the contract. In a bonus dispute where a contract similarly granted the employer "sole discretion" to revoke the bonus plan at any time, the Seventh Circuit determined there was no ambiguity about the employer's right to revoke a prospective bonus at any time before the bonus accrued. *Wilson*, 729 F.3d at 672. The *Wilson* plaintiff had already performed his entire portion of the bonus contract, but the court still found the discretionary language overwhelmed any claim of breach based on partial performance. *Id.* In addition, "certain contracts can include language

_____

plaintiff also waived the factual issue of the employer's discretion on appeal, so much of the decision turned on the application of procedural rules. *See id.*

indicating that one of the parties is to have discretion to interpret and apply the contract," which means "the court is to defer to that party's interpretation." *Id.* (citing *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 330–31 (7th Cir. 2000)).

BP's discretion to implement the bonus plan and to define the scope of the plan suggests BP did not breach any explicit term of its contract with Ragan. (Def. SOF ¶ 18, 20.) For example, the RSU plan refers to the shares as a "conditional entitlement" that accrues "at a date in the future, provided that the specified terms and/or conditions are met." (*Id.* ¶ 20.) The *main* terms for RSU grants is "continued employment with BP until the end of the restricted period and the satisfaction of conditions specified at the time of the grant . . . the Plan Rules or in a separate grant letter you would have received." (*Id.*) Under the terms of the plan, "[i]f your employment with BP ends before the vesting date then, with the exception of certain special circumstances, you will forfeit your RSUs." (*Id.*) Ragan ceased to be an employee because she failed to comply with the conditions of her employment letter, as described above, so she forfeited her shares under the explicit terms of the contract. (*Id.*) Although the plan contains an exception for "involuntary termination," this does not include termination due to the employee's "conduct or performance." (*Id.* ¶ 21.) Ragan was terminated for her conduct, including her failure to check CredEx, compliance issues, and apparent conflict of interest. (*Id.* ¶ 76.) Therefore, under the explicit terms of the RSU plan her shares were forfeited. (*See id.* ¶ 21) Nevertheless, BP was still required to exercise its contractual discretion in good faith, which is the basis for the remainder of Ragan's claims.

Ragan asserts BP violated its duty to exercise its contractual discretion reasonably and with proper motive. In *Jordan*, the Seventh Circuit held that firing an employee on the eve of his bonus vesting may be opportunistic behavior of the kind that violates the implied covenant of

good faith. 815 F.2d at 439 (citing *Rao v. Rao*, 718 F.2d 219 (7th Cir. 1983) (applying Illinois contract law)). Although *Jordan* deals with a statutory duty to disclose information, the thrust of the plaintiff's theory was that recession was appropriate because of an impermissibly opportunistic decision on the part of his employer intended to deprive Jordan of the benefit of his stock-based bonus. *Id.* at 439–40.

Like the *Jordan* plaintiff, Ragan alleges facts sufficient to suggest BP opportunistically terminated her before a portion of her RSUs vested. Ragan states a portion of her bonus was about to vest just as BP seized on her voluntary self-disclosure of a stock purchase that only created an attenuated perception of a conflict of interest. (Pl. SOF Resp. ¶ 63–67, 77; Ragan Dep. 306:21–308:10.) In other words, Ragan alleges BP had a financial motive to terminate her before her vesting date, in addition to a weaker-than-usual rationale for terminating her employment. Although BP contests Ragan's contention that its conflict of interest concerns were unreasonable, a reasonable jury could determine their actions were a pretext on the facts before us. (Def. SOF ¶ 63–67.) In fact, the main reason BP believes Ragan should have known purchasing CEF stock might appear to be a conflict of interest is its assertion that the biogas market is "very small." (*Id.* ¶ 67.) Such a loose characterization and inference is not enough to determine BP's actions were not pretextual as a matter of law.

B.      **Specific Performance**

Plaintiff's specific performance counts are alternative pleadings of her breach of contract counts. (FAC ¶¶ 63–89.) Neither count alleges distinct facts or rationales for recovery, the only difference is the remedy she seeks is specific performance of the terms of the employment and RSU contract provisions. (*Id.*)

"A party seeking specific performance must establish (1) the existence of a valid and enforceable contract, (2) that the plaintiffs have complied with all of the terms of the contract or that they stand ready, willing, and able to perform, and (3) that defendants have failed or refused to perform their part of the contract." *Shakir v. Anvi, LLC*, No 17 C 1318, 2018 WL 631482, *4 (1st Jan. 29, 2018) (citing *Schilling v. Stahl*, 395 Ill. App. 3d 882, 884, 918 N.E.2d 1077, 1080 (2nd 2009). "[W]here there is ambiguity, doubt, or uncertainty with respect to its terms, equitable enforcement by specific performance will be denied." *Stahl*, 395 Ill. App. 3d at 885, 918 N.E.2d at 1080 (citing *Cefalu v. Breznik*, 154 N.E.2d 237, 239 (Ill. 1958)). "It is not sufficient, as a basis for such relief, to show the existence of an agreement of some kind between the parties." *Cefalu*, 154 N.E.2d at 239. Where there is an adequate remedy at law, specific performance is not appropriate. *Schwinder v. Austin Bank of Chi.*, 348 Ill. App. 3d 461, 478, 809 N.E.2d 180, 197 (1st 2004). Violation of the covenant of good faith and fair dealing can form the basis for specific performance. *Id.* at 476, 809 N.E.2d at 195.

Ragan is not entitled to specific performance of the bonus or employment contracts unless she can prove BP denied her an unambiguous contractual right. The contact terms *at best* questionably entitled Ragan to relief, so specific performance is inappropriate here. As we explained above, the language of the contract is not facially ambiguous: BP has discretion under the contract to assign or revoke any bonus award to Ragan in its discretion. (Def. SOF ¶¶ 18, 20.) Nevertheless, since Ragan's claim under the implied covenant of good faith and fair dealing survives summary judgment, her claim for specific performance survives. *See Schwinder*, 348 Ill. App. 3d at 478, 809 N.E.2d at 197.

C.     **Illinois Wage Payment and Collection Act**

Plaintiff's claims under the IWPCA rise or fall with the breach of contract claim. "In interpreting the Wage Act, this court must ascertain and give effect to the intent of the legislature." *McLaughlin v. Sternberg Lanterns, Inc.*, 395 Ill. App. 3d 536, 541, 917 N.E.2d 1065, 1069 (2nd 2009). Section 2 of the IWPCA governs payment to separated employees, but only applies to "earned bonuses." *Id.* Cancellation of stock options under a bonus plan for a qualifying event does not count as an "earned bonus" for the purpose of the IWPCA. *Id.* at 542–43, 917 N.E.2d at 1070 (citing *Tatom v. Ameritech Corp.,* No. 99 C 683, 2000 WL 1648931, at *8–9 (N.D. Ill. Sept. 28, 2000) (mem. op.)) The *Tatom* plaintiff lost his stock options under an incentive plan where the court found he did not have a contractual right to the bonus; thus, the disposition turned on whether the bonus plan conferred a contractual right to him. *Tatom*, 2000 WL 1648931, at *9; *see also McLaughlin*, 395 Ill. App. 3d at 543, 917 N.E. 2d at 1070. In other words, the courts have "drawn a distinction between whether or not the employee was unequivocally promised a bonus by his or her employer. If no such unequivocal promise was made, then the employee is not entitled to any part of the bonus pursuant to section 2 of the Wage Act." *McLaughlin*, 395 Ill. App. 3d at 544, 917 N.E. 2d at 1071.

If BP discharged Ragan without cause, then Ragan may be entitled to a pro rata share of her bonus under the terms of the bonus agreement. As a result, whether or not Ragan was guaranteed any part of the bonus agreement as of the date of separation turns on the same question as the breach of contract claim, which we analyzed in further detail above. Thus, summary judgment is inappropriate for either party on this count.

## II.     SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIM FOR REPAYMENT OF $200,000 SIGNING BONUS.

BP argues Ragan must repay them the $200,000 signing bonus they paid her because she failed to remain employed for 24 months, a condition of the bonus. (Def. SOF ¶¶ 23–24.) Ragan

responds that BP waived the clawback provision of the contract when it failed to deduct the amount from her salary during her Garden Leave period. (Pl. MSJ Mem. at 2.) BP replies that there was no waiver because deducting the returned bonus from Ragan's salary was only one potential mechanism for them to seek return of the bonus and failure to take that specific course of action does not constitute a waiver. (Def. Mem. in Resp. to Pl.'s Mot. for Summary Judgment ("Def. Resp. Mem.") (Dkt. No. 87) at 3–4.)

The Parties do not dispute any element of BP's claim for repayment of the sign-on bonus except whether BP waived its right to repayment. "To recover the breach of a contract [in Illinois], a party must establish the following elements: '(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff.'" *Van Der Molen v. Washington Mutual Finance, Inc.*, 835 N.E.2d 61, 69 (4th 2005) (quoting *Henderson–Smith & Associates, Inc. v. Nahamani Family Serv. Center, Inc.*, 752 N.E.2d 33, 43 (1st 2001)). BP and Ragan's contract included a right for BP to request repayment of the $200,000 signing bonus it paid Ragan if she were terminated within her first 24 months of employment. (Pl. SOF ¶¶ 2–3, 7; Def. SOF ¶¶ 23–24.) Ragan was to repay the bonus "in cash in gross at least one day prior to the last date of employment" if she was "terminated with cause." (Pl. SOF ¶ 3, 7; Def. SOF ¶ 23.) Ragan did not repay this bonus at any time, at which point she breached a material term of the contract, assuming she was terminated with cause. (Def. MSJ Resp. Mem. at 1; Def. SOF ¶ 24, 80.) Thus, Ragan admits a contract existed, she breached the contract after a triggering event (her termination) occurred, and thus she owes repayment of the $200,000 signing bonus (a clear injury to BP) (Pl. SOF ¶¶ 7–10, 13,16); her only arguments are that BP waived its contractual rights and that her termination was not with cause. (Pl. MSJ Mem. at 1–5.) The undisputed material facts establish all elements

for a claim of breach of contract for the counterclaimants (leaving aside the broader issue of "for cause"), so much of the case turns on waiver.[3]

The Seventh Circuit has defined waiver as "a voluntary and intentional relinquishment or abandonment of a known existing right or privilege, which, except for such waiver, would have been enjoyed." *United States v. Sumner*, 265 F.3d 532, 537 (7th Cir. 2001); *Buffum v. Chase Nat'l Bank*, 192 F.2d 58, 60–61 (7th Cir. 1951). Waiver can be "expressed formally or it may be implied as a necessary consequence of the waiver's conduct inconsistent with an assertion of retention of the right." *Buffum*, 192 F.2d at 61; *see also Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 647 (7th Cir. 1993); *Cent. States, Se. & Sw. Areas Pension Fund v. Ekco Prod., Inc.*, 581 F. Supp. 374, 378 (N.D. Ill. 1984). "An implied waiver may arise where a person against whom the waiver is asserted has pursued such a course of conduct as to sufficiently evidence an intention to waive a right or where his conduct is inconsistent with any other intention than to waive it." *Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1140 (7th Cir. 2009) (quoting *Ryder v. Bank of Hickory Hills*, 146 Ill.2d 98, 585 N.E.2d 46, 49 (Ill. 1991)). Continuing to pay on a contract despite knowing the work of one party falls below the non-breaching party's standards can necessarily imply waiver. *Delta Consulting*, 554 F.3d at 1140–41. The party attempting to prove waiver has the burden of proof. *Buffum*, 192 F.2d at 61.

Ragan fails to meet her burden of proof to establish waiver. First, Ragan fails to show BP's conduct necessarily implies waiver of its right to recover. *See Buffum*, 192 F.2d at 61. She argues BP's failure to exercise its right to garnish her wages, payments, or vacation cash-out

---

[3] The phrase "termination with cause" references precisely the same conduct at issue in Ragan's complaint, so the existence of the genuine issue of material fact is laid out more directly above. (Def. SOF ¶ 23 ("[T]erminated with cause (e.g. breaching or non-compliance with the company's policies, guidelines, code of conduct, or not meeting performance requirements due to misbehaviours or willful disregards of BP rules or procedure)….)".)

necessarily equates to waiver. (Pl. SOF ¶¶ 2–3; Pl. MSJ Mem. at 2.) Ragan confuses specification of an allowable remedial action as excluding BP's right to seek return of her sign-on bonus through other means. (Pl. SOF ¶¶ 2–3, 7; Def. MSJ Mem. at 4.) Further, Ragan misidentifies her purportedly breaching conduct, failure to repay the bonus by her last day of employment, as a necessary condition for BP to claw back the signing bonus under the contract. (Def. Mem. at 4; Def. SOF ¶¶ 24, 80.)[4] Her theory would allow anyone who refuses to pay a contract to claim waiver any time the parties to the contract had any further interaction following breach, justifying a cascade of breach from a single breach. Such a broad reading is inconsistent with the requirement that the non-breaching party voluntarily relinquish their contractual rights; Ragan's theory would leave many non-breaching parties wishing to continue productive components of their relationships with a stark choice of relinquishing all activity or all rights to recover for breach of contract.

Unreasonable delay can result in waiver of a breach of contract claim. *See, e.g., Saverslak v. Davis-Cleaver Produce Co.*, 606 F.2d 208 (7th Cir. 1979); *Milnes v. Hunt*, 725 N.E.2d 779 (4th Dist. 2000). In *Saverslak*, the plaintiff waited almost seven years to file a breach of contract claim, which resulted in the court finding waiver. *Saverslak*, 606 F.2d at 213–14. In *Milnes*, the plaintiff similarly waited roughly six years to file his breach claim, which the court likewise determined constituted waiver because allowing the plaintiff to delay unduly would undermine the purpose of the statute of limitations. 725 N.E.2d at 981.

Ragan's claim is not close to any case finding waiver for failure to prosecute a breach in a timely fashion. At most, BP waited until Ragan commenced this action to file a counterclaim

---

[4] Unlike *Delta Consulting*, where happiness with performance was a *necessary* condition of the counter-plaintiff's decision to pay on the contract, BP was not required to enforce its repayment only though garnishment. *Delta Consulting*, 554 F.3d at 1141.

for breach of contract, a period of only seven months. (Pl. MSJ Mem. at 2–3.) Unlike both *Saverslak* and *Milnes*, where the plaintiffs sough recovery for a breach they had assented to for more than half a decade, BP sought recovery of the sign-on bonus well within a year. (*Id.*; Pl. SOF ¶ 13.) The rationale for finding waiver in *Milnes* was preserving the integrity of the statute of limitations; BP is in no danger of exceeding the statute in this case, because it filed its breach of contract claim only months after Ragan's termination. *See* 725 N.E.2d at 981; (*Id.*; Def. MSJ Mem. at 4; Pl. SOF ¶ 13.) Given Ragan's theory of waiver already reads "involuntary waiver" expansively, we decline to strain the logic of the few cases finding involuntary waiver through unreasonable delay in prosecuting breach by pushing beyond the statute of limitations justification for finding waiver.

Even viewing the facts and the terms of the contract in the light most favorable to the Plaintiff, there is no interpretation of the contract that renders BP's conduct a waiver of its right to recoup the $200,000 signing bonus from Ragan. There is no genuine issue of material fact as to the existence of a contract, BP's performance under the contract, or injury to BP outside of the waiver issue. Thus, we grant in part BP's motion for summary judgment on its signing bonus repayment counterclaim as to all of these components of its breach of contract claim (*See* Dkt. No. 67.), but we also deny in part BP's motion as to breach because a genuine issue of material fact exists as to whether Ragan was "terminated with cause." We deny Ragan's motion for summary judgment on the counterclaim for the reasons stated above (*See* Dkt. No. 72.)

## CONCLUSION

We grant in part and deny in part BP's motion for summary judgment on its counterclaim. Their motion is granted on its signing bonus counterclaim as to the existence of a contract, BP's performance under the contract, and injury to BP. We also grant BP summary

judgment on the waiver issue. We deny BP summary judgment as to breach, because a genuine issue of material fact exists as to whether Ragan was "terminated with cause." We deny Ragan's motion on the counterclaim in its entirety.

We deny BP's motion for summary judgment on Ragan's breach of contract, specific performance, and IWPCA claims because a genuine issue of material fact exists as to whether BP properly exercised its discretion under the contract. We deny Ragan's motion for summary judgment in its entirety. It is so ordered.

Accordingly, the remaining issue for trial is whether BP breached the implied covenant of good faith and fair dealing, as applied to each of Ragan's claim. As to BP's counterclaim, the remaining issue of fact is whether Ragan was "terminated with cause."



Honorable Marvin E. Aspen
United States District Judge

Dated: November 25, 2019
          Chicago, Illinois