# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KATHLEEN RAGAN, ) | |
| ) | |
| Plaintiff and Counter-Defendant, ) | |
| ) | No. 1:17 C 9208 |
| v. ) | Hon. Marvin E. Aspen |
| ) | |
| BP PRODUCTS NORTH AMERICA, INC. ) | |
| and BP AMERICA, INC. ) | |
| ) | |
| Defendant and Counter-Plaintiff. ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Before us is Defendants BP Products North America and BP America Inc.'s (collectively, "Defendants" or "BP") motion to reconsider our order denying Defendants' summary judgment motion in part and granting it in part and denying Plaintiff's summary judgment motion. (Def. Mem. in Support of Mot. to Reconsider ("Def. Mot.") (Dkt. No. 97); Mem. Order and Op. ("Mem.") (Dkt. No. 96).) Defendants argue we failed to consider the relationship between the Illinois Wage Payment and Collection Act and the $500,000 in restricted share units ("RSUs") (*Id.* at 1.) Defendants misconstrue our order, but we take their invitation to clarify this issue to prevent further confusion.

## BACKGROUND[1]

The parties dispute the exact nature of BP's offer to Ragan. Daniel Barry, the then-head of the Global Environmental Products ("GEP") group at BP called Ragan on April 17, 2015 to

---

[1] We do not recount the full factual record we relied upon in our previous order. (Order (Dkt. No. 96).) Instead, we include only the facts relevant to this motion to reconsider.

discuss an offer of employment at BP. (Def.'s Statement of Material Facts ("Def. SOF") (Dkt. No. 69) ¶ 7.) Barry emailed Ragan following their conversation with a summary of the compensation package BP was offering her. (Def. SOF ¶ 7; Pl.'s Resp. to Def.'s Statement of Material Facts ("Pl. SOF Resp.") (Dkt. No. 91.) ¶ 7.) The email refers to three categories of bonus: "Buyout," "Minimum Bonus subject to My Plan," and "Sign-on Bonus." (*Id.*) The term "Guarantee" is substituted in the "Total Sign-on" descriptor for the minimum bonus and sign-on bonus. (*Id.*) Ragan did not respond to Barry's email with an acceptance of these terms. (Def. SOF ¶ 9; Pl. SOF Resp. ¶ 9.) On April 23, 2015, BP sent Ragan a written offer letter that she signed four days later to work as an Emissions Trader for the Defendants' Integrated Supply and Trading ("IST") group. (Def. SOF ¶ 10; Pl. SOF Resp. ¶ 10.) The parties dispute whether the offer letter contained all the terms and conditions of Ragan's employment with BP, Ragan's position is that Barry's prior email was incorporated into the agreement. (Def. SOF ¶ 10; Pl. SOF Resp. ¶ 10.) Ragan therefore believes that the April 23rd letter does not constitute the complete offer. (*See* Def. SOF ¶¶ 11–24; Pl. SOF Resp. ¶¶ 11–24.) Ragan also points out that the letter references policies and codes to which she did not have access prior to her employment with BP. (Pl. SOF Resp. ¶¶ 10, 11, 13, 15, 19, 20, 21.)

The terms of the offer letter and the various BP policies referenced within it are undisputed. (*See* Def. SOF ¶¶ 11–24; Pl. SOF Resp. ¶¶ 11–24.) The offer letter stated, in relevant part, the following:

**<u>Restricted Stock [Share] Units</u>**

> In addition to the other elements of your compensation package, you will also be granted Restricted Stock [Share] United ("RSUs") representing BP plc American Depositary Shares ("ADSs") valued at $500,000 at the time of grant. Your grant will be issued in the quarter following your start date with BP, and will vary in amount with the price of BP's stock [shares] over time. 25% of the grant will vest 2 years after the grant date and the remaining 75% will vest 3 years after

the grant date, both calculated at the then-current value of the stock [shares]. **In general, in order for the RSUs to vest, you must be employed by BP on the vesting date. . . . all awards are subject to the terms of the plan under which they are granted**. You will receive . . . a link to the plan prospectus, which you should read in its entirety.

(Def. SOF ¶¶ 18 (emphasis added).) The Restricted Share Plan II included the following terms:

- Each RSU represents a conditional entitlement to receive one BP American Depositary Share ("ADS" or "share") at a date in the future, *provided* that the specified terms and/or conditions are met.
- The main terms and conditions for this grant or award are your continued employment with BP until the end of the restricted period and the satisfaction of conditions specified at the time of the grant or award, either in this document, the Plan Rules or in a separate grant letter you would have received.
- If your employment with BP ends before the vesting date then, **with the exception of certain special circumstances**, you will forfeit your RSUs.
- Generally, if you cease to be an employee of BP before the vesting date then you will forfeit your RSUs. Forfeited RSUs cannot vest . . .
- However, if your employment with BP terminates for any of the following exceptional reasons before the vesting fate, then you will not forfeit all of your RSUs, and a proportion of the RSUs will continue to vest according to the original terms: . . . **Termination . . . as a result of** "Disability" or "**involuntary termination of employment**" with any member of the Group, **other than due to your conduct or performance**. . . . Termination in the event of your death . . . Termination by mutual agreement between you and BP . . .
- Participation in the Plan is at BP's discretion.
- Your participation in the Plan does not constitute or form a part of any contract of employment and is strictly governed by the Plan Rules . . . . You have no right to compensation for any loss in relation to the [Share Plan], on termination of your employment or otherwise.
- The Plan is operated in the sole discretion of BP . . .
- The benefit to you of participating in the [Share Plan] shall not form any contractual right for any purpose . . .
- Frequently Asked Questions and Answers about the Plan . . . 13. What if I terminate employment with BP during a restricted period? The general rule is that if you terminate employment with BP during the restricted period you will forfeit your RSUs. . . .
- **If a US participant ceases to be employed** by any Member of the Group **more than 12 months after the start of the Restricted Period** . . . and before the end of the Restricted Period for any of the reasons set out below, **his Awards do not lapse and will Vest and will be Released after the end of the Restricted Period. The reasons are :** . . . (2) A US Participant's

3

> involuntary termination of employment with any Member of the Group, **other than due to such Participant's conduct or performance**. For avoidance of doubt, the following circumstances will be considered an involuntary termination of employment: (A) termination of a US Participant's employment by his or her employer, or a termination considered by the Designated Corporate Officer to have been initiated by the US Participant's employment, in both cases where the termination is not based on the US Participant's conduct or performance . . .

(Def. SOF ¶¶ 20–21 (emphasis added).) These three documents provide a clear picture regarding the factual surroundings of BP's motion to reconsider.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, a party is entitled to summary judgment only if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

Under Rule 59(e), district courts may entertain motions "to alter or amend a judgment." Fed. R. Civ. P. 59(e). Motions under Rule 59(e) will only be granted to correct manifest errors of law or fact. *Divane v. Krull Elec. Co.*, 194 F.3d 845, 848 (7th Cir. 1999) (citing *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996)). "A party moving for reconsideration pursuant to Rule 59(e) bears a heavy burden of establishing that the court should reverse its prior judgment." *Scott v. Bender*, 94 F. Supp. 2d 859, 865 (N.D. Ill. 2013) (citing *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996)). "Motions to reconsider sounding under Rule 59(e) should only be granted in rare circumstances." *Id*. (citing *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990)). A Rule 59(e) motion "is not appropriately used to advance arguments or theories that could and should have been made before the district court rendered a judgment, . . . or to present evidence that was available earlier." *LB Credit Corp. v. Resolution Tr.*, 49 F.3d 1263, 1267 (7th Cir. 1995) (citations omitted).

# ANALYSIS

Defendants contend we did not properly consider their motion for summary judgment on Ragan's discrete claim for $500,000 in RSUs granted as a "sign-on" bonus under the IWPCA. (Def. Mem. at 2–3.) Defendants appear to believe "earned" excludes all sign-on bonuses, regardless of the conditions required for those bonuses to vest. Defendants cite no caselaw compelling this interpretation, and we find none.

The Illinois Wage Payment and Collection Act defines final compensation as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2. The IWCPA does not define "earned bonuses" or "any other compensation owed," but the Illinois Department of Labor's definition of "earned bonuses" is:

> A bonus is compensation given in addition to the required compensation for services performed. The Department does not maintain jurisdiction over discretionary or gratuitous bonuses. In order to receive compensation under the Act, the bonus must be earned.
>
> a) An employee has a right to an earned bonus when there is an unequivocal promise by the employer and the employee has performed the requirements set forth in the bonus agreement between the parties and all of the required conditions for receiving the bonus set forth in the bonus agreement have been met. Unless one of the conditions for the bonus is that the employee be on the payroll at the time of the bonus payout, the bonus is due and owing to the employee at the time of separation.
>
> b) A former employee shall be entitled to a proportionate share of a bonus earned by length of service, regardless of any provision in the contract or agreement conditioning payment of the bonus upon employment on a particular date, when the employment relationship was terminated by mutual consent of the parties or by an act of the employer through no fault of the former employee.
>
> c) A gratuitous bonus does not obligate the employee to do or forgo something in return for the bonus and the employee has no right to make a demand for the bonus.

> d) A discretionary bonus is when the terms associated with the earning of the bonus are indefinite or uncertain, such as bonus being upon a positive evaluation of the "employee's performance" and not when the earning of a bonus is based on objective factors such as length of service, attendance or sign-on or relocation incentives.

Ill. Admin. Code tit. 56, § 300.500 (2019). In addition,"[b]ecause the IWPCA does not define the term 'earned bonuses,' Illinois courts often analogize the term to 'earned vacation.'" *Hess v. Bresney*, 784 F.3d 1154, 1162 (7th Cir. 2015).

A bonus paid for signing on is a bonus paid for services rendered, at least where the bonus agreement *connects the vesting of the options to services rendered. See People ex rel. Illinois Dept. of Labor v. General Elec. Co.*, 347 Ill. App.3d 72, 806 N.E.2d 1143, 1151–52 (1st Dist. 2004) (interpreting the earned vacation language to mean that vacation compensation based on past service performance is collected on a pro rata basis under the IWPCA). In addition, it is not clear that earned bonuses require any more than an agreement substantiating entitlement to compensation; rendering specific services may not be a requirement under the IWPCA. *See Kalechstein v. Abbassian*, No. 15 C 5929, 2017 WL 3394721, at *5 (N.D. Ill. Aug. 8, 2017) ("[T]he IWPCA plaintiff must allege the existence of an agreement substantiating entitlement to the wages and compensation sought." (quotation omitted)). This is particularly true given that the "earned" modifier does not appear in the catch-all provision of the IWPCA's definition of "final compensation," which covers "any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2. In other words, Defendants' interpretation of "services rendered" does not comport with any existing construction of the IWPCA, and is therefore incorrect legally.

BP's argument is also factually wrong, even accepting their interpretation of the IWPCA. BP's argument is that because the $500,000 in RSUs were granted in consideration of her

6

accepting employment at BP, so Ragan's bonus was not service-related. BP ignores the terms of its offer to make this argument. The terms of the DAB clearly link this grant of RSUs to Ragan's employment, including several non-discretionary factors.

*First*, Ragan had to remain employed for at least three years in order to receive any of these stock options, meaning she could not leave BP voluntarily and retain the options. (Def. SOF ¶¶ 20–21.) This is a "length of service" condition, which renders the bonus non-discretionary as to that factor. Ill. Admin. Code tit. 56, § 300.500(d) (2019).[2] Since non-discretionary bonuses are termed "earned bonuses" under the Illinois Department of Labor definition, that same definition arguably entitles Ragan to a pro-rata share of her stock options based on the length of time she served, assuming she prevails at trial on her claim that BP terminated her for non-performance reasons. *Id.*

*Second*, Ragan could not be terminated for good cause and retain the options. (*Id.*) In other words, the terms of the plan allowed BP to cancel *the entire plan*, but do not allow discretionary employee termination to result in termination of RSU vesting eligibility unless the termination was for cause. Whether the termination qualifies for this exception is precisely the question on which Ragan survived summary judgment. This question is entirely bound up in the quality of Ragan's service. Thus, the only question is *whether* this bonus was "earned" based on whether Ragan was terminated for cause, or put differently, based on the quality of her service. In other words, the contract terms clearly compelled our original finding: there is no separating

---

[2] Unlike *Hess v. Kanoski & Associates*, where the "right to a bonus was bound up in and determined by the performance of independent actors," here the right to a bonus was entirely contingent upon length of service. No. 309CV03334SLDJAG, 2014 WL 1282572, at *8 (C.D. Ill. Mar. 28, 2014), *aff'd sub nom. Hess v. Bresney*, 784 F.3d 1154 (7th Cir. 2015). The RSU plan does not contain any performance metrics or requirements of the type present in previous cases Defendants could have cited. (Def. SOF ¶ 20–21.) Instead, the RSU plan simply vests as long as the length of service and current employment requirements are met on the vesting date. (*Id.*)

7

the $500,000 in RSUs provided as a "sign-on" bonus from the remaining RSUs, since the contractual exception that motivated our ruling that Ragan may have a contractual right to the RSUs applies with equivalent force to both sets of shares. In addition, BP cannot on the one hand seek to exercise a contractual provision extricating itself from paying out Ragan's RSUs on the basis of her employment history, while on the other hand suggesting that the vesting of the RSUs was not at least partially contingent on competent performance of her duties for BP. (*See* Def. Mem. in Supp. Mot. for Summ. Judgment (Dkt. No. 68) at 2–3.)

Finally, it is worth noting that it is not settled whether Ragan choosing to give up her Shell stock options and bring her previous trading experience alone qualify as "services rendered" to BP. Arguably Ragan *did* perform a service when she chose to enter BP's employ, for which BP compensated her. She both gave up access to her Shell stock options and brought her experience as an emissions trader accrued on Shell's watch to BP. Arguably both of those were services performed in consideration of the receipt of BP's matching $500,000 RSU offer. Of course, we need not consider whether this standing alone would suffice to constitute service performed under the IWPCA, given the additional employment-related parameters for RSU vestment discussed above.

## CONCLUSION

Although arguably we used the word "bonus" too liberally in the IWPCA section of our opinion, BP's motion for reconsideration is denied in any event because the opinion did, in fact, apply to the initial grant of RSUs under the employment agreement.

_____
Honorable Marvin E. Aspen
United States District Judge

Dated: January 10, 2020
       Chicago, Illinois